EXHIBIT 1



UPS TRACKING
SERVICE DEPARTMENT
FIND TRAEGER DEALER
CONTACT US

CALL (800) 872-3437

TASTE *the* DIFFERENCE

TRAEGER

◆ COOKING OUTDOORS IS GREAT ANYTIME ON A TRAEGER ◆

Get to the Grills

WHAT's NEW at TRAEGER

THEY SWITCHED TO TRAEGER
And they'll never go back! Find out why you should switch to Traeger too.

WHISKEY CHICKEN, HONEYED HAM, & SMOKED SALMON
If you haven't checked our RECIPE PAGE for a while, it's time you did.



Click one of the options above to view Traeger Movie

We're the originators of the wood pellet grill, the most versatile cooking appliance you can own. Each of our distinctive grills allows you to bbq, grill, smoke, and bake using 100% hardwood barbecue pellets.

**Traeger owners submit your profile <u>Here</u>**

© 2003 Traeger Industries, Inc.

Website Designed by Cuffe Advertising/Marketing

**Maintenance & Hosting by <u>Wizbones PC</u>**

EXHIBIT 2




## COMPANY INFORMATION



The legacy of the Traeger family stretches back across the centuries to the Black Forest of Germany, when Fredric John Traeger and his family immigrated to the United States settling in South Dakota. As the Traegers became settled in their homeland they tried their hand at farming, blacksmithing and operating a tavern (responsible for the family's passion for a good German beer).

During the Great Depression of the 1930's, Traeger journeyed to Oregon, where he fell in love with the bountiful land of the Willamette Valley. Writing to the family in South Dakota, he convinced them to move to Oregon. The rest of the Traeger family joined Fredric John in their new home, Mt. Angel, Oregon.

In 1939, Joe Traeger, Sr. and his brother Tony opened a business called "Traeger Brothers." a combination blacksmith metal fab shop, trailer building facility and cabinet making operation. (In fact, the original foundry building, which housed Traeger Bros., is still being used to this day.)

Joe and Tony worked hard and along with their perspiration came inspiration in the form of new inventions, including the "stake setter", "pole bean stringer", and "screw-in-the-ground-anchor". Tragically, Tony would pass away in 1953, with Joe Sr. passing away the following year.

In 1959, Joe Traeger Jr., began working with his uncle's heating business based Mt. Angel. Three years later, Joe bought out his uncle's interest and took over the business, which supported his growing family of nine children. Sons Randy, Mark, and eventually Brian Traeger would join their father in this growing enterprise.

Joe Jr., like his father developed a knack for inventing, In 1978, he developed the Elf Wood Furnace. The following year, Joe incorporated as EWF Corporation and began production of wood-fired furnaces. The Elf line would grow to a dozen different models.

In 1980, the Traegers licensed their wood stoves to Earth Stoves Northwest in Tualatin, Oregon. The Traegers continued their HVAC business under the name, Traeger Heating.

### Fate in a Bucket
In 1980, a local farmer walked into the offices of Traeger Heating. We was carrying a tin bucket containing a product that would revolutionize the heating and the barbecue industry as well.

In the farmer's bucket were wood pellets, believed to have been manufactured in Brownsville, Oregon. The farmer asked Joe if he could develop a way of burning the wood pellets to create heat. Joe's invention instincts kicked in. Within a couple of months, Joe had developed the first wood pellet furnace and eventually the wood pellet stove now owned by Lennox.

Popularity of the new furnaces and stoves caught on. In 1987, the Traeger's would sell their pellet stove line to Oregon-based Earth Stoves.

### A New American Revolution
Fast forward to July 1985. All nine of Joe's children and their growing families are gathered together celebrating the holiday, eagerly anticipating "Papa Joe's" famous grilled chicken.

Stepping into the house for a few minutes, Joe returned to his deck and discovered that his 4th of July entree was engulfed in flames. Frustrated, he kicked the grill and ruined chicken off the deck. (The gas grill is still rusting away below the deck to this day.) The next morning Joe walked into his business determined to build a better barbecue-one using wood pellets. The first Traeger Wood Pellet grill rolled off the assembly line in 1988. That same year, the Traegers sold their HVAC business and licensed their Central Heating and Boiler business to Even Temp Company in Nebraska.

Today Traeger Industries continues to refine and manufacture wood pellet barbecues, grills, and smokers. Thousands of our Pellet Grills are being used around the world. "Papa Joe", is still tinkering, developing new models of our famous outdoor cooking units. Sons Randy, Mark and Brian are actively involved in the day-to-day operation of the business.

### Feel free to contact us if you would like to learn more about our high quality products.
Traeger Industries, Inc.
PO Box 829
1385 E. College St.
Mt. Angel, Oregon, 97362 USA
Phone: (503) 845-9234
Toll Free: (800) 872-3437
Fax: (503) 845- 6366
Email Traeger: traeger@traegerindustries.com



Map and Directions to Traeger

Top

EXHIBIT 3

**Int. Cls.: 4, 11, 21 and 30**

**Prior U.S. Cls.: 1, 2, 6, 13, 15, 21, 23, 29, 30, 31, 33, 34, 40, 46 and 50**

**Reg. No. 3,244,718**

## United States Patent and Trademark Office

Registered May 22, 2007

### TRADEMARK
#### PRINCIPAL REGISTER

# TRAEGER

TRAEGER PELLET GRILLS LLC (OREGON LTD LIAB CO)
990 N. FIRST ST.
SILVERTON, OR 97381

FOR: WOOD PELLETS FOR GRILLING, SMOKING AND FLAVORING FOOD, IN CLASS 4 (U.S. CLS. 1, 6 AND 15).

FIRST USE 1-1-1986; IN COMMERCE 1-1-1986.

FOR: BARBECUE GRILLS; GRILL ACCESSORIES, NAMELY, COOKING RACKS, IN CLASS 11 (U.S. CLS. 13, 21, 23, 31 AND 34).

FIRST USE 1-1-1986; IN COMMERCE 1-1-1986.

FOR: COOKING UTENSILS, NAMELY, GRILL COVERS, IN CLASS 21 (U.S. CLS. 2, 13, 23, 29, 30, 33, 40 AND 50).

FIRST USE 1-1-1992; IN COMMERCE 1-1-1992.

FOR: BARBECUE SAUCE; GRILLING MARINADES; SPICES; BARBECUE DRY RUB; SHAKES; HAM, FISH, CHICKEN AND BEEF GLAZES, IN CLASS 30 (U.S. CL. 46).

FIRST USE 1-1-1992; IN COMMERCE 1-1-1992.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 1,425,662.

SEC. 2(F) AS TO "TRAEGER".

SER. NO. 78-929,918, FILED 7-14-2006.

IRA J. GOODSAID, EXAMINING ATTORNEY

EXHIBIT 4

# Active TRAEGER Registered Trademarks

| MARK | REG. NO. | GOODS/SERVICES | DATE OF FIRST USE |
|---|---|---|---|
| TRAEGER | 3244718 | • Wood pellets for grilling, smoking and flavoring food.<br>• Barbecue grills; grill accessories.<br>• Cooking utensils.<br>• Barbecue sauce; grilling marinades; spices; barbecue dry rub; shakes; ham, fish, chicken and beef glazes. | 1/1/1986<br><br>1/1/1986<br>1/1/1992<br>1/1/1992 |
| TRAEGER | 4472461 | • Wood pellets for smoking, grilling, and flavoring food.<br>• Barbecue grills and part therefor; barbecue grill accessories.<br>• Cooking utensils.<br>• Retail store and on-line retail store services. | 1/12/2011<br><br>1/12/2011<br><br>10/00/2012<br>10/04/2012 |
| TRAEGER | 4559448 | • On-line retail store services. | 2008 |
| TRAEGER | 4569153 | • Retail store services. | 10/04/2012 |
| TRAEGER | 4989530 | • Wood pellets for grilling, smoking and flavoring food.<br>• Barbecue grills; grill accessories.<br>• Retail store and on-line services. | 1/1/2016 |
| TRAEGER WIFIRE | 5459568 | • Network-enabled cooking devices.<br>• Barbecue grills and grilling accessories. | 10/15/2016 |
| TRAEGER DOWNDRAFT EXHAUST | 1319847 | • Barbecue grills and barbecue smokers; accessories and parts for barbecue grills and barbecue. | 3/1/2017 |
| TRAEGER WIFIRE | 5601615 | • Providing an online store featuring recipes and accessories.<br>• Providing an online network environment featuring technology that enables users to upload and store related to cooking devices and usage. | 10/1/2016 |
| TRAEGER WOOD FIRED GRILLS | 1323303 | • Barbecue grills; grill accessories.<br>• Barbecue sauce; grilling marinades; spices; seasonings. | 3/1/2017 |
| TRAEGER GRILLS | 5055041 | • Barbecue grills; grill accessories.<br>• Retail store services, including on-line retail store services. | 5/11/2005<br>7/1/2002 |

EXHIBIT 5

**EXECUTION COPY**

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") made as of February 21st, 2006, by and among Traeger Pellet Grills LLC, a limited liability company under the laws of the State of Florida ("Buyer"), Traeger Industries, Inc., a corporation organized and existing under the laws of the State of Oregon (the "Seller"), The Joe Traeger Charitable Trust, organized and existing under trust agreement dated September 27, 2005 (the "Joe Traeger Trust"), The Randy Traeger Charitable Trust, organized and existing under a trust agreement dated September 27, 2005 (the "Randy Traeger Trust"), The Mark Traeger Charitable Trust, organized and existing under a trust agreement dated September 27, 2005 (the "Mark Traeger Trust") Brian Traeger, an individual residing at 405 Cindy Lane, Mt. Angel, Oregon 97362 ("Brian Traeger"), Joe Traeger, an individual residing at P.O. Box 1070, 255 Alder Street, Mt. Angel, Oregon 97362 ("Joe Traeger"), Randy Traeger an individual residing at 530 Alder Street, Mt. Angel, Oregon 97362 ("Randy Traeger"), Mark Traeger, an individual residing at P.O. Box 308, 260 S. Oak Street, Mt. Angel, Oregon 97362 ("Mark Traeger") (the Joe Traeger Trust, the Randy Traeger Trust, the Mark Traeger Trust, Brian Traeger, Joe Traeger, Randy Traeger, and Mark Traeger are referred to collectively as the "Other Responsible Parties"). The Seller and the Other Responsible Parties are collectively referred to as the "Seller Parties".

## W I T N E S S E T H :

WHEREAS, the Seller conducts the business of design, assembly, warehousing, manufacture, marketing, sale and distribution of wood pellet grills and smokers, wood pellet BBQs, camp stoves, other cooking devices using wood pellets, and flavored and/or BBQ wood pellets and related products and accessories for the foregoing by the Seller (the "Business"); and

WHEREAS, the Buyer has simultaneously with the execution hereof, entered into a Intellectual Property Rights Assignment Agreement, dated of even date herewith, with Joe Traeger, Randy Traeger, Mark Traeger and Brian Traeger (the "Rights Agreement"); and

WHEREAS, the Seller desires to sell to the Buyer all of the assets, properties and rights used or useful in the Business, other than the Excluded Assets (the "Purchased Assets"), free and clear of all liens, claims or encumbrances (the "Sale") and the Buyer desires to purchase from the Seller at the Closing all of the Purchased Assets, free and clear of all liens, claims or encumbrances, in each case upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties, intending legally to be bound, agree as follows:

[A list of defined terms is provided in Article 8 hereof]

{M1439739_14}

Article 1.     Purchase and Sale

1.1     General.  At the Closing (as defined in Section 1.8 hereof), and subject to the terms and conditions of this Agreement, the Seller agrees to sell, assign, convey and deliver to the Buyer, and the Buyer agrees to purchase, acquire and accept from the Seller, all of Seller's right, title and interest in and to the Business, including, without limitation, in and to all of the assets, properties, rights, goodwill, contracts and claims of the Business, wherever located, whether tangible or intangible, real or personal, known or unknown, actual or contingent, as the same shall exist as of the Closing, other than the Excluded Assets (such rights, title and interest in and to all such assets, properties, rights, contracts and claims, being collectively referred to herein as, the "Purchased Assets"). The Purchased Assets shall include, without limitation, the following assets:

(a)     all accounts receivable and other receivables of the Seller as of the Closing;

(b)     all inventory (including work in process, raw materials and finished goods), goods in transit, unbilled revenues and other properties and rights associated with the performance of contracts and the operation of the Business;

(c)     all equipment and machinery owned by the Seller related to the Business, including but not limited to those items described on Schedule 1.1 hereto, computers and software (including, without limitation, source code, object code, flow charts, operating systems and specifications, data, data bases, files, documentation, and other materials related thereto), office furniture and fixtures, as well as the rights to all communication numbers and addresses (telephone, fax, toll-free, e-mail, web site, domain name), telephone systems, office equipment and the like;

(d)     all of the tools, rotable and expendable spare parts, and supplies used in the Business;

(e)     all of Seller's interest in the Intellectual Property Rights, including, without limitation, all results of the Business's research and development activities and other Intellectual Property Rights developed or acquired for the Business, or related to, or of use or potential use in connection with any current or contemplated potential future products or activities of the Business or parts, components or subassemblies used or purchased by the Business;

(f)     all notes receivable and other claims for money or other obligations due (or which hereafter will become due) to Seller arising out of the Business together with any unpaid interest accrued thereon from the respective obligors and any security or collateral therefor;

(g)     all marketing materials, office supplies and letterhead used in connection with the Business;

(h)     all of Seller's rights to any real or personal property under any real or personal property lease or license;

{M1439739_14}

2

(i)     all right, title and interest in, to and under all contracts or purchase orders associated with the Business, subject in each case to the terms of such contracts or purchase orders, and all contracts and purchase orders with customers now and at the time of Closing;

(j)     all past or present business files, books and records (including such books and records as are contained in computerized storage media) of the Business (active or inactive), including all financial records, inquiries, contracts, agreements, letters of intent, inventory, purchasing, accounting, sales, export, import, research, engineering, manufacturing, maintenance, repairs, marketing, banking, documents and records constituting Intellectual Property Rights, shipping records, personnel files, customer and supplier lists, publications, literature, forms, sales leads, "pipeline", correspondence, and manuals regarding the maintenance or use of any of the Purchased Assets, wherever located, provided the Seller may retain copies of all books and records related to Excluded Liabilities and provided further that the Seller Parties and/or their agents shall have reasonable access to the business files, books and records for tax, litigation or other appropriate reasons at mutually scheduled times during regular business hours;

(k)     any other tangible assets of Seller which are used in the Business and which are of a nature not customarily reflected in the books and records of a business, such as assets which have been written off for accounting purposes but which are still used by or of value to the Business;

(l)     all Permits which are transferable and which are used in the Business, as presently conducted;

(m)     all rights of the Seller pursuant to any express or implied warranties, representations or guaranties made by suppliers to the Business;

(n)     all goodwill associated with the Business;

(o)     all rights under non-disclosure agreements with employees and agents of Seller and under confidentiality agreements with prospective purchasers of the Business or with other third parties to the extent relating to the Business;

(p)     all deposits, prepaid charges, insurance, sums and fees, offset credit balances in any country, refunds, and causes of action;

(q)     all rights in and proceeds of insurance contracts to the extent that such proceeds apply to assets that are within the definition of Purchased Assets and have been included in the calculation of Net Asset Value;

(r)     any other asset of Seller in respect of which there is an Assumed Liability; and

(s)     other than to the extent related to a liability asserted against Sellers, all rights of recovery, rights of set-off and rights of recoupment of Seller in connection with the Business.

The Seller shall not convey to the Buyer the following (the "Excluded Assets"):

{M1439739_14}

3

    (a)     all cash and cash equivalents of the Seller as of the Closing;

    (b)     prepaid income taxes;

    (c)     deferred income taxes; and

    (d)     any rights or liabilities under agreements whereby the Seller licensed rights to third party providers of products other than grills and barbecues previously disclosed by Seller to Buyer.

    1.2     Certain Provisions Relating to the Purchased Assets.

    (a)     To the extent that a contract, Permit or other asset which would otherwise be included within the definition of "Purchased Assets," or any claim, right or benefit arising thereunder or resulting therefrom (each an "Interest" and collectively the "Interests"), is not capable of being sold, assigned, transferred or conveyed without the approval, consent or waiver of the issuer thereof or the other party thereto, or any third person (including a Governmental Authority), and such approval, consent or waiver has not been obtained prior to the Closing, or if such sale, assignment, transfer or conveyance or attempted sale, assignment, transfer or conveyance would constitute a breach thereof or a violation of any law, decree, order, regulation or other governmental edict, this Agreement shall not constitute a sale, assignment, transfer or conveyance thereof, or an attempted sale, assignment, transfer or conveyance thereof.

    (b)     Seller and Buyer shall use their best efforts and shall cooperate to obtain all approvals, consents or waivers necessary to convey to Buyer each Interest as of the Closing. The failure to obtain any approval, consent or waiver necessary to convey any Interest to Buyer shall not affect the obligations of the Seller to close hereunder. Subsequent to the Closing, the Seller shall execute and deliver any other instruments and take any actions, which may be reasonably required for the implementation of this Agreement and the transactions contemplated hereby.

    1.3     Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer will assume and become responsible for:

    (a)     accounts payable arising in the ordinary course of business and set forth on a schedule presented by the Seller to the Buyer and accepted by the Buyer at Closing;

    (b)     customer deposits in an amount not to exceed $100,000.00 (One Hundred Thousand Dollars);

    (c)     net book value of capitalized leases, as specified on Schedule 1.3(c); and

    (d)     the liabilities and obligations of the Seller arising due to events subsequent to the Closing under the Material Contracts assumed by Buyer by agreements in writing delivered at the Closing (the "Assumed Liabilities").

    1.4     Excluded Liabilities. Except for the Assumed Liabilities, the Seller and the Buyer expressly understand and agree that Buyer shall not assume, pay, perform or discharge or

{M1439739_14}

become liable for any and all obligations, commitments or liabilities of any and every nature whatsoever of the Seller including, without limitation, all obligations, commitments or liabilities (whether known or unknown, recourse or non-recourse to the Seller, fixed or contingent, relating to the ownership of the Purchased Assets, the operation of the Business or otherwise) including, without limitation:

        (a)      Bank debt and other funded debt, including overdrafts of either of the Seller;

        (b)      liabilities resulting from Environmental Claims or arising under Environmental Law arising from activities or conditions existing prior to the Closing;

        (c)      claims based upon or relating to alleged infringement of the intellectual property rights of any Person;

        (d)      any liability or obligation arising out of any claim of or for injury to persons or property by reason of the improper performance or malfunctioning, improper design or manufacture, or failure to adequately package, label or provide warnings as to the hazards of, any product, where the product giving rise to such claim was manufactured on or prior to the Closing Date;

        (e)      any obligation to or any liability of any Affiliate of the Seller;

        (f)      any liability of the Seller to any plan, individual or governmental agency arising out of any failure of the Seller to comply with the applicable provisions of any Employee Benefit Plans, ERISA, the Code, or other applicable Laws with respect to its employees, including any obligation or liability of the Seller for any penalty, fine or similar amount due from the Seller on account of any breach of fiduciary duty or failure to comply with applicable laws or regulations;

        (g)      any liability arising from the hiring, employment or termination of any employees of the Seller at any time prior to Closing or any liability for severance pay, leaving allowances, guaranteed fixed terms of employment or retirement benefits beyond those provided under applicable law, collective bargaining agreements, or any Employee Benefit Plan applicable to employees of the Business generally, which arises out of any acts or omissions of the Seller on or prior to the Closing Date;

        (h)      any liability, whether known or unknown, arising from any agreements whereby Seller licensed any rights to third party providers of products other than grills and barbecues; and

        (i)      all liabilities of Seller or any Affiliate of the Seller for Taxes (collectively, the "Excluded Liabilities").

        The Seller Parties hereby agree to indemnify and hold Buyer and its Affiliates, officers, directors, Shareholders, employees, agents, representatives, Successors and assigns harmless from and against any Claims and Damages arising and/or resulting from the Excluded Liabilities.

1.5     Deliveries.  At the Closing, and subject to the terms and conditions of this Agreement, the Seller shall deliver to the Buyer, in addition to those items set forth elsewhere herein, the following items:

(i)     Duly executed bills of sale and such other executed assignments, bills of sale or certificates of title, each dated the Closing Date and in form and substance reasonably satisfactory to counsel to Buyer, as are reasonably necessary to transfer to Buyer all of the Seller's right, title and interest in, to and under the Purchased Assets;

(ii)     Duly executed assignments, sufficient to transfer all of Seller's right, title and interest in and to the Intellectual Property Rights to Buyer, in a form suitable for recording in the various appropriate national or regional patent, trademark, copyright offices or other governmental offices;

(iii)     Certificates of the Secretary of the Seller, dated the Closing Date, (A) as to the incumbency and signatures of the officers or representatives of the Seller executing this Agreement and each of the agreements and any other certificate or other document to be delivered pursuant hereto or thereto, together with evidence of the incumbency of the Secretary, and (B) certifying attached resolutions of the Board of Directors and the stockholders of the Seller, which authorize and approve the execution and delivery of this Agreement and each of the agreements to which the Seller is a party and the consummation of the transactions contemplated hereby and thereby;

(iv)     Duly executed and acknowledged assignment and assumption agreements, in form and substance reasonably acceptable to the Buyer, executed by the Seller and by the counterparty to each Material Contract transferring to Buyer all of right, title and interest of the Seller in and to each of the Material Contracts; and

(v)     Duly executed letters, in form and substance reasonably acceptable to the Buyer, whereby the Seller notifies its suppliers, vendors and lessors of the consummation of the Sale.

1.6     Purchase Price; Payment.

(a)     The consideration for the sale of the Purchased Assets shall be the aggregate of: (i) the Net Asset Value of the Seller as of 11:59 p.m., Mt. Angel, Oregon time on the day immediately prior to the Closing;  plus (ii) $284,737.00 (Two Hundred Eighty Four Thousand Seven Hundred Thirty Seven Dollars) representing the purchased goodwill of the Business; plus (iii) $237,471.00 (Two Hundred Thirty Seven Thousand Four Hundred Seventy One Dollars) representing the amount required by the Seller to compensate for an asset purchase structure for the transaction (iv) plus the Assumed Liabilities (the "Purchase Price").

(b)     The Buyer shall deliver $3,402,122.00 (Three Million Four Hundred Two Thousand One Hundred Twenty Two Dollars) at Closing by cashier's or bank check, or by wire transfer to the Seller at the Closing.  Schedule 1.6(b) hereto sets forth the calculation of Net Asset Value as of December 31, 2005 which was the basis for estimating the advance of $3,402,122.00 (Three Million Four Hundred Two Thousand One Hundred Twenty Two Dollars) as of Closing, subject to post-Closing adjustments as set forth herein.

{M1439739_14}

6

(c)     Prior to the Closing, the Seller shall provide Buyer with a completed IRS Form W-9.  Failure by the Seller to provide Buyer with the requisite document will result in the Buyer withholding of 30% of gross amount due to the Seller and reporting such amount as provided in the Internal Revenue Code and the Treasury Regulations promulgated thereunder.

1.7     Post-Closing Adjustment.

(a)     Not later than 120 days after the Closing, the Buyer shall cause to be prepared and shall deliver to the Seller (i) a statement of the actual amount of the Net Asset Value of the Seller as of 11:59 p.m., Mt. Angel, Oregon time, on the day immediately preceding the Closing Date (the "Closing Net Asset Value"), and the amount by which the Closing Net Asset Value is greater or less than $2,879,914.00 (Two Million Eight Hundred Seventy Nine Thousand Nine Hundred Fourteen Dollars), if any (the "Closing Statement") to be prepared in conformity with GAAP consistently applied, (ii) a determination of the amount (the "Proposed Adjustment") by which the Purchase Price as then determined by the Buyer is greater or less than $3,402,122.00 (Three Million Four Hundred Two Thousand One Hundred Twenty Two Dollars) (the amount by which the Purchase Price is greater or less than $3,402,122.00 (Three Million Four Hundred Two Thousand One Hundred Twenty Two Dollars), as finally determined, is referred to herein as the "Adjustment").  Seller shall, at the request of Buyer, assist the Buyer in the preparation of such statement.

(b)     During the 60-day period following the delivery by the Buyer of the Closing Statement and the Proposed Adjustment referred to in Section 1.7(a) (or such longer period during which such statement and adjustment reasonably can be reviewed in light of the compliance of the Buyer with its obligations set forth in the following sentence), the Seller and its independent accountants will be permitted to review the working papers of the Buyer relating to the preparation of the Closing Statement and the Proposed Adjustment.  The Buyer shall provide the Seller and its independent accountants access at all reasonable times to the relevant personnel, properties, books and records of the Seller for such purposes and to assist the Seller and its independent accountants in reviewing the Closing Statement.

(c)     Unless the Seller delivers written notice to the Buyer of its disagreement with the Closing Statement and the Proposed Adjustment within 60 days following delivery by the Buyer of the Closing Statement and the Proposed Adjustment, the Seller will be deemed to have accepted and agreed to the Closing Statement and Proposed Adjustment, and such Adjustment shall be final and binding. If, within such 60-day period, the Seller notifies the Buyer that it disagrees with the Closing Statement and the Proposed Adjustment, and the Seller and the Buyer cannot agree with respect to the Closing Statement and the Proposed Adjustment within 14 days of the notice of disagreement provided by the Seller to the Buyer, then the determination shall be submitted for resolution promptly to an independent nationally recognized accounting firm jointly selected by the Seller and the Buyer (the "Neutral Auditor"), whose determination (the "Neutral Auditor Determination") shall be instructed by the parties to be made within 30 days and be final and binding upon all parties hereto. All fees and expenses relating to the work, if any, to be performed by the Neutral Auditor will be borne (i) by the Seller in the same proportion that the aggregate amount of all of the objections on the Closing Statement that are submitted by the Seller to the Neutral Auditor and are unsuccessfully disputed by the Seller, bear to the total amount of all of such objections and (ii) by the Buyer in the same proportion that the

{M1439739_14}

7

aggregate amount of all of the objections on the Closing Statement, that are submitted by the Seller to the Neutral Auditor and are successfully disputed by the Seller, bear to the total amount of all of such objections. The Buyer and the Seller shall reimburse the other to the extent the other pays more than the amount so required pursuant to the preceding sentence. In the event of a Neutral Auditor Determination, the Neutral Auditor shall deliver a certificate to each of the Seller and the Buyer setting forth the amount of the Adjustment.

(d)     If the Adjustment provides that $3,402,122.00 (Three Million Four Hundred Two Thousand One Hundred Twenty Two Dollars) is greater than the Purchase Price as finally determined, then the Purchase Price shall be reduced to the amount as so determined and the Seller shall return to return to the Buyer cash in the amount of the Adjustment. If the Adjustment provides that $3,402,122.00 (Three Million Four Hundred Two Thousand One Hundred Twenty Two Dollars) is less than the Purchase Price as finally determined, then the Purchase Price shall be increased by the amount of the Adjustment as so determined, which shall be promptly paid by the Buyer to the Seller by cashier's or bank check or by wire transfer.

1.8     Closing and Closing Date.  Unless this Agreement shall have been terminated and the transactions herein contemplated shall have been terminated pursuant to Section 9.1 hereof, and subject to the satisfaction of the conditions precedent contained herein, the closing (the "Closing") of the transactions herein contemplated shall take place on April 30, 2006, or at such other time and date before April 30, 2006 as the Seller and the Buyer shall agree (such time and date being referred to herein as the "Closing Date"), at the offices of Adorno & Yoss LLP, Suite 400, 2525 Ponce de Leon Blvd., Coral Gables, Florida 33134, or at such other place as the Seller and the Buyer shall agree. At the Closing, each of the parties hereto shall take, or cause to be taken, all such actions and deliver, or cause to be delivered, all such documents, instruments, certificates and other items as may be required under this Agreement or otherwise, in order to perform or fulfill all covenants and agreements on its part to be performed at or prior to the Closing Date.

1.9     Taking of Necessary Action; Further Action.  Each of the parties shall use its respective reasonable best efforts to take all such action as may be necessary or appropriate in order to duly and timely effectuate the Closing. If, on or at any time after the Closing Date, any further reasonable action is necessary or desirable to carry out the purposes of this Agreement and to vest the Buyer with full right, title and possession to all Purchased Assets and the Business, the Seller shall take, and shall ensure that the officers of the Seller are fully authorized, in the name of the Seller or otherwise, to take, and shall take, all such lawful and necessary action.

1.10     Allocation of the Purchase Price.  The Purchase Price shall be allocated to the Purchased Assets as set forth on Schedule 1.10 hereto.

Article 2.     Representations and Warranties Relating to the Seller Parties.

The Seller Parties jointly and severally represent and warrant to the Buyer as follows:

2.1     Organization and Standing.

{M1439739_14}

8

(a)     The Seller is a corporation duly incorporated, validly existing, and in good standing under the laws of the state of Oregon and has all requisite corporate power and authority to own, lease and operate its properties and assets and to conduct its business as it is now being conducted and as contemplated. The Seller is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state in which the operation of its business or ownership of its assets makes such qualification necessary, except where the failure to so qualify or be in good standing would not have a Material Adverse Effect.

(b)     Each of the Joe Traeger Trust, the Randy Traeger Trust, and the Mark Traeger Trust (collectively, the "Trusts") is a trust duly and validly formed and in good standing under the laws of Oregon. The Trusts have caused to be delivered to the Buyer true and accurate copies of the trust agreements in force establishing the trusts. The trustees set forth in such agreements are the sole persons authorized to act for such Trusts and no consent of any beneficiary is required for the trustees of such Trusts to authorize any action contemplated hereby or by the agreements referred to in this Agreement. The Trusts have the requisite power to own the assets that they purport to hold.

2.2     Binding Agreement. Each of the Seller Parties has all requisite corporate power and authority to enter into this Agreement, to execute and deliver this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by the Seller Parties and the consummation by the Seller Parties of their obligations hereunder have been duly and validly authorized by all necessary corporate and stockholder action on the part of the Seller Parties. This Agreement has been duly executed and delivered on behalf of the Seller Parties and, assuming the due authorization, execution and delivery by the Buyer, constitutes a legal, valid and binding obligation of each of the Seller Parties enforceable in accordance with its terms. None of the spouses of Seller Parties have community property, dower or similar rights that restrict any of the Seller Parties from authorizing the sale of the Purchased Assets free and clear of any such rights.

2.3     Absence of Violations or Required Consents. Except for the Required Consents listed on Schedule 2.3 hereto, the execution, delivery and performance by the Seller Parties of this Agreement do not and will not (a) violate or result in the breach or default of any provision of articles, certificates of incorporation, trust agreements, or other charter or corporate governance documents of the Seller Parties, (b) violate any Law or Governmental Order applicable to any of the Seller Parties or any of their respective properties or assets, (c) except for the Required Consents, require any consent, approval, authorization or other order of, action by, registration or filing with or declaration or notification to any Governmental Authority or any other Person or (d) result in any violation or breach of, constitute a default (or event which with the giving of notice, or lapse of time or both, would become a default) under, require any consent under, or give to others any rights of notice, termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any Encumbrance on any of the Seller Parties' respective assets, or result in the imposition or acceleration of any payment, time of payment, vesting or increase in the amount of compensation or benefit payable, pursuant to, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license or permit, or franchise to which any of the Seller Parties is a party or by which their respective assets are bound. Except for the Required Consents, none of the Seller Parties needs to give any notice to,

make any filing with or obtain any authorization, consent or approval of any Government Entity in order for the parties to consummate the transactions contemplated by this Agreement.

2.4     Ownership of Purchased Assets.

(a)     The Seller is the record and beneficial owner of all of the Purchased Assets, free and clear of all Encumbrances, other than those encumbrances specified on Schedule 2.4. (the "Permitted Encumbrances").  Traeger Brothers, Inc., a corporation organized and existing under the Laws of the State of Oregon, has no right, title or interest in any asset, property or right, tangible or intangible, used in the Business.

(b)     Upon the consummation of the Sale at the Closing as contemplated by this Agreement, the Seller will deliver to the Buyer good title to the Purchased Assets free and clear of any Encumbrances; provided, that, Seller may obtain and furnish to the Buyer at Closing releases and satisfactions from any lienholders that are subject to the payment to such lienholders of Closing proceeds together with pay proceeds instructions of the Seller as contemplated by such lienholders.

(c)     The Seller does not own any shares of capital stock or other ownership interests in any other Person or any options, warrants or other securities, or other rights of any kind, convertible into or evidencing the right to purchase any shares of capital stock or other ownership interests in any other Person.

2.5     Entire Business.  The ownership of the Business and all assets, properties, agreements and rights associated therewith is evidenced solely by the Purchased Assets, and the intellectual property rights to be conveyed under the Rights Agreement and the sale, assignment, conveyance and delivery of the Purchased Assets to the Buyer pursuant to this Agreement and the patents described in the Rights Agreement will transfer all of the Seller Parties' and any Affiliates' ownership interests associated with or used or useful in the Business and the Purchased Assets constitute all that have been used in the past to conduct the Business.

2.6     Financial Information.

(a)     Seller has delivered to Buyer the reviewed balance sheets of the Seller as at July 31, 2005 and 2004 and the compiled balance sheet as at July 31, 2003, together with the reviewed statements of operations and cash flows for the years ended July 31, 2005 and 2004 and the compiled statement of operations for the year ended July 31, 2003, together with the notes thereto (the "Annual Financial Statements").

(b)     Seller has furnished to the Buyer the balance sheet of the Seller as at December 31, 2005, together with the statements of operations of the Seller for the five months ended December 31, 2005, (the "Interim Financial Statements").

(c)     Each of the balance sheets referred to above (including the related notes and schedules) fairly presents in all material respects the financial position of the Seller, as of its date and each of the statements of operations, and cash flows (including any related notes and schedules) fairly presents in all material respects the results of operations, net income and cash

flows, as the case may be, of the Seller, for the periods set forth therein, in each case in accordance with GAAP consistently applied during the periods involved.

(d)     The Seller has maintained a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions have been executed in accordance with management's general or specific authorizations, (ii) transactions have been recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

2.7     Title to Assets; Related Matters. (i) The Seller has good, valid and marketable title (as measured in the context of their current uses) to, or, in the case of leased or subleased assets or other possessory interests, valid and subsisting leasehold or other possessory interests (as measured in the context of their current uses) in order to conduct the Business, free and clear of all Encumbrances other than the Permitted Encumbrances, (ii) such assets constitute all the assets and rights necessary for the operation of the Business as currently conducted, (iii) the Real Property and Equipment are in good operating condition and repair and maintained in accordance with industry practices, (iv) Traeger Brothers has heretofore transferred and conveyed all of its assets, properties and rights related to the Business to the Seller, free and clear of all Encumbrances; and (v) there are no contractual or legal restrictions to which any Seller Party is a party or by which the Real Property and Equipment is otherwise bound that preclude or restrict the Seller's ability to use the Real Property or any Equipment for the purposes for which it is currently being used.  The Seller enjoys peaceful and undisturbed possession of all Real Estate and Equipment. The Real Property and the improvements (including leasehold improvements), Equipment and other tangible assets owned or used by the Seller have no known material defects. None of the Real Property, Equipment and other assets is subject to any commitment or other arrangement for its sale or use by any Seller Party, their Affiliates or third parties, other than the Business. The assets reflected on the December 31, 2005 Balance Sheet or acquired thereafter are valued on the books of the Seller at or below the actual cost less an adequate and proper depreciation charge. The Seller has not depreciated any of its assets on an accelerated basis (or in any other manner) inconsistent with applicable requirements of the Code.

2.8     Absence of Certain Changes, Events and Conditions.  Since July 31, 2005, except as otherwise provided in or contemplated by this Agreement, or set forth in Schedule 2.8, the Seller has not:

(a)     other than in the ordinary course of business consistent with past practice, sold, transferred, leased, subleased, licensed, encumbered or otherwise disposed of any assets, other than the sale of obsolete Equipment and transfers of cash;

(b)     borrowed any amount or incurred or become subject to any liabilities, that remain outstanding, except trade payables incurred in the ordinary course of business and liabilities under contracts entered into in the ordinary course of business (excluding any capital lease obligations);

(c)    discharged or satisfied any material Encumbrance or paid any material obligation or liability, in each case to any Affiliate other than in the ordinary course of business;

(d)    declared or made any payment or distribution of cash or other property to its stockholders with respect to its capital stock or other equity securities or purchased or redeemed any shares of its capital stock or other equity securities (including, without limitation, any warrants, options or other rights to acquire its capital stock or other equity securities);

(e)    sold, assigned or transferred any material Intellectual Property Rights or disclosed any proprietary confidential information to any Person;

(f)    except as set forth in Schedule 2.8(f), granted any increase, or announced any increase, in the wages, salaries, compensation, bonuses, incentives, pension or other benefits payable to any Person other than the Seller Parties greater than $7,000 per individual per annum to any of the officers, employees, independent contractors or agents, including, without limitation, any increase or change pursuant to any Employee Benefit Plan, or established, increased or accelerated the payment or vesting of any benefits under any Employee Benefit Plan with respect to officers or employees;

(g)    made any material change in any method of accounting or accounting practice or policy, including, without limitation, material changes in assumptions underlying or methods of calculating bad debt, contingency or other reserves, or notes or accounts receivable write-offs, or in corporate allocation methodology, in each case other than changes required by Law or under GAAP;

(h)    suffered any casualty loss or damage in excess of $10,000 with respect to any assets, whether or not covered by insurance;

(i)    experienced any material adverse change in the condition, financial or otherwise, business, prospects, assets or rights of the Seller;

(j)    conducted the business of the Seller outside the ordinary and usual course consistent with past practice;

(k)    compromised, settled, granted any waiver or release relating to, or otherwise adjusted any Action, Indebtedness or any other claims or rights other than in the ordinary and usual course of business consistent with past practice; or

(l)    entered into any agreement, contract, commitment or arrangement to do any of the foregoing.

2.9    Litigation. As of the date hereof: (i) there are no Actions against any of the Seller Parties pending, or, to the knowledge of any of the Seller Parties, threatened to be brought by or before any Governmental Authority, in each case with respect to the Seller or the Business, (ii) no Seller Party is subject to any Governmental Order (nor, to the knowledge of any of the Seller Parties, are there any such Governmental Orders threatened to be imposed by any Governmental Authority), in each case with respect to the Seller or the Business; and (iii) there is no Action pending, or, to the knowledge of any of the Seller Parties, threatened to be brought before any

Governmental Authority, that seeks to question, delay or prevent the consummation of the transactions contemplated hereby.

2.10    Insurance.

(a)    (i) All insurance policies to which the Seller is an insured or under which the Seller is covered as an additional named insured or otherwise (or replacement policies therefor) are in full force and effect, and the Seller have paid all premiums due and are not in default, (ii) no notice of cancellation or non-renewal with respect to, or disallowance of any claim under, any such policy has been received by the Seller, and (iii) the Seller has not been refused insurance, nor has coverage been previously canceled or materially limited, by an insurer to which the Seller has applied for such insurance, or with which either has held insurance, within the last three years.

(b)    The Seller has maintained product liability insurance covering all of the products associated with the Business that it has sold since inception.  Since inception no claims of product liability have been made by a purchaser of any products of the Seller and the Seller has made no claims under any such insurance.  John Chaney has been the insurance agent of the Seller since 1990 and will prior to the Closing provide an affidavit to the Buyer in form and content satisfactory to the Buyer that it has no knowledge of any claim being made against or by the Seller at any time.

2.11    Material Contracts.

(a)    Schedule 2.11 sets forth all Material Contracts as of the date hereof.

(b)    Each agreement, contract, policy, plan, mortgage, lease, license, understanding, arrangement or commitment of the Seller that is intended to be binding upon the parties thereto is legal, valid and binding on the parties thereto, enforceable in accordance with the terms thereof.

(c)    The Seller has performed all of its obligations under each such agreement, contract, policy, plan, mortgage, lease, license, understanding, arrangement or commitment and the Seller is not in default under any such agreement, contract, policy, plan, mortgage, understanding, arrangement or commitment and no event has occurred which with the passage of time or the giving of notice or both would result in a material default, material breach or event of material noncompliance by the Seller under any such agreement, contract, policy, plan, mortgage, lease, license, understanding, arrangement or commitment.

(d)    The Seller has no present expectation or intention of not fully performing all its material obligations under each such agreement, contract, policy, plan, mortgage, lease, license, understanding, arrangement or commitment.

(e)    To the knowledge of each of the Seller Parties, no other party to any of its agreements, contracts, policies, plans, mortgages, leases, licenses, understandings, arrangements or commitments has breached or is in default thereunder.

{M1439739_14}

13

(f)     The Seller has delivered true, correct and complete copies of each Material Contract and all amendments thereto and documentation or correspondence modifying the terms thereof to the Buyer.

(g)     Except for the Material Contracts, the Seller is not a party to any written or oral: (i) commitment, contract, note, loan, evidence of indebtedness, purchase order or letter of credit involving any obligation or liability on the part of the Seller of more than $50,000 (and not more than $100,000 in the aggregate for related instruments) and not cancelable (without further liability) on not more than 30 days' notice; (ii) lease of real property; (iii) lease of personal property involving any annual expense in excess of $5,000 and not cancelable without further liability within 30 days; (iv) contracts and commitments not otherwise described above which materially affect the business of the Seller and which are not entered into in the ordinary course of business; (v) contracts or agreements containing covenants limiting the freedom of the Seller to engage in any line of business or compete with any person; (vi) contracts, commitments, leases, licenses or permits containing any "change in control" or "parachute payment" provision, as those terms are commonly understood, including without limitation those which would be triggered by the execution, delivery or consummation of the transactions contemplated by this Agreement, including without limitation, any right of termination, right of payment or acceleration of any other right under such contracts, commitments, licenses or permits; (vii) employment or severance contracts, plans or arrangements; or (viii) Tax sharing or similar agreements.

2.12    Accounts Receivable. All of the accounts receivable of the Seller reflected on the July 31, 2005 Balance Sheet and that shall be set forth in the Seller's trial balance as of the Closing are collectible, actual and bona fide receivables representing obligations for the total dollar amount thereof shown on its books, subject to no defenses or counterclaims. No accounts have been written off since the July 31, 2005 Balance Sheet, except as detailed in Schedule 2.12A. The revenue in respect of the sales that gave rise to such receivables have been properly recognized in accordance with GAAP, except as detailed in Schedule 2.12B.  No reserves for bad debt in excess of the amounts thereof on July 31, 2005 are required by GAAP. The allowance for doubtful accounts set forth in the Interim Balance Sheet is adequate in accordance with GAAP. The revenue in respect of the sales that gave rise to such receivables have been properly invoiced to customers and properly recognized in accordance with GAAP.  The Seller Parties have no knowledge of any facts or circumstances generally (other than general economic conditions) which would result in any material increase in the uncollectability of such receivables as a class in excess of the reserves therefore set forth in the Annual Financial Statements.  Schedule 2.12C accurately lists as of December 31, 2005, all receivables arising out of or relating to the Business, the amount owing, and the aging of such receivable, and Schedule 2.12D sets forth as of December 31, 2005 the name of the party from whom such receivable is owing, together with the address and contact persons at all accounts and any security in favor of the Seller for the repayment of such receivable which the Seller purports to have.  Since July 31, 2005, the Seller has collected its receivables and payments in accordance with past business practices and has not negotiated for or accepted advance payments nor accelerated the collection of any such receivables or payments, except as set forth in detail in the Schedule 2.12E.

2.13    Inventory.  The value at which the inventory of the Seller is carried on the December 31, 2005 Balance Sheet reflects the lower of cost or market value and reflects

14

writeoffs or writedowns for damaged or obsolete items, or items of below standard quality, in accordance with GAAP consistently applied. The inventory of the Seller as of the Closing shall not be inadequate in kind or amount in light of the ordinary and normal course of conduct and reasonably anticipated needs of the Business.

2.14    Permits and Licenses; Compliance with Law.

(a)    The Seller currently holds all, federal, state and local permits, licenses, authorizations, certificates, exemptions and approvals of Governmental Authorities or other Persons including, without limitation, Environmental Permits, necessary to conduct the Business and to own and use the facilities and properties owned and used by the Seller (collectively, "Permits"). Each such Permit is valid and in good standing with the issuer of the Permit and not subject to any proceedings for suspension, modification or revocation. Without limiting the generality of the foregoing: (i) the Seller has not received any written notice from any Governmental Authority revoking, canceling, rescinding, materially modifying or refusing to renew any Permit and (ii) the Seller is in compliance with the requirements of all Permits.

(b)    Except as set forth in Schedule 2.14(b), the Seller Parties are in compliance with all Laws (including, without limitation, with respect to affiliate transactions) and Governmental Orders applicable to the Business and no Seller Party has been charged at any time with a violation of any Law or any Government Order relating to the Business nor has been charged at any time with a violation of any Law or any Governmental Order relating to the Seller or any predecessor or affiliated company or business which at any time were Affiliates of any of the Seller Parties (collectively the "Predecessors" and individually a "Predecessor").

2.15    Environmental Matters. Except for any matters specifically described in the ENVIRON International Corporation "Environmental Review of Traeger Industries" reports related to the Oregon facilities and the Alabama facility dated December 2005, a copy of which has been furnished to Buyer and Seller, (i) there has been no Release of any Hazardous Materials on any Real Property or any Release in connection with the operation of the Seller or any Predecessors that could give rise to a duty to investigate, report or take responsive action under any applicable Environmental Law; (ii) there have been no events related to the Seller or any of its Predecessors regarding any real property that could give rise to liability under any Environmental Law; (iii) the Seller and its Predecessors have been  and the Seller is now, in compliance with all applicable Environmental Laws and there are no extant conditions that could constitute an impediment to such compliance in the future; (iv) the Seller and its Predecessors have disposed of all wastes containing Hazardous Materials in compliance with all applicable Environmental Laws (including the filing of any required reports with respect thereto) and Environmental Permits; (v) there are no pending or threatened Environmental Claims against the Seller relating to the Real Property or the operations of the Seller or any of its Predecessors; (vi) there is no environmental remediation or other environmental response occurring on any Real Property (including any easements, rights-of-way or other possessory interests in the real property of others) nor has the Seller issued a request for proposal or otherwise requested an environmental contractor to begin plans for any such environmental remediation or other environmental response; (vii) the Seller has not received any notice, and has no knowledge of any circumstances related to liability, under any Environmental Law; and (viii) neither the Seller

nor any of its Predecessors has used, handled, processed, manufactured or sold any materials or products containing asbestos, polychlorinated biphenyls (PCB's), or chlorinated solvents.

2.16    Employee Benefit Matters.

(a)    Schedule 2.16 sets forth a true and complete list of all Employee Benefit Plans that are maintained or operated by the Seller Parties  and the Seller Parties have delivered true, accurate and complete copies of all Employee Benefit Plans that are now or since inception of the Seller have been applicable to any director, officer, employee, independent contractor or agent of the Seller.  Except as disclosed on Schedule 2.16, the Seller does not maintain or contribute to any "employee pension benefit plan" (as defined in Section 3(2) of ERISA) or "multiemployer plan" (as defined in Section 3(37) of ERISA) and the Seller has never contributed or been obligated to contribute to a multiemployer plan and has no withdrawal liability with respect to any multiemployer plan.

(b)    To the extent applicable, (i) each such Employee Benefit Plan has been maintained and operated in all material respects in compliance with its terms and with all applicable provisions of ERISA, the Code and regulations, rulings and other authority issued thereunder; (ii) all contributions required by law to have been made under each such Employee Benefit Plan (without regard to any waivers granted under Section 412 of the Code) to any fund or trust established thereunder or in connection therewith have been made by the due date thereof; (iii) each Employee Benefit Plan that is intended to be qualified, as most recently amended, is (and from its establishment has been) the subject of a favorable determination letter issued by the IRS with respect to its qualification under Section 401 of the Code, or an application for such determination has been filed within the applicable remedial amendment period, and nothing has occurred with respect to the operation of any such Plan which could cause the loss of such qualification or exemption or the imposition of any liability, penalty or tax under ERISA or the Code; (iv) all amendments and actions required to bring the Employee Benefit Plans into conformity in all material respects with all of the applicable provisions of ERISA, the Code, and other laws have been made or taken except to the extent that such amendments or actions are not required by law to be made or taken until a date after the Closing Date;  and (v) any bonding required with respect to the Employee Benefit Plans in accordance with the applicable provisions of ERISA has been obtained and is in full force and effect.

(c)    No Employee Benefit Plan is subject to Title IV of ERISA or Section 412 of the Code and no Employee Benefit Plan that is an "employee welfare benefit plan" (as defined in Section 3(1) of ERISA) provides for continuing benefits or coverage for any participant or beneficiary of a participant after such participant's termination of employment, except as required by applicable law, including Section 4980B of the Code and Section 601 of ERISA.

(d)    There are currently no, and during the past three years there have been no, inquiries, claims, actions, suits or proceedings pending or, to the Seller Parties' knowledge, threatened by any Governmental Authority or by any participant or beneficiary against (i) any Employee Benefit Plan, (ii) the assets of any of the trusts under any Employee Benefit Plan, (iii) the sponsor or administrator of any Employee Benefit Plan, or (iv) any fiduciary of any

{M1439739_14}

16

Employee Benefit Plan with respect to the design or operation of such Employee Benefit Plan, other than routine claims for benefits.

(e)     All reports and information required to be filed with the U.S. Department of Labor, the Pension Benefit Guaranty Corporation or any other Governmental Authority or to be furnished to plan participants and their beneficiaries with respect to each Employee Benefit Plan have been so filed and/or furnished, all annual reports (including Form 5500 series) of each Employee Benefit Plan for which such reports were required to be filed were filed in a timely manner and no material change has occurred with respect to the matters covered by the most recent Form 5500 since the date thereof.

(f)     Neither the Seller nor any "party in interest" (as defined in Section 3(14) of ERISA) or "disqualified person" (as defined in Section 4975(e)(2) of the Code) with respect to any Employee Benefit Plan has engaged in a "prohibited transaction" within the meaning of Part 4 of Subtitle B of Title I of ERISA or Section 4975 of the Code for which a statutory, administrative or regulatory exemption was not available.

(g)     No payment made to any officer, director, employee or agent of the Seller pursuant to any employment contract, severance agreement or other arrangement as a consequence of the transaction described herein will be non-deductible to the Seller because of the applicability of the "golden parachute" provisions of sections 280G and 4999 of the Code, nor will the Seller be required to "gross up" or otherwise compensate any recipient because of the imposition of any excise tax (including any interest or penalties related thereto) on the recipient as a result of the applicability of such sections 280G and 4999.

(h)     The Seller does not now have nor has at any time since inception of the Seller had any Union Employees.

(i)     The Seller shall not grant any additional equity-based awards to any current or former directors, officers, independent contractors or agents of the Seller or otherwise increase the salary or benefits of any of the directors, officers, independent contractors or agents of the Seller prior to the Closing Date.

(j)     The Seller has no actual or potential liability attributable to any employee benefit plan covering any employees of any ERISA Affiliate.  For purposes of this subsection, "ERISA Affiliate" means (i) a member of any "controlled group" (as defined in Section 414(b) of the Code) of which the Seller is a member, (ii) a trade or business, whether or not incorporated, under common control (within the meaning of Section 414(c) of the Code) with the Seller, or (iii) a member of any affiliated service group (within the meaning of Section 414(m) of the Code) of which the Seller is a member

2.17    Labor Relations.  There are no labor organizations recognized as representing any of the directors, officers, employees, independent contractors or agents of the Seller and (i) the Seller is not party to any collective bargaining agreement or other labor union contract, (ii) there are no strikes, slowdowns or work stoppages pending or threatened between the Seller and any of their employees, and the Seller has not experienced any such strike, slowdown, or work stoppage within the past ten years, (iii) there are no unfair labor practice complaints or employee disputes

pending against the Seller before the National Labor Relations Board or any other Governmental Authority or any current union representation questions involving employees of the Seller, and (iv) the Seller is in compliance in all respects with its obligations under all Laws and Governmental Orders governing its employment practices, including, without limitation, provisions relating to wages, hours and equal opportunity, occupational safety or workers' compensation.

2.18    Employee Accruals. The Seller does not have accrued vacation time of any employees in excess of three weeks as of the date hereof. There were, at the date hereof and on the Closing Date there will be, no bonuses, profit sharing, incentives, commissions or other compensation of any kind with respect to work done prior to July 31, 2005 due to present or former employees of the Seller not fully paid prior to such applicable date, it being understood that Traeger Industries may provide bonuses out of the Excluded Assets.

2.19    Intellectual Property.

(a)    All Intellectual Property held by any of the Seller Parties relating to the Business are valid and subsisting and provide the Seller with the right to exclude all others from the use thereof, except for the licenses set forth on Schedule 2.19A, and: (i) the Seller is not, nor as a result of the execution and delivery of this Agreement or the performance by Seller Parties of their obligations hereunder will be, in violation of any license, sublicense or other agreement applicable to the Business or required to make any payment in respect thereof; provided, however, that Buyer will be responsible for any customary license transfer fees for shrink wrap, off the shelf, software programs. The Seller Parties own all right, title and interest to, or have the right to use pursuant to a valid license, all Intellectual Property Rights used in the Business and this Agreement and the Rights Agreement are sufficient to vest in the Buyer all right, title and interest to or the right to use pursuant to a valid license from unrelated third parties, all Intellectual Property Rights used in the Business without any further cost therefore and (ii) there have been no claims made against any of the Seller Parties or the Seller or threatened or, to the knowledge of any of the Seller Parties, likely to be threatened by any Person, asserting the invalidity, misuse or unenforceability of any Intellectual Property Rights referred to in (i) above or challenging the ownership, validity or effectiveness of any of the Intellectual Property Rights. The Seller Parties have delivered to the Buyer true, correct and complete copies of each of the licenses set forth on Schedule 2.19A and all amendments thereto, and other than as set forth therein there is no restriction on the Seller to fully exploit the Intellectual Property Rights. Schedule 2.19B sets forth a list of the Intellectual Property owned by the Seller.

(b)    The Seller has not received any notices of any material unauthorized use, infringement or misappropriation by, or conflict with, any present or former employee of the Seller, principal shareholders, strategic partners or any other third party with respect to the Intellectual Property Rights (including, without limitation, any demand or request that the Seller license any rights from a third party).

(c)    The conduct of the Seller has not infringed, misappropriated or conflicted with and does not infringe, misappropriate or conflict with any intellectual property rights of other Persons to the best knowledge of the Seller Parties after reasonable diligence.

(d)     To the knowledge of each of the Seller Parties, the Intellectual Property Rights owned by or licensed to any of the Seller Parties have not been infringed, misappropriated or conflicted by other Persons except as set forth in Schedule 2.19(d).

(e)     No Intellectual Property Right is subject to any Encumbrance, except the Permitted Encumbrances, and there is no fact that would render the Intellectual Property Rights invalid. No Intellectual Property Right is subject to any outstanding order, judgment, decree, stipulation or agreement restricting in any manner the licensing or exploitation thereof by the Seller. The Seller has not entered into any agreement to indemnify any other person against any charge of infringement relating to any Intellectual Property Right. No employee of the Seller is in violation of any term of any confidentiality or invention assignment agreement, employment contract (whether written or verbal), patent disclosure agreement or any other contract or agreement relating to the relationship of any such employee with the Seller or any other party (including prior employers) because of the nature of the business conducted or proposed to be conducted by the Seller.

(f)     To the extent they exist, the engineering drawings for all major products being sold or manufactured by the Seller in the Business represent the most recent drawings used in the Business.  For the products currently being developed by the Business, engineering drawings being transferred represent all drawings used by the Seller Parties for such development work.

2.20     Taxes.

(a)     All Tax Returns required to be filed by the Seller have been timely filed;

(b)     All Taxes shown on such Tax Returns have been timely paid;

(c)     No audits with respect to the Seller is in process, pending or threatened, no deficiencies or adjustments to Tax Returns exist or have been asserted in writing with respect to Taxes of the Seller, no notice has been received in writing that any Tax Return or Taxes of the Seller required to be filed or paid has not been filed or have not been paid;

(d)     There are no Tax liens on any of the Purchased Assets;

(e)     All Taxes that the Seller is required to withhold or collect have been duly withheld or collected and, to the extent required, have been paid to the proper Tax authority;

(f)     The Seller (i) is not currently nor has ever been a member of an affiliated group filing a consolidated federal income tax return or (ii) does not have any liability for the Taxes of any person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law), or as transferee or successor, by contract or otherwise;

(g)     The Seller has never been a party to any Tax sharing or similar agreement;

(h)     No consent under Section 341(f) of the Code has been filed with respect to the Seller; and

(i)      The Seller is not a USRPI as that term is defined in Section 897 of the Internal Revenue Code and the Treasury Regulations thereunder.

2.21    Commissions.  With the exception of any responsibility that the Buyer has to PAC – West Resources Group, whose fees will be paid by the Buyer, and with the exception of any responsibility that the Seller has to Equity Management Group LLC whose fees will be paid by the Seller, there is no broker or finder or other Person who has any valid claim against either of the Seller, the Buyer, any of their respective Affiliates or any of their respective assets for a commission, finders' fee, brokerage fee or other similar fee in connection with this Agreement, or the transactions contemplated hereby, by virtue of any actions taken by on or behalf of the Seller Parties, or any of their respective officers, employees, independent contractors or agents.

2.22    Affiliate Transactions.  Except pursuant to the employment agreements referred to in Section 5.9 hereof or the Rights Agreement, none of the Seller Parties will as of the Closing be a party to any agreements or arrangements with the Seller, or will have any obligations due it from the Seller that will continue in effect after the Closing Date that are not terminable by the Seller at will without cost, penalty or premium.

2.23    Payments. The Seller has not, directly or indirectly, paid or delivered any fee, commission or other sum of money or item or property, however characterized, to any finder, agent, government official or other party, in the United States or any other country, which were illegal under any federal, state or local laws of the United States or any other country having jurisdiction; and neither the Seller nor any one acting on its behalf have paid or offered a bribe or other personal inducement to any employee of any customer of the Seller.  The Seller has not participated, directly or indirectly, in any boycotts or other similar practices affecting any of its actual or potential customers.

2.24    Intentionally Omitted.

2.25    Health and Safety Conditions.

(a)      To the best of the Seller Parties' knowledge, after reasonable diligence, the Seller is in compliance with all Laws designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, and any program, whether governmental or private, designed to provide safe and healthful working conditions including without limitation the Occupational Safety and Health Act of 1970, as amended, as well as any similar state or local Law.

(b)      Schedule 2.25 lists the following items with respect to the Business:

(i)      personnel safety statistics and OSHA Form 200s related to the Business since January 1, 2002;

(ii)     citations, notices of violations, orders, consent orders, administrative or judicial enforcement proceedings from state and federal OSHA agencies concerning the Business since January 1, 2002 or which are currently pending; and

(iii)     all current health and safety permits and licenses.

2.26     Customers and Suppliers.

(a)     Schedule 2.26 contains a list of (i) all customers and suppliers of the Business which have contracts (including oral contracts and purchase orders) with the Business involving purchases or sales in an amount in excess of $50,000 per annum; and (ii) sole source suppliers to the Business with contracts with the Business.

(b)     The Seller has not received any notice nor has any reason to believe that any distributor or dealer that purchased more than $50,000 of Seller's products in 2005 (i) has ceased, or will cease, to buy or use its products, (ii) has substantially reduced or will substantially reduce, the level of purchases of products of the Seller or (iii) has sought, or is seeking, to reduce the price it will pay or change the terms of purchase for products of the Seller, including in each case after the consummation of the transactions contemplated hereby.  No customer of the Seller described in clause (a) above has otherwise threatened to take any action described in the preceding sentence as a result of the consummation of the transactions contemplated by this Agreement.

(c)     The Seller has not received any notice nor has any reason to believe that there has been any material adverse change in the price of such raw materials, supplies, merchandise or other goods or services, or that any such supplier will not sell raw materials, supplies, merchandise and other goods to the Seller at any time after the Closing Date on terms and conditions similar to those used in its current sales to the Seller, subject to general and customary price increases. No supplier of the Seller described in clause (a) above has otherwise threatened to take any action described in the preceding sentence, whether or not as a result of the consummation of the transactions contemplated by this Agreement.

2.27     Sales Channel.

(a)     The Seller has entered into dealer agreements solely with unrelated third parties, except as set forth in Schedule 2.27(a)(i), and solely in accordance with the form of dealer agreement that has been furnished to the Buyer by the Seller with no material changes or amendments thereto.  The Seller currently has such agreements in force with not less than 650 dealers.  The terms of payment provided under such dealer agreements do not exceed thirty (30) days and in no case provide a discount of more than 2% (two percent) for payment with ten (10) days.  The Seller has provided Buyer with true, correct and complete copies of all dealer agreements of the Seller.  Schedule 2.27(a)(ii) sets forth those dealer agreements with any terms that are materially different than those set forth in the standard form dealer agreement, attaching copies thereof.

(b)     The Seller has entered into distributorship agreements solely with unrelated third parties and solely in accordance with the form of distributorship agreement that has been furnished to the Buyer by the Seller with no material changes or amendments thereto. The Seller currently has distributorship agreements in force with not less than 12 distributors. The terms of payment provided under such agreements do not exceed thirty (30) days and in no case provide a discount of more than two percent (2%) for payment within ten (10) days.  The

Seller has provided the Buyer with true, correct and complete copies of all distributorship agreements of the Seller. Schedule 2.27(b) sets forth those distributorship agreements with any terms that are materially different than those set forth in the standard form distributorship agreement, attaching copies thereof.

2.28    Product Warranties and Product Approvals.

(a)    Set forth on Schedule 2.28 are representative forms of product warranties and guarantees granted or issued by the Seller in connection with the Business. None of the other product warranties or guarantees granted or issued by the Seller differ in any material respect from such representative forms. Since inception, the total annual net cost of satisfying product warranty or similar claims that have been made against the Seller or any of the Seller Parties in connection with the Business have not exceeded one percent (1%) of the net revenues of the Seller during such period. The Seller has committed no act, and there has been no omission, which would result in, and there has been no occurrence which would give rise to, any material product liability or liability for breach of warranty (whether covered by insurance or not) on the part of the Seller, with respect to products sold prior to the Closing by the Seller or any of its licensees or in the operation of the Business.

(b)    To the best knowledge of the Seller Parties after reasonable diligence, all products manufactured, sold or licensed by the Seller and its Predecessors have in the past had, and currently have such governmental or third party approvals or certificates relating to design safety and industry standards as required by Applicable Law. All such products were and are designed, labeled and manufactured in conformance with applicable published industry standards relating to safety.

2.29    Compliance with WARN Act. The Seller has been exempt from, or has complied with, all applicable provisions of the WARN Act and the regulations thereunder in connection with all past reductions in work force relating to the Business.

2.30    Disclosure. No representation or warranty by the Seller Parties contained in this Agreement nor any statement or certificate furnished or to be furnished by or on behalf of the Seller Parties to the Buyer or its representatives in connection herewith or pursuant hereto contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to make the statements contained herein or therein not misleading. There is no fact known to the Seller Parties that has not been disclosed by the Seller Parties to the Buyer that might reasonably be expected to have or result in a material adverse effect on the financial condition, financial position, properties, assets, rights, results of operations, or prospects of the Business.

Article 3.    Representations and Warranties of the Buyer.

The Buyer represents and warrants to the Seller as follows:

3.1    Organization and Standing. The Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Florida and has

all requisite corporate power and authority to own, lease and operate its properties and assets and to conduct its business as it is now being conducted.

3.2     **Binding Agreement.** The Buyer has all requisite corporate power and authority to enter into this Agreement, to execute and deliver this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by the Buyer and the consummation by the Buyer of its obligations hereunder have been duly and validly authorized by all necessary corporate and member action on the part of the Buyer. This Agreement has been duly executed and delivered on behalf of the Buyer and, assuming the due authorization, execution and delivery by the Seller Parties, constitutes a legal, valid and binding obligation of the Buyer enforceable in accordance with its terms.

3.3     **Absence of Violations or Required Consents.** The execution, delivery and performance by the Buyer of this Agreement does not and will not: (a) violate or result in the breach or default of any provision of the articles of organization or Limited Liability Company Agreement of the Buyer; (b) violate any Law or Governmental Order applicable to the Buyer or any of its properties or assets; (c) except for the Required Consents, require any consent, approval, authorization or other order of, action by, registration or filing with or declaration or notification to any Governmental Authority or any other Person; or (d) result in any violation or breach of, constitute a default (or event which with the giving of notice, or lapse of time or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any Encumbrance on any of the Buyer's assets pursuant to, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license or permit, or franchise to which the Buyer is a party or by which its assets are bound.

3.4     **Litigation.** There are no Actions pending or threatened to be brought by or before any Governmental Authority, against the Buyer or any of its Affiliates that (i) seeks to question, delay or prevent the consummation of the transactions contemplated hereby, or (ii) would reasonably be expected to affect adversely the ability of the Buyer to fulfill its obligations hereunder, including without limitation, the Buyer's obligations under Article 1 hereof.

3.5     **Commissions.** With the exception of any responsibility that the Buyer has to PAC-West Resource Group, whose fees will be paid by the Buyer, and with the exception of any responsibility that the Seller has to Equity Management Group, LLC, whose fees will be paid by the Seller, there is no broker or finder or other Person who has any valid claim against the Seller, any of its Affiliates or any of its assets for a commission, finders' fee, brokerage fee or other similar fee in connection with this Agreement, or the transactions contemplated hereby, by virtue of any actions taken by on or behalf of the Buyer or its officers, employees or agents.

3.6     **Disclosure.** No representation or warranty by the Buyer contained in this Agreement nor any statement or certificate furnished or to be furnished by or on behalf of the Buyer to the Seller Parties or their representatives in connection herewith or pursuant hereto contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to make the statements contained herein or therein not misleading.  There is no fact known to the Buyer that has not been disclosed by the Buyer to the Seller Parties that might reasonably be expected to have or result in a material adverse effect on the financial

condition, financial position, properties, assets, rights, results of operations, or prospects of the Buyer.

Article 4.       Covenants and Agreements.

4.1       Conduct of the Business Prior to Closing; Access.  The Seller Parties covenant as follows:

(a)       Between the date hereof and the Closing Date, except as contemplated by this Agreement, or except with the prior written consent of the Buyer, the Seller will operate the Business in the ordinary course of business consistent with past practice (including, without limitation, with respect to compliance with Laws and performance under contracts) and will not permit:

(i)       any of the Purchased Assets to be subjected to any further Encumbrance;

(ii)       any changes, including changes to contracts, employment practices and collection practices, to be made in the operations of the Seller, other than in the ordinary and usual course of business in accordance with past practice;

(iii)       any assets of the Seller to be sold, transferred, leased, subleased, licensed, further encumbered or otherwise disposed of, other than in the ordinary and usual course of business in accordance with past practice (including, without limitation, sales, transfers, leases, subleases, licenses or dispositions of material assets to any Affiliates of the Seller Parties);

(iv)       (A) any increase, or the announcement of any increase, in the wages, salaries, compensation, bonuses, incentives, pension or other benefits payable by the Seller to any director, officer, employee, independent contractor or agent to be granted, including, without limitation, any increase or change pursuant to any Employee Benefit Plan to any Person other than the Seller Parties, provided that Seller will be entitled to furnish annual adjustments not to exceed 5% (five percent) of the prior year's salary to those employees that earn less than $40,000.00 (Forty Thousand Dollars) per annum, or (B) any benefits under any Employee Benefit Plan to be established or increased or to be promised to be increased, or any payment or vesting thereof to be accelerated;

(v)       any material change in any method of accounting or accounting practice or policy used by the Seller to be made, including, without limitation, material changes in assumptions underlying or methods of calculating bad debt, contingency or other reserves, or notes or accounts receivable write-offs, or in corporate location methodology, in each case other than as required by Law or under GAAP;

(vi)       any commitments for the Seller to make capital expenditures in excess of $25,000 individually or $50,000.00 in the aggregate;

(vii)       any amendment of the certificate or articles of incorporation, by-laws or other organizational instruments of the Seller or any of the Seller Parties;

(viii)      any material Action, Indebtedness or any other claims or rights related to the Seller to be compromised, settled or otherwise adjusted, or any waiver or release relating thereto to be granted other than in the ordinary and usual course of business consistent with past practice;

(ix)      any Indebtedness in excess of a net amount of $25,000 to be created, incurred, assumed or guaranteed by the Seller that cannot be prepaid or terminated without payment of premium or penalty, except for borrowings under existing credit agreements (or replacements therefor on substantially the same terms) or the creation of trade payables;

(x)      any new Material Contract or any amendments or modifications to any existing such Material Contract, to be entered into;  or

(xi)      any agreement, contract, commitment or arrangement to do any of the foregoing to be entered into.

(b)      Pending the Closing Date, the Seller Parties shall:

(i)      Ensure that the Buyer, potential lenders, financial advisors and their respective accountants, counsel, environmental consultants and its other representatives are given reasonable access during normal business hours to all of the facilities and employees (including appropriate experts and other knowledgeable personnel), attorneys, accountants, agents, independent contractors, properties, books and records of the Seller and the Business and that the Buyer and its representatives are furnished with such information concerning the Seller as the Buyer may reasonably require, including without limitation such access and cooperation as may be necessary to allow the Buyer and its representatives to:

A.      identify those contracts and Permits that require third party consent to the transactions contemplated hereby, those that expire or may be terminated prior to or soon after the Closing and those that may require special documentation at the Closing;

B.      arrange appropriate operational financing and insurance coverage by the Closing with respect to the Purchased Assets;

C.      become familiar with the location and organization of the books and records;

D.      make appropriate arrangements for the continuation of ongoing maintenance, construction and upgrade activities of the Business after the Closing;

E.      plan advertising, promotion and marketing campaigns to be launched after the Closing;

        F.      plan new product launches to be made following the Closing; and

        G.      perform environmental reviews and soil tests with respect to each parcel of Real Property at Buyer's expense;

provided that this right of access shall not be exercised in any way which would unreasonably interfere with the normal operations, business or activities of the Seller;

        (ii)      Make available promptly to the Buyer all routine management and statistical reports of the Seller;

        (iii)      Make available interviews requested with key distributors and dealers and key suppliers of the Seller which will be initiated, scheduled and coordinated by the Seller;

        (iv)      From time to time, furnish to the Buyer such additional information (financial or otherwise) concerning the Seller as the Buyer may reasonably request (which right to request information shall not be exercised in any way which would unreasonably interfere with the normal operations, business or activities of the Seller);

        (v)      Obtain the prior written consent of the Buyer with respect to taking, or permitting the Seller to take, any material action with respect to the Business other than in the ordinary course of business consistent with past business or other than as contemplated by this Agreement;

        (vi)      Notify the Buyer promptly after any of the Seller Parties have obtained knowledge of the occurrence of any circumstance, change in, or effect on the Business or the Purchased Assets that could have a Material Adverse Effect; and

        (vii)      Provide training, office facilities and integration support for any CEO, VP Operations and VP Finance hired by the Buyer (whose compensation shall be the obligation of the Buyer).

    4.2    Non-Solicitation. Neither the Seller Parties nor their Affiliates shall, for the period from the date hereof through the date that is two years following the Closing Date, without the prior written consent of the Buyer, directly or indirectly, solicit to hire or hire (or cause or seek to cause to leave the employ of the Seller) any employee, independent contractor or agent of the Seller.

    4.3    Cooperation. Following the execution of this Agreement, the Buyer and the Seller agree as follows:

    (a)    Subject to the terms and conditions of this Agreement, each party will use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable, including under applicable Laws and regulations, to consummate the Sale and the other transactions contemplated by this Agreement on the Closing Date. In furtherance and not in limitation of the foregoing, each party hereto agrees to use its

reasonable best effort to obtain as soon as practicable all other required consents from third parties.

(b)     As used in this Section 4.3, "reasonable best efforts" shall not require the Buyer or any of its Affiliates to divest or hold separate or otherwise take or commit to take any action that limits their freedom of action with respect to, or their ability to retain, any of their assets or businesses or the Business or assets of the Seller or that limits their freedom of action with respect to their business or assets.

4.4     Confidentiality.

(a)     Prior to the Closing Date.  The terms of the Confidentiality Agreement are herewith incorporated by reference and shall continue in full force and effect with respect to the Buyer until the Closing Date and shall remain in effect in accordance with its terms even if this Agreement is terminated.

(b)     After the Closing Date, the Seller Parties shall maintain the confidentiality of all information of the Seller prior to the Closing under terms similar to those set forth in the Confidentiality Agreement with respect to "Information" as though such terms applied to the Sellers and continued after the Closing Date.

4.5     Public Announcements.  Except as otherwise required by law or the rules of any stock exchange or automated quotation system, the parties shall not issue any report, statement or press release or otherwise make any public announcement with respect to this Agreement and the other transactions contemplated hereby without prior consultation with and approval of the other parties hereto (which approval shall not be unreasonably withheld); provided, that, the Buyer shall be entitled to disclose the acquisition and portfolio ownership of the Business after the Closing has occurred.

4.6     No Solicitation.  Prior to the Closing or termination of this Agreement, the Seller Parties shall not and shall use their best efforts to cause its officers, directors, representatives, Affiliates or associates not to, (a) initiate contact with, solicit, encourage or respond to any inquiries or proposals by, or (b) enter into any discussions or negotiations with, or disclose, directly or indirectly, any information concerning the Seller to, or afford any access to the properties, books and records of the Seller to, any Person in connection with any possible proposal for the acquisition (directly or indirectly, whether by purchase, merger, consolidation or otherwise) of all or any of the assets, business or capital stock of the Seller, outside of the ordinary course of business.

4.7     Related Party Transactions.  Prior to Closing, the Seller Parties and Traeger Brothers will contribute to the Seller all of the equipment or other assets used in the Business that they hold, including but not limited to any equipment used by the Seller and owned by Joe Traeger and any equipment used in the Business, except the Intellectual Property Rights to be assigned to the Buyer under the Rights Agreement.

{M1439739_14}

4.8    Non-Compete.

(a)    The Seller Parties covenant and agree on their own behalf and on behalf of each of their Affiliates that from the date hereof and until the seventh anniversary of the Closing Date, neither the Seller Parties nor their Affiliates will directly or indirectly, engage in or have any interest in any sole proprietorship, partnership, corporation, limited liability company or business, whether as an employee, partner, agent, security holder, consultant or otherwise, that directly or indirectly is engaged in any business relating to the Business in any Restricted Area or to sell wood pellet grills, BBQ or cooking equipment or related accessories or supplies (including without limitation wood pellets for grills, BBQs and other cooking equipment) to any customer of the Seller as of the Closing Date or at any time during the preceding three (3) years. For the purposes of this Section 4.8, a "Restricted Area" means the area on the date hereof or on the Closing Date of one hundred miles from the facilities owned or leased by the Seller.

(b)    Each of the Seller Parties acknowledges and agrees that the covenants provided for in this Section are reasonable and necessary in terms of time, area and line of business to protect the Buyer's legitimate business interests as a purchase of the Purchased Assets, which includes protecting valuable confidential business information, substantial relationships with customers and throughout the Restricted Area and customer goodwill associated with the Seller. The Seller Parties expressly authorize the enforcement of the covenants provided for in this Section by (i) the Buyer, (ii) the Seller, and (iii) any successors to the ownership of the Seller. To the extent that the covenant provided for in this Section may later be deemed by a court to be too broad to be enforced with respect to its duration or with respect to any particular activity or geographic area, the court making such determination shall have the power to reduce the duration or scope of the provision. The provision as modified shall then be enforced.

(c)    Seller agrees and understands that Buyer may in the future expand the scope of the purchased Business and Seller will not assert or claim that any future activity of Buyer infringe or violate the Intellectual Property Rights of Seller unless and to the extent such activities infringe rights of Seller pursuant to valid issued patents that are unrelated to the Business.

(d)    It is agreed by each of the Seller Parties on their own behalf and on behalf of their Affiliates that Buyer would be irreparably damaged by reason of any violation of this Section by any of the Seller Parties or their Affiliates, and that any remedy at law for breach of such provisions would be inadequate. Therefore, the Buyer shall be entitled to seek and obtain injunctive or other equitable relief (including, but not limited to, a temporary restraining order, a temporary injunction or a permanent injunction) against the Seller Parties and their Affiliates, for breach or threatened breach of such provisions and without the necessity of proving actual monetary loss. It is expressly understood by each of the Seller Parties that this injunctive or other equitable relief shall not be the Buyer's exclusive remedy for any breach of this covenant and the Buyer shall be entitled to seek any other relief or remedy that may be available by contract, statute, law or otherwise for any breach hereof. It is agreed that the Buyer shall also be entitled to recover any and all attorney's fees and expenses in the enforcement of the provisions hereof.

{M1439739_14}

28

(e)     The Seller Parties hereby agree to execute and deliver covenants not to compete with the purchaser of the Business from the Buyer as and when requested by such purchaser; provided any such covenants not to compete do not materially expand the scope, terms or conditions of this Section 4.8.

4.9     Collections.

The Seller and the Seller Parties covenant and agree that Seller shall collect its receivables and payments in accordance with past business practices and not negotiate for or accept advance payments nor accelerate the collection of any such receivables or payments.  On or prior to the Closing Date, the Seller shall deliver an executed letter of instruction to all of the Seller's distributors and dealers notifying such parties of the new name and remittance instructions for the Business.  In the event the Seller receives payments from any customer with respect to any accounts receivable which are part of the Purchased Assets or any other amount due to the Buyer, the Seller shall hold such funds in trust for the benefit of the Buyer and immediately turnover such receipts to the Buyer.

4.10     Recruitment.

Buyer agrees to hire a CEO, VP Operations and VP Finance of Buyer on or prior to July 1, 2006.  To the extent Buyer does not do so, Buyer will pay to the Seller a sum, during each pay period following July 1, 2006 that Buyer has not recruited a CEO, VP Operations and/or VP Finance, equal to the pro rata amount of the base salary that would have been payable to such executive had they been employed by the Buyer as of July 1, 2006 at the following annual rates of pay until such positions are filled by the Buyer:  CEO $180,000.00; VP Operations $125,000.00; and/or VP Finance $125,000.00.  If the Buyer shall not have hired a CEO, VP Operations and a VP Finance by November 30, 2006, the Buyer shall pay the Seller $500,000.00 (Five Hundred Thousand Dollars) as a penalty.

Article 5.     Conditions to Obligations of the Buyer.

The obligations of the Buyer to consummate the transactions contemplated by this Agreement are, at its option, in its sole discretion, subject to satisfaction of each of the following conditions:

5.1     Representations and Warranties.

(a)     The representations and warranties of the Seller Parties contained herein shall be true and correct in all material respects (other than those representations and warranties that are qualified by Material Adverse Effect and those described in clause (b) below, which shall be true and correct in all respects) at and as of the Closing Date as though each such representation and warranty were made at and as of such time, other than such representations and warranties as are made as of a specific date.

(b)     The representations and warranties of the Seller Parties contained in Sections 2.3, 2.4, 2.5, 2.6, 2.11, 2.13 and 2.14 shall be true and correct in all respects at and as of the Closing Date.

{M1439739_14}

29

5.2     Performance by the Seller Parties.  All of the covenants and agreements to be complied with and performed by the Seller Parties on or before the Closing Date shall have been complied with or performed in all material respects.

5.3     Certificate.  The Seller Parties shall have delivered to the Buyer a certificate, dated as of the Closing Date, executed on behalf of the Seller Parties by their duly authorized officers to the effect of Sections 5.1 and 5.2.

5.4     Consents; No Objections.  All consents, waivers, approvals, orders and authorizations from third parties required to be made or obtained for the authorization, execution, delivery and performance of this Agreement, the consummation of the transactions contemplated hereby and the continuation in force of any rights, licenses, permits, authorizations, agreements, instruments or documents of the Seller, or that relate to the Business shall have been obtained and become final and non-appealable.  Neither any statute, rule, regulation, order, stipulation, decree, judgment, or injunction shall be enacted, promulgated, entered, enforced, or deemed application to the purchase nor any other action shall have been taken by any Government Entity (i) which prohibits the consummation of the transactions contemplated by this Agreement; (ii) which prohibits Buyer's ownership or operation of all or any material portion of the business or assets of the Seller, or which compels the Buyer to dispose of or hold separately all or any portion of the business or assets of Buyer, any affiliate of Buyer, or the Seller as a result of the transaction contemplated herein; (iii) which makes the purchase of, or payment for, some or all of the Purchased Assets illegal; (iv) which imposes material limitations on the ability of the Buyer to acquire or hold or to exercise effectively all rights of ownership of the Purchased Assets; or (v) which imposes any limitations on the ability of the Buyer effectively to control in any material respect the business or operations of the Seller, of Buyer or of any Affiliate of the Buyer.

5.5     No Proceedings or Litigation.  There shall not have been instituted, pending or threatened any action or proceeding (or any investigation or other inquiry that might result in such an action or proceeding) by or before any Government Entity (i) which prohibits the consummation of the transactions contemplated by this Agreement; (ii) which prohibits Buyer's ownership or operation of all or any of the Business or the Purchased Assets, or which compels the Buyer to dispose of or hold separately all or any portion of the Business or the Purchased Assets of the Seller, the Buyer or any Affiliate of the Buyer as a result of the transaction contemplated herein; (iii) which makes the purchase of, or payment for, some or all of the Purchased Assets illegal; (iv) which imposes limitations on the ability of the Buyer to acquire or hold or to exercise effectively all rights of ownership of the Purchased Assets; or (v) which imposes any limitations on the ability of the Buyer to effectively control in any material respect the Business or the business or operations of the Buyer or any Affiliate of the Buyer.  No preliminary or permanent injunction or other order issued by any United States federal or state Governmental Authority, nor any Law promulgated or enacted by any United States federal or state Governmental Authority, that restrains, enjoins or otherwise prohibits the transactions contemplated hereby or limits the ability in any respect of the rights of the Seller to hold its assets and conduct its present, planned or prospective business, or imposes civil or criminal penalties on any member, manager, stockholder, director or officer of the Buyer if such transactions are consummated, shall be proposed or be in effect.

{M1439739_14}

30

5.6    No Material Events.  Since the date hereof, there have not been any circumstances, changes in or effects on the Seller or its assets, financial or other condition or prospects, or the patents to be conveyed pursuant to the Rights Agreement that, individually or in the aggregate, had or could have a Material Adverse Effect.

5.7    Rights Agreement Closing.  The closing of the Rights Agreement shall have occurred.

5.8    Employment Agreements.  Each of Brian Traeger, Joe Traeger, Randy Traeger and Mark Traeger shall have entered into employment agreements with the Buyer in form and content previously approved by the Buyer.

5.9    Estoppel Letters.  The Seller shall have delivered to Buyer estoppel letters from all lessors and lendors to the Seller in form and content acceptable to the Buyer.

5.10    Name Change Amendment.  At or prior to the Closing, the Seller shall file with the Secretary of State of Oregon articles of amendment to the articles of incorporation of the Company effectuating a change in the Seller's name from Traeger Industries, Inc. to a name which is substantially dissimilar.

5.11    Opinion of Counsel.  Hooper, Englund & Weil, LLP, counsel to the Seller, shall have delivered to the Buyer an opinion letter, dated the date of the Closing in form and content acceptable to the Buyer, addressed to the Buyer and its lenders.

5.12    Miscellaneous.  The Seller shall deliver to the Buyer addressed to the Buyer and its lenders, dated the Closing Date, such additional certificates and opinions as the Buyer shall reasonably request.

Article 6.    Conditions to Obligations of the Seller.

The obligations of the Seller to consummate the transactions contemplated by this Agreement are, at its option, in its sole discretion, subject to satisfaction of each of the following conditions:

6.1    Representations and Warranties.  The representations and warranties of the Buyer contained herein shall be true and correct in all material respects (other than those representations and warranties that are qualified by Material Adverse Effect, which shall be true and correct in all respects) at and as of the Closing Date as though each such representation and warranty were made at and as of such time, other than such representations and warranties as are made as of a specific date, in each case except for changes that are expressly contemplated by this Agreement, and except for such failures to be true and correct that (without regard to materiality concepts therein once such failure is established) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the business, results of operations or financial condition of the Buyer.

6.2    Performance by the Buyer.  All of the covenants and agreements to be complied with and performed by the Buyer on or prior to the Closing Date shall have been complied with or performed in all material respects.

{M1439739_14}

31

6.3     Certificate.  The Buyer shall have delivered to the Seller a certificate, dated as of the Closing Date, executed on behalf of the Buyer by its duly authorized officers to the effect of Sections 6.1 and 6.2.

6.4     No Proceedings or Litigation.  No preliminary or permanent injunction or other order issued by any United States federal or state Governmental Authority, nor any Law promulgated or enacted by any United States federal or state Governmental Authority, that restrains, enjoins or otherwise prohibits the transactions contemplated hereby.

Article 7.     Indemnification.

7.1     Indemnification by the Seller Parties.  Subject in all respects to the provisions of this Article 7, the Seller Parties hereby agree jointly and severally to indemnify and hold harmless the Buyer and its Affiliates, officers, directors, employees, agents, representatives, successors and assigns after the Closing Date from and against any Claims and Damages incurred by them arising out of or resulting from:

(a)     any breach on the part of any of the Seller Parties of (i) any representation or warranty made herein or in any certificate delivered by the Seller Parties pursuant to this Agreement or any employment agreement or (ii) any covenant or agreement made by the Seller Parties in this Agreement or any employment agreement; or

(b)     any third party claim existing as of the Closing Date, including those in which the Seller is a plaintiff, or any dispute initiated by the Seller prior to the Closing, and any third party claim initiated following the Closing arising out of any event that occurred at or prior to the Closing (a "Liability Claim").

7.2     Indemnification by the Buyer.  Subject in all respects to the provisions of this Article 7, the Buyer hereby agrees to indemnify and hold harmless the Seller and its officers, directors, employees, agents and representatives after the Closing Date from and against any Claims and Damages incurred by them arising out of or resulting from any breach on the part of the Buyer of (i) any representation or warranty made by the Buyer in Article 3 hereof or in any certificate delivered pursuant to this Agreement or (ii) any covenant or agreement made by the Buyer in this Agreement, (iii) any claims against the Seller arising out of the conduct of the business of the Buyer following the Closing.

7.3     Limitations on Indemnification Claims and Liability.

(a)     The respective representations and warranties of the Seller Parties and the Buyer set forth in this Agreement or in any certificate delivered pursuant to this Agreement, and the opportunity to make a claim for indemnification, or otherwise be indemnified or held harmless, under this Article 7 with respect thereto or with respect to (i) any covenant or agreement relating to any action required by this Agreement to be taken prior to or at the Closing or (ii) any Liability Claim shall survive until a final, unappealable order is entered with respect to such Liability Claim and indemnification is made by the Seller as provided herein; provided, however, that any claim based on a breached representation or warranty is made prior to the third anniversary of the Closing.  Any and all covenants and agreements relating to any action required by this Agreement to be taken after the Closing shall survive the Closing for the

{M1439739_14}

32

applicable period of the statutes of limitations and shall not expire with, and be terminated and extinguished upon, the Closing.

(b)     The Seller Parties shall not be obligated to indemnify or hold harmless any Indemnified Party under Section 7.1 (i) for any Claims or Damages incurred by such Indemnified Party in connection with any individual occurrence or related series of occurrences unless and until Claims or Damages in respect of the indemnification obligations of the Seller Parties under Section 7.1 exceed in the aggregate $10,000, together with the indemnification obligations of the Seller Parties under Section 7.1 of the Rights Agreement, following which the Seller Parties shall be obligated to indemnify or hold harmless an Indemnified Party for all Claims or Damages.

(c)     Notwithstanding anything to the contrary in this Agreement, the indemnifications in Sections 7.1 and 7.2 hereof will be the sole and exclusive remedies available to the Buyer or the Seller Parties, or any of their respective Affiliates, officers, directors, employees, agents or representatives, after the Closing for breaches of any representations or warranties in this Agreement, or any certificate delivered pursuant to this Agreement.  Any claim for indemnification must be made as provided in Sections 7.5 and 7.6 hereof.

(d)     Once a claim for indemnification has been made under this Article 7, each Indemnified Party may, as one of its remedies to effect indemnification under this Article 7, withhold or cause to be withheld and setoff any amounts payable (under this Agreement or otherwise) following the Closing to the Indemnifying Party.  The right to setoff will be exercisable whether the claim for indemnification is liquidated or unliquidated, whether or not the claim for indemnification has been reduced to judgment, and regardless of any difficulty or uncertainty in determining or computing the ultimate amount of the indemnification claim. The exercise of a right of setoff in good faith, whether or not ultimately deemed to be justified, will not constitute a default of any obligation against which such setoff is made.  Any amount withheld by an Indemnified Party in setoff and which is ultimately determined not to be payable by the Indemnifying Party will be promptly paid to the Indemnifying Party.

7.4     Computation of Claims and Damages.  Whenever an Indemnifying Party is required to indemnify and hold harmless an Indemnified Party from and against and hold the Indemnified Party harmless from, or to reimburse the Indemnified Party for, any item of Claim or Damage under this Agreement, the Indemnifying Party will, subject to the provisions of this Article 7, pay the Indemnified Party the amount of the Claim or Damage reduced by (i) any amounts to which the Indemnified Party actually recovers from third parties in connection with such Claim or Damage ("Reimbursements"), and reduced by (ii) the Net Proceeds of any insurance policy payable to the Indemnified Party with respect to such Claim or Damage.  For purposes of this Section 7.4, "Net Proceeds" shall mean the insurance proceeds actually paid, less any deductibles, co-payments' premium increases, retroactive premiums or other payment obligations (including attorneys' fees and other costs of collection) that relates to or arises from the making of the claim for indemnification.  If any Indemnified Party receives any Reimbursement or Net Proceeds after an indemnification payment is made which relates thereto, the Indemnified Party shall promptly repay to the Indemnifying Party such amount of the indemnification payment as would not have been paid had the Reimbursement or Net Proceeds reduced the original payment (and any such repayment shall be a credit against any applicable

indemnification threshold or limitation set forth in Section 7.3(b) hereof) at such time or times as and to the extent that such Reimbursement or Net Proceeds is actually received.  The Indemnified Party shall make available to the Indemnifying Party and its agents and representatives all pertinent records, materials and information, and provide reasonable access during normal business hours to the Indemnified Party's employees, properties, books and records, and shall otherwise cooperate with and assist the Indemnifying Party and its agents and representatives in reviewing the propriety and the amount of any Claims or Damages, including, without limitation, the availability and/or amounts of Reimbursements and Net Proceeds.

7.5     Notice of Claims.  Upon obtaining actual knowledge of any Claim or Damage which has given rise to, or could reasonably give rise to, a claim for indemnification hereunder, the party seeking indemnification (the "Indemnified Party") shall, as promptly as reasonably practicable (but in no event later than 30 days) following the date the Indemnified Party has obtained such knowledge, give written notice (a "Notice of Claim") of such claim to the  party or parties from which indemnification is or will be sought under this Article 7 (the "Indemnifying Party").  The Indemnified Party shall furnish to the Indemnifying Party in good faith and in reasonable detail such information as the Indemnified Party may have with respect to such indemnification claim (including copies of any summons, complaint or other pleading which may have been served on it and any written claim, demand, invoice, billing or other document evidencing or asserting the same).  No failure or delay by the Indemnified Party in the performance of the foregoing shall reduce or otherwise affect the obligation of the Indemnifying Party to indemnify and hold the Indemnified Party harmless, except to the extent that such failure or delay shall have materially adversely affected the Indemnifying Party's ability to defend against, settle or satisfy any liability, damage, loss, claim or demand for which such Indemnified Party is entitled to indemnification hereunder.

7.6     Intentionally omitted.

7.7     Liability for Taxes.

(a)     The Seller shall be liable for and shall indemnify the Buyer, for (i) all Taxes (as defined below) imposed on the Seller, or for which the Seller may otherwise be liable, for any taxable year or period that ends on or before the Closing Date ("Pre-Closing Tax Periods") and, with respect to any portion of a taxable year or period beginning before and ending after the Closing Date ("Straddle Period"), the portion of such Straddle Period ending on and including the Closing Date, and (ii) all liabilities imposed on the Seller on or before the Closing Date under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law) for Taxes of the Seller or any other corporation which is affiliated with the Seller (other than the Seller).

(b)     For purposes of this Section 7.7, whenever it is necessary to determine the liability for Taxes of the Seller for a portion of a Straddle Period:

(i)     real, personal and intangible property Taxes ("Property Taxes") for the Pre-Closing Tax Period shall be equal to the amount of such Property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of

[1.3.1] [Stock Purchase Agreement - Master.pdf] [Page 38 of 425]

days during the Straddle Period that are in the Pre-Closing Tax Period and the denominator of which is the number of days in the Straddle Period; and

(ii)    all other Taxes for the Pre-Closing Tax Period shall be determined by assuming that the Sellers had a taxable year or period that ended at the close of the Closing Date.

7.8     Adjustment to Purchase Price. The Buyer and the Seller agree to report any indemnification payment made by the Seller under Section 7.7 as an adjustment to the Purchase Price, or other non-taxable amount to the extent that there is substantial authority for such reporting position under applicable law.

7.9     Transfer and Conveyance Taxes. The Seller shall be liable for and shall pay all applicable sales, transfer, recording, deed, stamp and other similar taxes resulting from the consummation of the transactions contemplated by this Agreement.

7.10     Survival.  Claims for indemnification under this Agreement based on breached representations or warranties shall survive until the third anniversary of the Closing and other claims for indemnification under this Agreement shall survive until the expiration of the applicable statute of the limitations (including any extensions or waivers of such statutes).

Article 8.     Definitions.

Unless otherwise stated in this Agreement, the following capitalized terms have the following meanings:

"Action" means any action, suit, claim, arbitration, or proceeding or investigation commenced by or pending before any Governmental Authority.

"Adjustment" has the meaning set forth in Section 1.4 hereof.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such specified Person.

"Agreement" or "this Agreement" means this Purchase Agreement dated as of the date first above written (including the Annexes, Schedules and Exhibits hereto) and all amendments hereto made in accordance with the provisions of Section 9.17 hereof.

"Annual Financial Statements" has the meaning set forth in Section 2.6(a) hereof.

"Assumed Liabilities" has the meaning set forth in Section 1.3 hereof.

"Business" has the meaning set forth in the Recitals hereto.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of Tampa, Florida.

{M1439739_14}

35

"Buyer" has the meaning specified in the introductory paragraph to this Agreement.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980.

"Claims and Damages" means, except as otherwise expressly provided in this Agreement, any and all losses, claims, demands, liabilities, obligations, actions, suits, orders, statutory or regulatory compliance requirements, environmental response costs, including without limitation costs to investigate, remediate and effect closure, or proceedings asserted by any Person (including, without limitation, Governmental Authorities), and all damages, costs, contractor and laboratory costs, expenses, assessments, judgments, recoveries and deficiencies, including, to the extent required pursuant to Article 8, reasonable attorneys', experts' and paralegals' fees and costs, whether prior to the filing of proceedings, during proceedings and through all appellate levels, incurred by or awarded against a party to the extent indemnified in accordance with Article 7 hereof, but shall not include any consequential, special, multiple, punitive or exemplary damages, except to the extent such damages have been recovered by a third party and are the subject of a third party claim for which indemnification is available under the express terms of Article 7 hereof.

"Closing" has the meaning set forth in Section 1.6 hereof.

"Closing Cash Payment" has the meaning set forth in Section 1.3 hereof.

"Closing Date" has the meaning set forth in Section 1.6 hereof.

"Closing Statement" has the meaning set forth in Section 1.4 hereof.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means that certain Standard Buyer's Confidentiality and Warranty Agreement dated August 22, 2005 signed by Equitable Capital Management LLP.

"Control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly, of the power to direct or to cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.

"December 31, 2005 Balance Sheet" means the balance sheet contained in and that is part of the Interim Financial Statements.

"Employee Benefit Plans" means all "employee benefit plans" within the meaning of Section 3(3) of ERISA, all bonus, stock option, stock purchase, incentive, deferred compensation, retirement, supplemental retirement, severance and other employee benefit plans, programs, policies or arrangements, and all employment, retention, change of control or compensation agreements, in each case for the benefit of, or relating to, any current employee or

former employee of the Seller, other than any de minimis, fringe or unwritten benefit plans, programs, policies or arrangements, the costs of which, to the Seller, are not material.

"Encumbrance" means any security interest, pledge, mortgage, lien (including, without limitation, tax liens), charge, encumbrance, easement, adverse claim, preferential arrangement, restriction or defect in title.

"Environmental Claims" means any and all actions, suits, demands, demand letters, claims, liens, notices of non-compliance or violation, investigations, proceedings, consent orders or consent agreements relating in any way to any Environmental Law, any Environmental Permit, Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment, including, without limitation (a) by Governmental Authorities for investigation, closure, enforcement, cleanup, removal, response, remedial or other actions or damages and (b) by any Person for damages, contributions, indemnification, cost recovery, compensation or injunctive relief.

"Environmental Law" means any Law relating to the environment, health, safety or Hazardous Materials, in force and effect on the date hereof or, in the case of the Seller Parties' certificate to be delivered in accordance with the provisions of Section 5.3 hereof, on the Closing Date (exclusive of any amendments or changes to such Law or any regulations promulgated thereunder or orders, decrees or judgments issued pursuant thereto which are enacted, promulgated or issued after the date hereof, or in the case of such certificate, on or after the Closing Date), including but not limited to, CERCLA; the Resource Conservation and Recovery Act of 1986 and Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. (S)(S)6901 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. (S)(S)6901 et seq.; the Clean Water Act, 33 U.S.C. (S)(S)1251 et seq.; the Toxic Substances Control Act of 1976, 15 U.S.C. (S)(S)2601 et seq.; the Clean Air Act of 1966, as amended, 42 U.S.C. (S)(S)7401 et seq.; the Safe Drinking Water Act, 42 U.S.C. (S)(S)300f et seq.; the Atomic Energy Act, 42 U.S.C. (S)(S)2011 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. (S)(S)136 et seq.; and the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. (S)(S)1101 et seq.

"Environmental Permits" means all permits, approvals, identification numbers, licenses and other authorizations required under any applicable Environmental Law.

"Equipment" means all of the tangible personal property, machinery, equipment, vehicles, rolling stock, furniture, and fixtures in which the Seller has an interest, by ownership or lease, together with any replacements thereof, or additions thereto made in the ordinary course of business between the date hereof and the Closing Date.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" has the meaning set forth in Section 1.3 hereof.

"Escrow Agreement" has the meaning set forth in Section 1.3 hereof.

"Estimated Adjustment" has the meaning set forth in Section 1.3 hereof.

"GAAP" means United States generally accepted accounting principles and practices as in effect from time to time.

"Governmental Authority" means any United States federal, state or local government or any foreign government, any governmental, regulatory, legislative, executive or administrative authority, agency or commission or any court, tribunal, or judicial body.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.  Governmental Orders shall not include Permits.

"Hazardous Materials" means petroleum and petroleum products, byproducts or breakdown products, asbestos or asbestos containing material, polychlorinated biphenyls ("pcbs"), chlorinated solvents, radioactive materials, and any other chemicals, materials, or substances designated, classified or regulated as being "hazardous" or "toxic", or words of similar import, under any Environmental Law, without taking into account any minimum or threshold amounts specified in such Laws.

"Indebtedness" means obligations with regard to borrowed money and leases classified or accounted for as capital or financing leases on financial statements, but shall expressly not include either accounts payable or accrued liabilities that are incurred in the ordinary course of business or obligations under operating leases classified or accounted for as such on financial statements.

"Indemnified Party" has the meaning set forth in Section 7.5 hereof.

"Indemnifying Party" has the meaning set forth in Section 7.5 hereof.

"Interim Financial Statements" has the meaning set forth in Section 2.6(b) hereof.

"Intellectual Property Rights" include but are not limited to the items listed on Exhibit A to the Rights Agreement and all of the patents, applications, trademarks, copyrights, know-how, droit moral, show-how, mask work, proprietary innovations and inventions, methods or techniques, likenesses or other intellectual property held by the Sellers or any of their Affiliates and used or useful, directly or indirectly, in the Business and any other matters within the scope of business of the Company whether or not reduced to writing.

"Knowledge" with respect to a party means such information as any of its officers or key employees actually knew or should with the exercise of due diligence have known.

"Law" means any federal, state, local or foreign constitution, statute, law, ordinance, regulation, rule, code, injunction, judgment, order, decree or other requirement, restriction or rule of law.

"Liability Claim" has the meaning set forth in Section 7.1 hereof.

"Material Adverse Effect" means any circumstance, change in, or effect on the Seller that has a material adverse effect on the business, results of operations, condition (financial or otherwise), or prospects of the Seller.

"Material Contracts" means the written agreements, contracts, policies, plans, mortgages, understandings, arrangements or commitments to which the Seller is a party or by which any of the assets of the Seller and used in the Business are bound as described below: (i) any agreement or contract providing for payments by the Seller to any Person in excess of $50,000 per year or $100,000 in the aggregate over the five-year period commencing on the date hereof; (ii) any employment agreement or consulting agreement or similar contract; (iii) any retention or severance agreement or contract; (iv) any lease of Equipment or Real Property or license with respect to Intellectual Property Rights (v) any joint venture, partnership or similar agreement or contract of the Seller; (vi) any agreement or contract under which the Seller has borrowed or loaned any money in excess of $100,000 or issued or received any note, bond, indenture or other evidence of indebtedness in excess of $10,000 or directly or indirectly guaranteed indebtedness, liabilities or obligations of others in an amount in excess of $10,000; (vii) any covenant not to compete or contract or agreement, understanding, arrangement or any restriction whatsoever limiting in any respect the ability of the Seller to compete in any line of business or with any Person or in any area; (viii) any agreement or contract with any Seller Party or any Affiliate thereof or officer, director or employee of any Seller Party; and (ix) any of the contracts, agreements or arrangements, listed on Schedule 2.11.

"Net Asset Value" means the tangible assets of the Seller that are sold and transferred to the Buyer at the Closing and listed on a schedule of tangible assets as of Closing certified by Seller and Buyer, valued in accordance with GAAP, less the amount of the Assumed Liabilities.

"Neutral Auditor" has the meaning set forth in Section 1.4 hereof.

"Neutral Auditor Determination" has the meaning set forth in Section 1.4 hereof.

"Notice of Claim" has the meaning set forth in Section 7.5 hereof.

"Permits" has the meaning set forth in Section 2.12 hereof.

"Permitted Encumbrances" means the liens of Silver Falls Bank and the sublicenses of the Intellectual Property Rights set forth on Schedule 2.19 of the Rights Agreement.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"Pre-Closing Tax Period" has the meaning set forth in Section 7.7(a) hereof

"Proposed Adjustment" has the meaning set forth in Section 1.4 hereof.

"Purchased Assets" has the meaning set forth in Section 1.1 hereof.

[1.3.1] [Stock Purchase Agreement - Master.pdf] [Page 43 of 425]

"Purchase Price" has the meaning set forth in Section 1.3 hereof.

"Real Property" means the real property and related mineral rights owned by, and all easements, rights-of-way and other possessory interests in real estate of the Seller, together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of the Seller attached or appurtenant thereto, and all easements, licenses, rights and appurtenances relating to the foregoing.

"Regulatory Law" has the meaning set forth in Section 4.4(b).

"Release" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, emitting, escaping, emptying, seeping, placing and the like into or upon any land or water or air or otherwise entering into the environment.

"Required Consents" means the consents, approvals, orders, authorizations, registrations, declarations and filings required under or in relation to applicable law or any Material Contracts that are set forth on Schedule 2.3.

"Rights Agreement" has the meaning set forth in the Recitals hereto.

"Seller" has the meaning set forth in the Recitals hereof.

"Seller Parties" has the meaning set forth in the introductory paragraph of this Agreement.

"Sale" has the meaning set forth in the recitals hereto.

"SEC" means the Securities and Exchange Commission.

"Sellers" has the meaning set forth in the introductory paragraph to this Agreement.

"Straddle Period" has the meaning set forth in Section 7.7(a) hereof.

"Subsidiary" of any Person means (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation is owned by such Person directly or indirectly through Subsidiaries and (ii) any partnership, limited partnership, limited liability company, associates, joint venture or other entity in which such Person directly or indirectly through Subsidiaries has more than a 50% equity interest.

"Tax" or "Taxes" means any and all taxes, fees, withholdings, levies, duties, tariffs, imposts, and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto), fees, surcharges, contributions, or other payments and administrative or regulatory fees, imposed by any local, state, federal or foreign government or governmental agency or taxing authority, including, without limitation, taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers'

{M1439739_14}

40

compensation, unemployment compensation, or net worth, taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value added or gains taxes, license, registration and documentation fees, and customs duties, tariffs and similar charges.

"Tax Return" means any report, return, document, declaration or other information or filing required to be supplied to any Tax authority or jurisdiction (foreign or domestic) with respect to Taxes, including, without limitation, information returns, any documents with respect to or accompanying payments of estimated Taxes, or with respect to or accompanying requests for the extension of time in which to file any such report, return, document, declaration or other information.

"Union Employee" means an employee of the Seller whose terms and conditions of employment are governed by the terms of any collective bargaining agreement.

Article 9.       Miscellaneous Provisions.

    9.1       Termination Rights.

        (a)       Grounds for Termination.  This Agreement may be terminated:

            (i)       by mutual consent of the parties;

            (ii)       by the Seller if the Seller is ready, willing and able to close the transactions contemplated hereby and by the Rights Agreement on the Closing Date, the Seller Parties and  Traeger Industries, Inc. have not violated their representations, warranties or covenants herein or in the Rights Agreement and have satisfied the Closing conditions herein and in the Rights Agreement, and Buyer is not prepared to close on the Closing Date;

            (iii)       by the Buyer if the Seller is not ready, willing and able to close the transactions contemplated hereby and by the Rights Agreement on the Closing Date, or any of the Seller Parties or Traeger Industries, Inc. have violated their representations, warranties or covenants herein or in the Rights Agreement or have not satisfied the conditions to the Closing herein or in the Rights Agreement and the Buyer is prepared to close on the Closing Date;

            (iv)       by either the Seller or the Buyer, upon written notice to the other party or parties, if any Governmental Authority shall have issued a statute, rule, regulation, order, decree or injunction or taken any other action permanently restraining, enjoining or otherwise prohibiting the purchase and sale contemplated by this Agreement and such statute, rule, regulation, order, decree or injunction or other action shall have become final and nonappealable;

            (v)       by the Buyer, if there has been a breach of any representation or warranty of any of the Seller Parties set forth in this Agreement or if there has been a material breach by any of the Seller Parties of their covenants and agreements set forth in this Agreement; or

(vi)     by the Seller Parties, if there has been a breach of any representation or warranty of the Buyer set forth in this Agreement or if there has been a material breach by the Buyer of its covenants and agreements set forth in this Agreement.

(b)     Post-Termination Liability.  If this Agreement is terminated pursuant to Subsection 9.1(a) hereof, this Agreement shall thereupon become void and of no further effect whatsoever, and the parties shall be released and discharged of all obligations under this Agreement, except (i) to the extent of a Seller Party's liability for willful material breaches of this Agreement prior to the time of such termination, (ii) to the extent of the Deposit as provided in Section 1.4 of the Rights Agreement; (iii) as set forth in Section 4.5 hereof and (iv) the obligations of each party for its own expenses incurred in connection with the transactions contemplated by this Agreement as provided herein.

9.2     Expenses.  Except as otherwise specifically provided in this Agreement, all out-of-pocket costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Seller Parties other than the Seller on behalf of the Seller with respect to this Agreement and the Patent Assignment Agreement, on the one hand, and the Buyer on the other, whichever is the Party incurring such costs and expenses, whether or not the Closing shall have occurred.

9.3     Notices.  Any notice, demand, claim, notice of claim, request or communication required or permitted to be given under the provisions of this Agreement shall be in writing and shall be deemed to have been duly given (i) upon delivery if delivered in person, (ii) on the date of mailing if mailed by registered or certified mail, postage prepaid and return receipt requested, (iii) on the date of delivery to a national overnight courier service, or (iv) upon transmission by facsimile (if such transmission is confirmed by the addressee) if delivered through such services to the following addresses, or to such other address as any party may request by notifying in writing all of the other parties to this Agreement in accordance with this Section 9.3.

If to the Buyer:

> Traeger Pellet Grills LLC
> 601 North Ashley Drive, Suite 1200
> Tampa, Florida 33602
> Attn: Albert E. Strausser
> Telephone:  813-226-3900
> Facsimile:  813-226-3995

With a copy to:

> Adorno & Yoss LLP
> 2525 Ponce de Leon Blvd.
> Suite 400
> Coral Gables, FL  33134
> Attention: Seth P. Joseph, Esq.

{M1439739_14}

42

Telephone: (305) 460-1469
Facsimile:  (305) 328-4024

If to the Seller Parties:

Traeger Industries, Inc.
P.O. Box 1070
530 Alder Street
Mt. Angel, Oregon 97362
Attn:  Joe Traeger
Telephone:  (503) 845-6495
Facsimile:  (503) 845-6366

With a copy to:

Hooper, Englund & Weil LLP
1100 SW 6th Avenue, Suite 1507
Portland, Oregon 97204
Attn:  Gregory J. Englund
Telephone:  (503) 226-0500
Facsimile:  (503) 226-7192

Any such notice shall be deemed to have been received on the date of personal delivery, the date set forth on the Postal Service return receipt, or the date of delivery shown on the records of the overnight courier, as applicable.

9.4     Benefit and Assignment.  This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  There shall be no assignment of any interest under this Agreement by any party except that the Buyer may assign its rights hereunder to any wholly owned subsidiary of the Buyer or any purchaser of the Business, in whole or in part; provided, however, that no such assignment shall relieve the assignor of its obligations under this Agreement.  Nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement; provided that all of the obligations of Seller Parties hereunder shall be assignable by Buyer to any third party purchaser of the Business and such person is an intended beneficiary hereof.

9.5     Waiver.  Any party to this Agreement may (a) extend the time for the performance of any of the obligations or other acts of any other party, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered by any other party pursuant hereto or (c) waive compliance with any of the agreements or conditions of any other party contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition, of this Agreement.  The failure of any party to assert any of its rights hereunder shall not constitute a waiver of any such rights.

{M1439739_14}

43

9.6     Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

9.7     Amendment.  This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, the Seller Parties and the Buyer or (b) by a waiver in accordance with Section 9.5 hereof.

9.8     Effect and Construction of this Agreement.  This Agreement embodies the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior agreements, arrangements and understandings, whether written or oral, relating to matters provided for herein; provided, however, that the Confidentiality Agreement shall remain in effect until the Closing.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual agreement, and this Agreement shall not be deemed to have been prepared by any single party hereto.  The headings of the sections and subsections of this Agreement are inserted as a matter of convenience and for reference purposes only and in no respect define, limit or describe the scope of this Agreement or the intent of any section or subsection.  This Agreement may be executed in one or more counterparts and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Florida, applicable to contracts executed in and to be performed entirely within that State.  The parties agree that the exclusive venue for any dispute concerning the entitlement to the Deposit shall be the courts of  competent jurisdiction situated in Portland, Oregon and that the exclusive venue for any other dispute between the parties (except those arising from a third party claim) shall be Hillsborough County, Florida.

9.9     Specific Performance. Each of the Seller Parties acknowledge and agree that in the event of any breach of this Agreement, the Buyer would be irreparably and immediately harmed and could not be made whole by monetary damages.  It is accordingly agreed that the parties hereto (i) waive, in any action for specific performance, the defense of adequacy of a remedy at law and (ii) shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Traeger Pellet Grills LLC

By: _____

Name: Albert Strausser

Title: Managing Director of The Barish Fund LLC, as
Managing Member of Traeger Pellet Grills LLC

Traeger Brothers, Inc.

By: _____

Name: JOSEPH P. TRAEGER

Title: President.

The Joe Traeger Charitable Trust

By: _____

Name: TONY SMITH

Title: Special Independent Trustee

The Randy Traeger Charitable Trust

By: _____

Name: TONY SMITH

Title: Special Independent Trustee

The Mark Traeger Charitable Trust

By: _____

Name: TONY SMITH

Title: Special Independent Trustee

{M1439739_14}

45

_____
Joe Traeger

_____
Brian Traeger

_____
Mark Traeger

_____
Randy Traeger

# EXHIBIT 6

**EXECUTION COPY**

# INTELLECTUAL PROPERTY RIGHTS
## ASSIGNMENT AGREEMENT

This INTELLECTUAL PROPERTY RIGHTS ASSIGNMENT AGREEMENT (this "Agreement") made as of February 21st, 2006, by and among Traeger Pellet Grills LLC, a limited liability company under the laws of the State of Florida ("Buyer"), Joe Traeger, an individual residing at P.O. Box 1070, 255 Alder Street, Mt. Angel, Oregon 97362 ("Joe Traeger") Brian Traeger, an individual residing at 405 Cindy Lane, Mt. Angel, Oregon 97362 ("Brian Traeger"), Mark Traeger an individual residing at P.O. Box 308, 260 S. Oak Street, Mt. Angel, Oregon 97362 ("Mark Traeger"), Randy Traeger, an individual residing at 530 Alder Street, Mt. Angel, Oregon 97362 ("Randy Traeger") (Joe Traeger, Brian Traeger, Mark Traeger, and Randy Traeger are referred to collectively as the "Sellers").

W I T N E S S E T H :

WHEREAS, the Sellers are the record and beneficial owners of all of the Intellectual Property Rights, as hereinafter defined;

WHEREAS, the Intellectual Property Rights are used or useful in the conduct of the business of design, assembly, warehousing, manufacture, marketing, sale and distribution of wood pellet grills and smokers, wood pellet BBQs, camp stoves, other cooking devices using wood pellets, and flavored and/or BBQ wood pellets and related products and accessories for the foregoing (the "Business"); and

WHEREAS, the Buyer has simultaneously with the execution hereof, entered into an Asset Purchase Agreement, dated of even date herewith, with Traeger Industries, Inc., a corporation organized and existing under the laws of the State of Oregon (the "Company"), the Sellers and their Affiliates (the "Asset Purchase Agreement") to purchase the assets of the Company; and

WHEREAS, the Sellers desire to sell and assign to the Buyer all of the Intellectual Property Rights and the Buyer desires to purchase from the Sellers at the Closing all of the then Intellectual Property Rights, in each case upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties, intending legally to be bound, agree as follows:

[A list of defined terms is provided in Article 8 hereof]

Article 1.     Purchase and Sale

1.1     General.  At the Closing (as defined in Section 1.5 hereof), and subject to the terms and conditions of this Agreement, the Sellers agree to sell, assign, convey and deliver to

{M1429618_15}

the Buyer, and the Buyer agrees to purchase, acquire and accept from the Sellers, all of Seller's right, title, and interest in and to the Intellectual Property Rights.

      1.2     Assignment of Rights.

      (a)     For good and valuable consideration, the sufficiency of which is hereby acknowledged, Sellers hereby agree to assign and transfer to Buyer all of their right, title and interest in and to the Intellectual Property Rights, and Buyer hereby agrees to accept such assignment (the "Assignment").

      (b)     On and after the Closing Date, Sellers shall, from time to time and promptly upon request by Buyer, in order to effect and perfect the Assignment contained herein or to enable Buyer to obtain the full benefits of this Agreement and the transactions contemplated hereby, (i) deliver to Buyer records, data or other documents relating to the Intellectual Property Rights that are in the possession of Sellers and its Affiliates or will be in the possession of Sellers and its Affiliates, (ii) execute and deliver assignments, licenses, consents, documents or further instruments of transfer, and (iii) take other actions, render other assistance and execute other documents as requested by Buyer. Sellers will also assist Buyer in filing and prosecuting United States and foreign patent, copyright and trademark applications claiming the Intellectual Property Rights.

      (c)     Buyer, in the exercise of its sole discretion, may add to, subtract from, arrange, rearrange, revise, abandon, adapt and translate all or any part of the Intellectual Property Rights, and/or combine the Intellectual Property Rights with any other work by any other person(s); and/or change or substitute the title of the Intellectual Property Rights. Sellers hereby waives any so-called "droit moral" or "moral rights of authors" or any similar rights in and/or to the Intellectual Property Rights. Sellers shall not institute, support, maintain or permit any action or lawsuit on the ground that any version of the Intellectual Property Rights, or any part thereof, as produced, used, exhibited, abandoned, enforced or not enforced or exploited by or on behalf of Buyer in any manner whatsoever (i) constitutes a violation of any of Sellers' "moral rights" or other rights in any country of the world, (ii) defames or mutilates the Intellectual Property Rights or any part thereof, (iii) contains unauthorized variations, alterations, modifications, changes or translations or (iv) defames or injures any of the Sellers in any manner.

      1.3     Delivery of Assignments.  At the Closing, and subject to the terms and conditions of this Agreement, the Sellers shall deliver to the Buyer in form and substance satisfactory to the Buyer assignments of the Intellectual Property Rights to be filed as applicable, with the domestic and foreign patent and trademark offices, and such other instruments as shall reasonably be required to transfer to the Buyer all right, title and interest in and to the Intellectual Property Rights, free and clear of any Encumbrances.

      1.4     Purchase Price; Payment.

      (a)     The consideration for the sale of the Intellectual Property Rights shall be the aggregate of :

      (i)     No later than 5:00 p.m., Tampa, Florida time on the first Business Day following the execution and delivery hereof by all parties hereto, the Buyer shall

deliver to the Escrow Agent a deposit of cash in an amount equal $2,000,000.00 (Two Million Dollars) (the "Deposit").  The parties agree that the Sellers shall have the right to draw on the Deposit and retain the proceeds thereof if (A) the Sellers are ready, willing and able to close the transactions contemplated hereby and by the Asset Purchase Agreement on the Closing Date, the Sellers and Traeger Industries, Inc. have not violated their representations, warranties or covenants herein or in the Asset Purchase Agreement and have satisfied the Closing conditions herein and in the Asset Purchase Agreement, and Buyer is not prepared to close or (B) the Closing occurs. In the event that the Sellers are not ready, willing and able to close the transactions contemplated hereby and by the Asset Purchase Agreement on the Closing Date, or the Sellers or Traeger Industries, Inc. have violated their representations, warranties or covenants herein or in the Asset Purchase Agreement or have not satisfied the conditions to the Closing herein or in the Asset Purchase Agreement and the Buyer is prepared to close, then the Deposit shall be returned to the Buyer.

(ii)     $9,000,000.00 (Nine Million Dollars) (the "Cash Payment"), less the amount of the Deposit referred to in clause (i) above and interest thereon, payable by certified or bank check, or by wire transfer at the Closing to the Sellers pro rata in accordance with Annex I hereto.

(iii)     As additional consideration for the Sellers under the terms of this Agreement, Sellers shall receive, pro rata in accordance with their interests as set forth on Annex I hereto, during the period hereafter set forth, a contingent amount calculated as follows:

(A)     The contingent amount will be calculated each calendar year, during the three years ending December 31, 2008.  The maximum aggregate amount to be paid to Sellers during  the three years, shall be $2,000,000.00 (Two Million Dollars), calculated each year and payable thirty (30) days after completion of the audited financial statements of the Buyer for the respective calendar year (but in no event later than 120 days after such December 31).

(B)     Each of the three years ending December 31, 2008 a calculation shall be made:

(I) For the year ending December 31, 2006, the contingent amount of $666,666 (Six Hundred Sixty Six Thousand Six Hundred Sixty Six Dollars) will be paid if but only if the Buyer achieves EBITDA of $4,100,000 (Four Million One Hundred Thousand Dollars) during the year ending December 31, 2006. In the event the Buyer achieves EBITDA of less than $4,100,000.00 (Four Million One Hundred Thousand Dollars) but more than $3,433,334.00 (Three Million Four Hundred Thirty Three Thousand Three Hundred Thirty Four Dollars), then the contingent amount payable in respect of 2006 shall be amount of EBITDA earned during 2006 in excess of $3,433,334.00 (Three Million

Four Hundred Thirty Three Thousand Three Hundred Thirty Four Dollars).

(II)  For the year ending December 31, 2007, the contingent amount of $666,667 (Six Hundred Sixty Six Thousand Six Hundred Sixty Seven Dollars) will be paid if the Buyer achieves net sales of at least $22,000,000.00 (Twenty Two Million Dollars) and EBITDA of at least $4,300,000 (Four Million Three Hundred Thousand Dollars) during the year ending December 31, 2007.  In the event that for the year ended December 31, 2007 Buyer achieves net sales of at least $22,000,000.00 (Twenty Two Million Dollars) and EBITDA of more than $3,633,333.00 (Three Million Six Hundred Thirty Three Thousand Three Hundred Thirty Three Dollars) but less than $4,300,000.00 (Four Million Three Hundred Thousand Dollars), then the contingent amount payable in respect of 2007 shall be the amount of EBITDA earned during 2007 in excess of $3,633,333.00 (Three Million Six Hundred Thirty Three Thousand Three Hundred Thirty Three Dollars).

(III)  For the year ending December 31, 2008, the contingent amount of $666,667 (Six Hundred Sixty Six Thousand Six Hundred Sixty Seven Dollars) will be paid if but only if the Buyer achieves net sales of $27,400,000.00 (Twenty Seven Million Four Hundred Thousand Dollars) and EBITDA of at least $4,300,000 (Four Million Three Hundred Thousand Dollars) during the year ending December 31, 2008.  In the event that for the year ended December 31, 2008 Buyer achieves net sales of at least $27,400,000.00 (Twenty Seven Million Four Hundred Thousand Dollars) and EBITDA of more than $3,633,333.00 (Three Million Six Hundred Thirty Three Thousand Three Hundred Thirty Three Dollars) but less than $4,300,000.00 (Four Million Three Hundred Thousand Dollars), then the contingent amount payable in respect of 2008 shall be the amount of EBITDA earned during 2008 in excess of $3,633,333.00 (Three Million Six Hundred Thirty Three Thousand Three Hundred Thirty Three Dollars).

(IV)  To the extent the Buyer earns more EBITDA during 2007 or 2008 than $4,300,000.00 (Four Million Three Hundred Thousand Dollars) and generates net sales of at least $22,000,000.00 (Twenty Two Million Dollars) during 2007 or $27,400,000.00 (Twenty Seven Million Four Hundred Thousand Dollars) during 2008, as applicable, and the maximum contingent amount in one or more prior years was not earned by the Sellers, then an additional amount will be payable in respect of 2007 and/or 2008, as applicable, up to the amount of the remaining shortfall from prior years to the extent the EBITDA exceeds

$4,300,000.00 (Four Million Three Hundred Thousand Dollars) for such 2007 or 2008 year.

(iv)     Upon a Change in Control, the persons listed in Annex II shall be entitled, as their interests may appear, to an aggregate amount equal to three percent of the following sum, when, as and if received:  (a) the enterprise value of Buyer; (b) less all liabilities of the Buyer not assumed by such purchaser; and (d) less all costs of such transaction.

(b)     All amounts calculated hereunder shall be performed by the independent certified public accountants of the Buyer which shall be final and binding in the absence of fraud or manifest error.

(c)     Prior to the Closing, each Seller shall provide Buyer with a completed IRS Form W-9.  Failure by a Seller to provide Buyer with the requisite document will result in the Buyer withholding of 30% of gross amount due to such noncompliant Seller and reporting such amount as provided in the Internal Revenue Code and the Treasury Regulations promulgated thereunder.

1.5     Closing and Closing Date.  Unless this Agreement shall have been terminated and the transactions herein contemplated shall have been terminated pursuant to Section 9.1 hereof, and subject to the satisfaction of the conditions precedent contained herein, the closing (the "Closing") of the transactions herein contemplated shall take place on April 30, 2006, or at such other time and date prior to April 30, 2006 as the Sellers and the Buyer shall agree (such time and date being referred to herein as the "Closing Date"), at the offices of Adorno & Yoss, Suite 400, 2525 Ponce de Leon Blvd., Miami, Florida 33134, or at such other place as the Sellers and the Buyer shall agree. At the Closing, each of the parties hereto shall take, or cause to be taken, all such actions and deliver, or cause to be delivered, all such documents, instruments, certificates and other items as may be required under this Agreement or otherwise, in order to perform or fulfill all covenants and agreements on its part to be performed at or prior to the Closing Date.

1.6     Taking of Necessary Action; Further Action.  Each of the parties shall use its respective reasonable best efforts to take all such action as may be necessary or appropriate in order to duly and timely effectuate the Closing. If, on or at any time after the Closing Date, any further reasonable action is necessary or desirable to carry out the purposes of this Agreement and to vest the Buyer with full right, title and possession to all of the Intellectual Property Rights, the Sellers shall take, and shall ensure that the officers of the Sellers are fully authorized, in the name of the Sellers or otherwise, to take, and shall take, all such lawful and necessary action.

Article 2.     Representations and Warranties of the Sellers.

The Sellers jointly and severally represent and warrant to the Buyer as follows:

2.1     Standing.  Each of the Sellers have all requisite power and authority to enter into this Agreement, to execute and deliver this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The Sellers are of the age of majority, and are sui juris.

{M1429618_15}                                         5

2.2     Binding Agreement.  This Agreement has been duly executed and delivered on behalf of the Sellers and, assuming the due authorization, execution and delivery by the Buyer, constitutes a legal, valid and binding obligation of each of the Sellers enforceable in accordance with its terms.  None of the spouses of the Sellers have community property, dower or similar rights that in any way restrict the Sellers from delivery and performance of the transactions contemplated hereby free and clear of any such rights.

2.3     Absence of Violations or Required Consents.  The execution, delivery and performance by the Sellers of this Agreement do not and will not (a) violate any Law or Governmental Order applicable to any of the Company or the Sellers or any of their respective properties or assets, (b) require any consent, approval, authorization or other order of, action by, registration or filing with or declaration or notification to any Governmental Authority or any other Person or (c) result in any violation or breach of, constitute a default (or event which with the giving of notice, or lapse of time or both, would become a default) under, require any consent under, or give to others any rights of notice, termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any Encumbrance on any of the Company's or the Sellers respective assets, or result in the imposition or acceleration of any payment, time of payment, vesting or increase in the amount of compensation or benefit payable, pursuant to, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license or permit, or franchise to which any of the Company or the Sellers is a party or by which their respective assets are bound.  None of the Company nor the Sellers needs to give any notice to, make any filing with or obtain any authorization, consent or approval of any Government Entity in order for the parties to consummate the transactions contemplated by this Agreement.

2.4     Ownership of Intellectual Property Rights.

(a)     The Sellers are the record and/or beneficial owner of all of the Intellectual Property Rights, free and clear of any Encumbrances other than the Permitted Encumbrances and subject to no licenses or restriction on use other than as set forth on Schedule 2.4(a) hereto.

(b)     The Intellectual Property Rights include but are not limited to the items listed on Exhibit A hereto, and all of the patents, trademarks, copyrights, know-how, droit moral, show-how, mask work, proprietary innovations and inventions, methods or techniques or other intellectual property held by the Sellers or any of their Affiliates and used or useful, directly or indirectly, in the Business and any other matters within the scope of business of the Company whether or not reduced to writing.  There are no US or unpublished foreign filings owned or controlled by any of the Sellers or their Affiliates filed as of the date hereof or as of the Closing Date other than those listed on Exhibit A nor do any of the Sellers or their Affiliates have any present intentions to make any such filings.  If any of the Sellers or their Affiliates (including the Company) become aware of any Intellectual Property Rights prior to the Closing that are not set forth in writing they shall promptly notify the Buyer and cause such Exhibit A to be modified to include such additional Intellectual Property Rights.

(c)     This Agreement and the assignments made pursuant hereto (i) effectively convey all of the rights of the Sellers with respect to the Intellectual Property Rights, including but not limited to any claims by any of the Sellers or their affiliates against the Company and (ii)

includes all Intellectual Property Rights necessary to conduct the Business so currently conducted.

2.5     Title to Assets; Related Matters. (i) The Sellers have good, valid and marketable title to, the Intellectual Property Rights free and clear of all Encumbrances, and (ii) there are no contractual or legal restrictions to which any of the Sellers is a party or by which any Intellectual Property Rights is otherwise bound that preclude or restrict the Company's ability or subsequent to the Closing would restrict in any manner the Buyer's ability, to use the Intellectual Property Rights, other than as specified on Schedule 2.4(a) hereto. The Company enjoys peaceful and undisturbed possession of all Intellectual Property Rights. None of the Intellectual Property Rights are subject to any commitment or other arrangement for their sale or use by any Seller, their Affiliates or third parties.

2.6     Intellectual Property.

(a)     All of the Intellectual Property Rights are valid and subsisting and will provide the Buyer right to exclude all others from the use thereof and the Sellers are not, nor as a result of the execution and delivery of this Agreement or the performance by Sellers of their obligations hereunder will be to the best of Sellers' knowledge with reasonable diligence, in violation of the rights of any other parties. The Sellers own all right, title and interest to the Intellectual Property Rights and this Agreement, sufficient to vest in the Buyer all right, title and interest to the Intellectual Property Rights used in the Business without any further cost therefor as it exists as of the date hereof. Except as disclosed in Schedule 2.6(a), there have been no claims made against any of the Sellers or threatened or, to the knowledge of the Sellers, likely to be threatened by any Person, asserting the invalidity, misuse or unenforceability of any Intellectual Property Rights, or challenging the ownership, validity or effectiveness of any of the Intellectual Property Rights, or claiming that the Intellectual Property Rights or Sellers conduct of the Business infringes on any rights of any other Persons.

(b)     No Intellectual Property Right is subject to any Encumbrance and there is no fact that would render the Intellectual Property Rights invalid. No Intellectual Property Right is subject to any outstanding order, judgment, decree, stipulation or agreement restricting in any manner the licensing or exploitation thereof by the Sellers. The Sellers have not entered into any agreement to indemnify any other person against any charge of infringement, invalidity or any other claim relating to any Intellectual Property Right.

2.7     Commissions. With the exception of any responsibility that the Buyer has to PAC West Resources Group, whose fees will be paid by the Buyer, and any responsibility that the Sellers may have to Equity Management Group LLC, which will be paid by the Sellers, there is no broker or finder or other Person who has any valid claim against either of the Company, the Buyer, any of their respective Affiliates or any of their respective assets for a commission, finders' fee, brokerage fee or other similar fee in connection with this Agreement, or the transactions contemplated hereby, by virtue of any actions taken by on or behalf of the Sellers, or any of their respective Affiliates, officers, employees, independent contractors or agents.

2.8     Disclosure. No representation or warranty by the Sellers contained in this Agreement nor any statement or certificate furnished or to be furnished by or on behalf of the

Sellers or its representatives in connection herewith or pursuant hereto contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to make the statements contained herein or therein not misleading.  There is no fact known to the Sellers that has not been disclosed by the Sellers or the Company to the Buyer that might reasonably be expected to have or result in a material adverse effect on the ownership or the exploitation of the Intellectual Property Rights.

Article 3.        Representations and Warranties of the Buyer.

The Buyer represents and warrants to the Sellers as follows:

3.1        Organization and Standing.  The Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Florida and has all requisite corporate power and authority to own, lease and operate its properties and assets and to conduct its business as it is now being conducted.

3.2        Binding Agreement.  The Buyer has all requisite corporate power and authority to enter into this Agreement, to execute and deliver this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by the Buyer and the consummation by the Buyer of its obligations hereunder have been duly and validly authorized by all necessary corporate and member action on the part of the Buyer. This Agreement has been duly executed and delivered on behalf of the Buyer and, assuming the due authorization, execution and delivery by the Sellers, constitutes a legal, valid and binding obligation of the Buyer enforceable in accordance with its terms.

3.3        Absence of Violations or Required Consents.  The execution, delivery and performance by the Buyer of this Agreement does not and will not: (a) violate or result in the breach or default of any provision of the articles of organization or Limited Liability Company Agreement of the Buyer; (b) violate any Law or Governmental Order applicable to the Buyer or any of its properties or assets; (c) except for the Required Consents, require any consent, approval, authorization or other order of, action by, registration or filing with or declaration or notification to any Governmental Authority or any other Person; or (d) result in any violation or breach of, constitute a default (or event which with the giving of notice, or lapse of time or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any Encumbrance on any of the Buyer's assets pursuant to, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license or permit, or franchise to which the Buyer is a party or by which its assets are bound.

3.4        Litigation.  There are no Actions pending or threatened to be brought by or before any Governmental Authority, against the Buyer or any of its Affiliates that (i) seeks to question, delay or prevent the consummation of the transactions contemplated hereby, or (ii) would reasonably be expected to affect adversely the ability of the Buyer to fulfill its obligations hereunder, including without limitation, the Buyer's obligations under Article 1 hereof.

3.5        Commissions.  With the exception of any responsibility that the Buyer has to PAC West Resources Group, whose fees will be paid by the Buyer, and any responsibility that the

Sellers may have to Equity Management Group LLC, which will be paid by the Sellers. There is no broker or finder or other Person who has any valid claim against the Sellers, any of their respective Affiliates or any of their respective assets for a commission, finders' fee, brokerage fee or other similar fee in connection with this Agreement, or the transactions contemplated hereby, by virtue of any actions taken by on or behalf of the Buyer or its officers, employees or agents.

3.6     Disclosure. No representation or warranty by the Buyer contained in this Agreement nor any statement or certificate furnished or to be furnished by or on behalf of the Buyer or its representatives in connection herewith or pursuant hereto contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to make the statements contained herein or therein not misleading. There is no fact known to the Buyer that has not been disclosed by the Buyer to the Sellers that might reasonably be expected to have or result in a material adverse effect on the ownership or the exploitation of the Intellectual Property Rights.

Article 4.     Covenants and Agreements.

4.1     Conduct of the Sellers Prior to Closing; Access. The Sellers covenant as follows:

(a)     Between the date hereof and the Closing Date, except as contemplated by this Agreement, or except with the prior written consent of the Buyer, the Sellers:

(i)     will not permit any of the Intellectual Property Rights to be licensed or otherwise to be subjected to any Encumbrance;

(ii)     will not permit any of the Intellectual Property Rights to be sold, transferred, leased, subleased, licensed, encumbered or otherwise disposed of (including, without limitation, sales, transfers, leases, subleases, licenses or dispositions to any Affiliates of the Sellers;

(iii)     will immediately notify the Buyer of any publications, office actions, objections or interferences with respect to any filings; and

(iv)     will cooperate in the filing and execution of any and all documents necessary to effectuate the assignment to the Buyer of the Intellectual Property Rights, including the filing of assignments or other transfer of the title covenants with the U.S. Patent and Trademark Office and foreign patent offices as applicable to the Intellectual Property Rights. Prior to the Closing, Sellers will notify all attorneys handling the prosecution of the Intellectual Property Rights to continue such efforts for the benefit of the Buyer following the Closing and prior to the Closing to provide a status update on the Intellectual Property Rights and to prepare the documents necessary to transfer the Intellectual Property Rights to the Buyer. The cost of recording assignments of the Intellectual Property Rights will be borne by the Buyer. Not later than five business days to the Closing Date, the Sellers and their Affiliates will transfer all files and supporting documents relating to the Intellectual Property Rights to the Buyer, including but not limited to, all initial invention disclosure documents, all documents sent to the U.S. Patent and Trademark Office regarding inventions and claims, all draft patent applications, all filing or prosecution documents submitted to the patent offices, and all

file wrappers. Conception notebooks and all other documents in the possession or under the control of Sellers or their counsel relating to conception and/or reduction to practice, such as notebooks shall be obtained and made available to Buyer.

4.2     Cooperation. Following the execution of this Agreement, the Buyer and the Sellers agree as follows:

(a)     Subject to the terms and conditions of this Agreement, each party will use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable, including under applicable Laws and regulations, to consummate the Assignment and the other transactions contemplated by this Agreement on the Closing Date. In furtherance and not in limitation of the foregoing, each party hereto agrees to use its reasonable best effort to obtain as soon as practicable all other required consents from third parties.

(b)     As used in this Section 4.2, "reasonable best efforts" shall not require the Buyer or any of its Affiliates to divest or hold separate or otherwise take or commit to take any action that limits their freedom of action with respect to, or their ability to retain, any of their assets or businesses or the Business or assets or that limits their freedom of action with respect to their business or assets.

4.3     Confidentiality.

(a)     Prior to the Closing Date. The terms of the Confidentiality Agreement are herewith incorporated by reference and shall continue in full force and effect with respect to the Buyer until the Closing Date and shall remain in effect in accordance with its terms even if this Agreement is terminated.

(b)     After the Closing Date, the Sellers shall maintain the confidentiality of all information associated with the Intellectual Property Rights similar to those set forth in the Confidentiality Agreement with respect to "Information" as though such terms applied to the Sellers and continued after the Closing Date.

4.4     Public Announcements. Except as otherwise required by law or the rules of any stock exchange or automated quotation system, the parties shall not issue any report, statement or press release or otherwise make any public announcement with respect to this Agreement and the other transactions contemplated hereby without prior consultation with and approval of the other parties hereto (which approval shall not be unreasonably withheld); provided, that, the Buyer shall be entitled to disclose the acquisition of the Intellectual Property Rights after the Closing.

4.5     No Solicitation. The Sellers shall not (a) initiate contact with, solicit, encourage or respond to any inquiries or proposals by, or (b) enter into any discussions or negotiations with, or disclose, directly or indirectly, any information concerning the Intellectual Property Rights to, or afford any access to the Intellectual Property Rights, or to the books and records relating thereto, any Person in connection with any possible proposal for the acquisition (directly or indirectly), of all or any of the Intellectual Property Rights.

Article 5.    Conditions to Obligations of the Buyer.

The obligations of the Buyer to consummate the transactions contemplated by this Agreement are, at its option, in its sole discretion, subject to satisfaction of each of the following conditions:

5.1    Representations and Warranties.

(a)    The representations and warranties of the Sellers contained herein shall be true and correct in all material respects (other than those representations and warranties that are qualified by Material Adverse Effect and those described in clause (b) below, which shall be true and correct in all respects) at and as of the Closing Date as though each such representation and warranty were made at and as of such time, other than such representations and warranties as are made as of a specific date.

(b)    The representations and warranties of the Seller Parties contained in Sections 2.3, 2.4, 2.5, and 2.6, shall be true and correct in all respects at and as of the Closing Date.

5.2    Performance by the Sellers.  All of the covenants and agreements to be complied with and performed by the Sellers on or before the Closing Date shall have been complied with or performed in all material respects.

5.3    Certificate.  The Sellers shall have delivered to the Buyer a certificate, dated as of the Closing Date, executed on behalf of the Sellers to the effect of Sections 5.1 and 5.2.

5.4    Consents; No Objections.  All consents, waivers, approvals, orders and authorizations from third parties required to be made or obtained for the authorization, execution, delivery and performance of this Agreement, the consummation of the transactions contemplated hereby and the continuation in force of any rights, of the Intellectual Property Rights shall have been obtained and become final and non-appealable.  Neither any statute, rule, regulation, order, stipulation, decree, judgment, or injunction shall be enacted, promulgated, entered, enforced, or deemed application to the purchase nor any other action shall have been taken by any Government Entity (i) which prohibits the consummation of the transactions contemplated by this Agreement; (ii) which prohibits Buyer's ownership or operation of all or any portion of the Intellectual Property Rights, or which compels the Buyer to dispose of or hold separately all or any portion of the Buyer's business or assets as a result of the transaction contemplated herein; (iii) which makes the purchase of, or payment for, some or all of the Intellectual Property Rights illegal; or (iv) which imposes material limitations on the ability of the Buyer to acquire or hold or to exercise effectively all rights of ownership of the Intellectual Property Rights.

5.5    No Proceedings or Litigation.  There shall not have been instituted, pending or threatened any action or proceeding (or any investigation or other inquiry that might result in such an action or proceeding) by or before any Government Entity (i) which prohibits the consummation of the transactions contemplated by this Agreement; (ii) which prohibits Buyer's ownership or operation of any of the Intellectual Property Rights, or which compels the Buyer to dispose of or hold separately all or any portion of the Buyer's business or assets as a result of the transaction contemplated herein; (iii) which makes the purchase of, or payment for, any of the

Intellectual Property Rights illegal; (iv) which imposes limitations on the ability of the Buyer to acquire or hold or to exercise effectively all rights of ownership of any of the Intellectual Property Rights; or (v) which imposes any limitations on the ability of the Buyer effectively to control in any material respect the business or operations of the Company.  No preliminary or permanent injunction or other order issued by any United States federal or state Governmental Authority, nor any Law promulgated or enacted by any United States federal or state Governmental Authority, that restrains, enjoins or otherwise prohibits the transactions contemplated hereby or limits the ability in any respect of the rights of the Buyers to hold its assets and conduct its present, planned or prospective business, or imposes civil or criminal penalties on any stockholder, director or officer of the Buyer if such transactions are consummated, shall be in effect.

5.6     No Events.  Since the date hereof, there have not been any adverse circumstances, changes in or effects on the Intellectual Property Rights.

5.7     Asset Purchase Closing.  All conditions to the Closing of the Asset Purchase Agreement shall have been satisfied.

5.8     Opinion of Cousel.  Hooper, Englund & Weil LLP, counsel to the Sellers, shall have delivered to the Buyer an opinion letter, dated the date of the Closing in form and content acceptable to the Buyer, addressed to the Buyer and its lenders.

5.9     Miscellaneous.  The Sellers shall deliver to the Buyer addressed to the Buyer and its lenders, dated the Closing Date, such additional certificates and opinions as the Buyer shall reasonably request.

Article 6.     Conditions to Obligations of the Sellers.

The obligations of the Sellers to consummate the transactions contemplated by this Agreement are, at its option, in its sole discretion, subject to satisfaction of each of the following conditions:

6.1     Representations and Warranties.  The representations and warranties of the Buyer contained herein shall be true and correct in all material respects (other than those representations and warranties that are qualified by Material Adverse Effect, which shall be true and correct in all respects) at and as of the Closing Date as though each such representation and warranty were made at and as of such time, other than such representations and warranties as are made as of a specific date, in each case except for changes that are expressly contemplated by this Agreement, and except for such failures to be true and correct that (without regard to materiality concepts therein once such failure is established) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the business, results of operations or financial condition of the Buyer.

6.2     Performance by the Buyer.  All of the covenants and agreements to be complied with and performed by the Buyer on or prior to the Closing Date shall have been complied with or performed in all material respects.

{M1429618_15}                    12

6.3     Certificate.  The Buyer shall have delivered to the Sellers a certificate, dated as of the Closing Date, executed on behalf of the Buyer by its duly authorized officers to the effect of Sections 6.1 and 6.2.

6.4     No Proceedings or Litigation.  No preliminary or permanent injunction or other order issued by any United States federal or state Governmental Authority, nor any Law promulgated or enacted by any United States federal or state Governmental Authority, that restrains, enjoins or otherwise prohibits the transactions contemplated hereby.

Article 7.     Indemnification.

7.1     Indemnification by the Sellers.  Subject in all respects to the provisions of this Article 7, the Sellers hereby agree jointly and severally to indemnify and hold harmless the Buyer and its Affiliates, officers, directors, employees, agents, representatives, successors and assigns, after the Closing Date from and against any Claims and Damages incurred by them arising out of or resulting from:

(a)     any breach on the part of any of the Sellers, or the Company or any Seller Parties (as defined in the Asset Purchase Agreement) of (i) any representation or warranty made herein or in the Asset Purchase Agreement or in any certificate delivered by the Sellers or the Company or any Seller Parties (as defined in the Asset Purchase Agreement) pursuant to this Agreement and the Asset Purchase Agreement or (ii) any covenant or agreement made by any of the Sellers or the Company  or any Seller Parties (as defined in the Asset Purchase Agreement) in this Agreement or in the Asset Purchase Agreement; or

(b)     any third party claim existing as of the Closing Date, or any dispute initiated by the Company prior to the Closing, and any third party claim initiated following the Closing arising out of any event that occurred at or prior to the Closing, in each case including those in which the Company is a plaintiff.

(c)     any claim made by any Person at any time arising out of acts or omissions of, or products sold by, any licensees of the Sellers or any of their Affiliates other than the product lines conveyed herein or in the Asset Purchase Agreement for full exploitation by the Buyer.

(d)     any claim made by any Person at any time alleging or based on an allegation that at any time prior to Closing any of the Intellectual Property Rights were invalid, infringed the rights of other parties, or at anytime prior to Closing were procured, utilized or enforced in an improper or illegal manner (claims within the scope of (b) – (d) are "Liability Claims").

7.2     Indemnification by the Buyer.  Subject in all respects to the provisions of this Article 7, the Buyer hereby agrees to indemnify and hold harmless the Sellers and their respective Affiliates, officers, directors, employees, agents and representatives after the Closing Date from and against any Claims and Damages incurred by them arising out of or resulting from any breach on the part of the Buyer of (i) any representation or warranty made by the Buyer in Article 3 hereof or in any certificate delivered pursuant to this Agreement or (ii) any covenant or

{M1429618_15}                                  13

agreement made by the Buyer in this Agreement; and (iii) any claims against the Sellers arising out of the conduct of the business of the Buyer following the Closing.

7.3     Limitations on Indemnification Claims and Liability.

(a)     The respective representations and warranties of the Sellers and the Buyer set forth in this Agreement or in any certificate delivered pursuant to this Agreement, and the opportunity to make a claim for indemnification, or otherwise be indemnified or held harmless, under this Article 7 with respect thereto or with respect to (i) any covenant or agreement relating to any action required by this Agreement to be taken prior to or at the Closing or (ii) any Liability Claim shall survive until a final, unappealable order is entered with respect to such Liability Claim and indemnification is made by the Sellers as provided herein; provided, however, that any claim based on a breached representation or warranty is made prior to the third anniversary of the Closing. Any and all covenants and agreements relating to any action required by this Agreement to be taken after the Closing shall survive the Closing for the applicable period of the statutes of limitations and shall not expire with, and be terminated and extinguished upon, the Closing.

(b)     The Sellers shall not be obligated to indemnify or hold harmless any Indemnified Party under Section 7.1 (i) for any Claims or Damages incurred by such Indemnified Party in connection with any individual occurrence or related series of occurrences unless and until Claims or Damages in respect of the indemnification obligations of the Seller Parties under Section 7.1 exceed in the aggregate $10,000, together with the indemnification obligations of the Sellers under Section 7.1 of the Asset Purchase Agreement, following which the Sellers shall be obligated to indemnify or hold harmless an Indemnified Party for all Claims or Damages arising hereunder and under the Asset Purchase Agreement.

(c)     Notwithstanding anything to the contrary in this Agreement, the indemnifications in Sections 7.1 and 7.2 hereof will be the sole and exclusive remedies available to the Buyer or the Sellers, or any of their respective Affiliates, officers, directors, employees, agents or representatives, after the Closing for breaches of any representations or warranties in this Agreement, or any certificate delivered pursuant to this Agreement. Any claim for indemnification must be made as provided in Sections 7.5 and 7.6 hereof.

(d)     Once a claim for indemnification has been made under this Article 7, each Indemnified Party may, as one of its remedies to effect indemnification under this Article 7, withhold or cause to be withheld and setoff any amounts payable (under this Agreement or otherwise) following the Closing to the Indemnifying Party. The right to setoff will be exercisable whether the claim for indemnification is liquidated or unliquidated, whether or not the claim for indemnification has been reduced to judgment, and regardless of any difficulty or uncertainty in determining or computing the ultimate amount of the indemnification claim. The exercise of a right of setoff in good faith, whether or not ultimately deemed to be justified, will not constitute a default of any obligation against which such setoff is made. Any amount withheld by an Indemnified Party in setoff and which is ultimately determined not to be payable by the Indemnifying Party will be promptly paid to the Indemnifying Party.

7.4     Computation of Claims and Damages.  Whenever an Indemnifying Party is required to indemnify and hold harmless an Indemnified Party from and against and hold the Indemnified Party harmless from, or to reimburse the Indemnified Party for, any item of Claim or Damage under this Agreement, the Indemnifying Party will, subject to the provisions of this Article 7, pay the Indemnified Party the amount of the Claim or Damage reduced by (i) any amounts to which the Indemnified Party actually recovers from third parties in connection with such Claim or Damage ("Reimbursements"), and reduced by (ii) the Net Proceeds of any insurance policy payable to the Indemnified Party with respect to such Claim or Damage.  For purposes of this Section 7.4, "Net Proceeds" shall mean the insurance proceeds actually paid, less any deductibles, co-payments, premium increases, retroactive premiums or other payment obligations (including attorneys' fees and other costs of collection) that relates to or arises from the making of the claim for indemnification.  If any Indemnified Party receives any Reimbursement or Net Proceeds after an indemnification payment is made which relates thereto, the Indemnified Party shall promptly repay to the Indemnifying Party such amount of the indemnification payment as would not have been paid had the Reimbursement or Net Proceeds reduced the original payment (and any such repayment shall be a credit against any applicable indemnification threshold or limitation set forth in Section 7.3(b) hereof) at such time or times as and to the extent that such Reimbursement or Net Proceeds is actually received.  The Indemnified Party shall make available to the Indemnifying Party and its agents and representatives all pertinent records, materials and information, and provide reasonable access during normal business hours to the Indemnified Party's employees, properties, books and records, and shall otherwise cooperate with and assist the Indemnifying Party and its agents and representatives in reviewing the propriety and the amount of any Claims or Damages, including, without limitation, the availability and/or amounts of Reimbursements and Net Proceeds.

7.5     Notice of Claims.  Upon obtaining actual knowledge of any Claim or Damage which has given rise to, or could reasonably give rise to, a claim for indemnification hereunder, the party seeking indemnification (the "Indemnified Party") shall, as promptly as reasonably practicable (but in no event later than 30 days) following the date the Indemnified Party has obtained such knowledge, give written notice (a "Notice of Claim") of such claim to the  party or parties from which indemnification is or will be sought under this Article 7 (the "Indemnifying Party").  The Indemnified Party shall furnish to the Indemnifying Party in good faith and in reasonable detail such information as the Indemnified Party may have with respect to such indemnification claim (including copies of any summons, complaint or other pleading which may have been served on it and any written claim, demand, invoice, billing or other document evidencing or asserting the same).  No failure or delay by the Indemnified Party in the performance of the foregoing shall reduce or otherwise affect the obligation of the Indemnifying Party to indemnify and hold the Indemnified Party harmless, except to the extent that such failure or delay shall have materially adversely affected the Indemnifying Party's ability to defend against, settle or satisfy any liability, damage, loss, claim or demand for which such Indemnified Party is entitled to indemnification hereunder.

7.6     Survival.  Claims for indemnification under this Agreement based on breached representations or warranties shall survive until the third anniversary of the Closing and other claims for indemnification under this Agreement shall survive until the expiration of the applicable statute of the limitations (including any extensions or waivers of such statutes).

Article 8.     Definitions.

Unless otherwise stated in this Agreement, the following capitalized terms have the following meanings:

"Action" means any action, suit, claim, arbitration, or proceeding or investigation commenced by or pending before any Governmental Authority.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such specified Person.

"Agreement" or "this Agreement" means this Intellectual Property Rights Assignment Agreement dated as of the date first above written (including the Annexes, Schedules and Exhibits hereto) and all amendments hereto made in accordance with the provisions of Section 9.17 hereof.

"Business" has the meaning set forth in the Recitals hereto.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of Tampa, Florida.

"Buyer" has the meaning specified in the introductory paragraph to this Agreement.

"Cash Payment" has the meaning set forth in Section 1.3 hereof.

"Change in Control" means and occurs upon (i) the closing date relative to a plan of liquidation of Buyer or a plan or agreement for the direct or indirect sale or other disposition of more than 50% of the assets of the Buyer; or (ii) the effective date of a merger, reorganization, consolidation, or similar transaction (a "Merger") as a result of which the Members of Buyer immediately before the Merger are not expected to own, immediately after the Merger, directly or indirectly more than 50% of the membership interests in the Buyer.

"Claims and Damages" means, except as otherwise expressly provided in this Agreement, any and all losses, claims, demands, liabilities, obligations, actions, suits, orders, statutory or regulatory compliance requirements, or proceedings asserted by any Person (including, without limitation, Governmental Authorities), and all damages, costs, expenses, assessments, judgments, recoveries and deficiencies, including, to the extent required pursuant to Article 8, reasonable attorneys', experts' and paralegals' fees and costs, whether prior to the filing of proceedings, during proceedings and through all appellate levels, incurred by or awarded against a party to the extent indemnified in accordance with Article 7 hereof, but shall not include any consequential, special, multiple, punitive or exemplary damages, except to the extent such damages have been recovered by a third party and are the subject of a third party claim for which indemnification is available under the express terms of Article 7 hereof.

"Closing" has the meaning set forth in Section 1.5 hereof.

"Closing Date" has the meaning set forth in Section 1.5 hereof.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Recitals hereof.

"Confidentiality Agreement" means that certain Standard Buyer's Confidentiality and Warranty Agreement dated August 22, 2005 signed by Equitable Capital Management LLP.

"Control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly, of the power to direct or to cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.

"Deposit" has the meaning set forth in Section 1.4 hereof.

"EBITDA" means the net income of the Buyer determined in accordance with GAAP, plus a sum equal to:

    (i)    interest;

    (ii)    income taxes;

    (iii)    depreciation and amortization;

    (iv)    management fees payable to the Managers or Members of the Buyer as defined in the Limited Liability Company Agreement;

    (v)    amounts prior to the Closing paid by Traeger Industries, Inc. for:

        (A)    license fees paid to the Sellers in accordance with past practices;

        (B)    rental of equipment in the amount not to exceed $3,000.00 (Three Thousand Dollars) per month payable to Joe Traeger;

        (C)    legal and accounting fees directly related to the negotiation and preparation of this Agreement and the other agreements contemplated hereby;

        (D)    perquisites of the shareholders of Traeger Industries, Inc. not to exceed $47,000.00 (Forty Seven Thousand Dollars) on an annualized basis;

        (E)    moving expenses directly for the move of the headquarters office of Traeger Industries, Inc. not to exceed $25,000.00 ( Twenty Five Thousand Dollars);

    (vi)    compensation of the new CEO, VP Operations or VP Finance of the Buyer in excess of $430,000.00 (Four Hundred Thirty Thousand Dollars) combined per annum;

(vii)    any selling, general and administrative expense in excess of 16.6% of net sales of the Buyer after reducing selling, general and administrative expense by an amount equal to the excess over $430,000.00 per annum of the compensation of the new CEO, VP Operations and VP Finance as provided for in clause (vi) above;

(viii)    any penalty under Section 4.10 of the Asset Purchase Agreement; and

(ix)    any non-recurring items of income, gain, expense or loss.

"Encumbrance" means any security interest, pledge, mortgage, lien (including, without limitation, tax liens), charge, encumbrance, easement, adverse claim, preferential arrangement, restriction or defect in title.

"Escrow Agent" means Powers, McCulloch & Bennett LLP.

"Escrow Agreement" means that certain Escrow Agreement, dated of even date herewith, among the Buyer, the Sellers and the Escrow Agent.

"GAAP" means United States generally accepted accounting principles and practices as in effect from time to time.

"Governmental Authority" means any United States federal, state or local government or any foreign government, any governmental, regulatory, legislative, executive or administrative authority, agency or commission or any court, tribunal, or judicial body.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.  Governmental Orders shall not include Permits.

"Indemnified Party" has the meaning set forth in Section 7.5 hereof.

"Indemnifying Party" has the meaning set forth in Section 7.5 hereof.

"Intellectual Property Rights" include but are not limited to the items listed on Exhibit A hereto and all of the patents, applications, trademarks, copyrights, know-how, droit moral, show-how, mask work, proprietary innovations and inventions, methods or techniques, likenesses or other intellectual property held by the Sellers or any of their Affiliates and used or useful, directly or indirectly, in the Business and any other matters within the scope of business of the Company whether or not reduced to writing.

"Knowledge" with respect to a party means such information as any of its officers or key employees actually knew or should with the exercise of due diligence have known.

"Law" means any federal, state, local or foreign constitution, statute, law, ordinance, regulation, rule, code, injunction, judgment, order, decree or other requirement, restriction or rule of law.

{M1429618_15}    18

"Liability Claim" means claims within the scope of Section 7.1 (b) – (d) hereof.

"Material Adverse Effect" means any circumstance, change in, or effect on the Company that has a material adverse effect on the business, results of operations, condition (financial or otherwise), or prospects of the Company.

"Notice of Claim" has the meaning set forth in Section 7.5 hereof.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"Purchase Price" has the meaning set forth in Section 1.3 hereof.

"Regulatory Law" has the meaning set forth in Section 4.4(b).

"Required Consents" means the consents, approvals, orders, authorizations, registrations, declarations and filings required.

"Seller Parties" has the meaning set forth in the introductory paragraph of this Agreement.

"Sellers" has the meaning set forth in the introductory paragraph to this Agreement.

Article 9.       Miscellaneous Provisions.

9.1       Termination Rights.

(a)       Grounds for Termination.  This Agreement may be terminated:

(i)       by mutual consent of the parties;

(ii)       by the Sellers if the Sellers are ready, willing and able to close the transactions contemplated hereby and by the Asset Purchase Agreement on the Closing Date, the Sellers and Traeger Industries, Inc. have not violated their representations, warranties or covenants herein or in the Asset Purchase Agreement and have satisfied the Closing conditions herein and in the Asset Purchase Agreement, and Buyer is not prepared to close on the Closing Date;

(iii)       by the Buyer if the Sellers are not ready, willing and able to close the transactions contemplated hereby and by the Asset Purchase Agreement on the Closing Date, or any of the Sellers or Traeger Industries, Inc. have violated their representations, warranties or covenants herein or in the Asset Purchase Agreement or have not satisfied the conditions to the Closing herein or in the Asset Purchase Agreement and the Buyer is prepared to close on the Closing Date;



(iv)     by either the Sellers or the Buyer, upon written notice to the other party or parties, if any Governmental Authority shall have issued a statute, rule, regulation, order, decree or injunction or taken any other action permanently restraining, enjoining or otherwise prohibiting the purchase and sale contemplated by this Agreement and such statute, rule, regulation, order, decree or injunction or other action shall have become final and nonappealable;

(v)     by the Buyer, if there has been a breach of any representation or warranty of the Sellers set forth in this Agreement or if there has been a material breach by any of the Sellers of their covenants and agreements set forth in this Agreement; or

(vi)     by the Sellers, if there has been a breach of any representation or warranty of the Buyer set forth in this Agreement or if there has been a material breach by the Buyer of its covenants and agreements set forth in this Agreement.

(b)     Post-Termination Liability.  If this Agreement is terminated pursuant to Subsection 9.1(a) hereof, this Agreement shall thereupon become void and of no further effect whatsoever, and the parties shall be released and discharged of all obligations under this Agreement, except (i) to the extent of the Deposit under the circumstances described in Section 1.4, which shall be the sole and exclusive remedy of the Sellers under such circumstances, (ii) to the extent of a Parties' liability for willful material breaches of this Agreement prior to the time of such termination, (iii) as set forth in Section 4.3 hereof, and (iv) the obligations of each party for its own expenses incurred in connection with the transactions contemplated by this Agreement as provided herein.

9.2     Expenses.  Except as otherwise specifically provided in this Agreement, all out-of-pocket costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by whichever is the Party incurring such costs and expenses, whether or not the Closing shall have occurred.

9.3     Notices.  Any notice, demand, claim, notice of claim, request or communication required or permitted to be given under the provisions of this Agreement shall be in writing and shall be deemed to have been duly given (i) upon delivery if delivered in person, (ii) on the date of mailing if mailed by registered or certified mail, postage prepaid and return receipt requested, (iii) on the date of delivery to a national overnight courier service, or (iv) upon transmission by facsimile (if such transmission is confirmed by the addressee) if delivered through such services to the following addresses, or to such other address as any party may request by notifying in writing all of the other parties to this Agreement in accordance with this Section 9.3.

{M1429618_15}                                          20



If to the Buyer:

> Traeger Pellet Grills LLC
> 601 North Ashley Drive
> Suite 1200
> Tampa, Florida 33602
> Attn:  Albert E. Strausser
> Telephone:  813-226-3900
> Facsimile:  813-226-3995

With a copy to:

> Adorno & Yoss
> 2525 Ponce de Leon Blvd.
> Suite 400
> Miami, FL  33134
> Attention: Seth P. Joseph, Esq.
> Telephone: (305) 460-1469
> Facsimile: (305) 328-4024

If to the Sellers:

> Traeger Industries, Inc.
> P.O. Box 1070
> 530 Alder Street
> Mt. Angel, Oregon 97362
> Attn:  Joe Traeger
> Telephone:  (503) 845-6495
> Facsimile:  (503) 845-6366

With a copy to:

> Hooper, Englund & Weil LLP
> 1100 SW 6th Avenue, Suite 1507
> Portland, Oregon 97204
> Attn:  Gregory J. Englund
> Telephone:  (503) 226-0500
> Facsimile:  (503) 226-7192

Any such notice shall be deemed to have been received on the date of personal delivery, the date set forth on the Postal Service return receipt, or the date of delivery shown on the records of the overnight courier, as applicable.

   9.4     Benefit and Assignment.  This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  There shall be no assignment of any interest under this Agreement by any party except that the Buyer may assign its rights hereunder to any wholly owned subsidiary of the Buyer of any purchaser of the

Business, in whole or in part; provided, however, that no such assignment shall relieve the assignor of its obligations under this Agreement. Nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

9.5     Waiver. Any party to this Agreement may (a) extend the time for the performance of any of the obligations or other acts of any other party, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered by any other party pursuant hereto or (c) waive compliance with any of the agreements or conditions of any other party contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition, of this Agreement. The failure of any party to assert any of its rights hereunder shall not constitute a waiver of any such rights.

9.6     Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

9.7     Amendment. This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, the Sellers and the Buyer or (b) by a waiver in accordance with Section 9.5 hereof.

9.8     Effect and Construction of this Agreement. This Agreement embodies the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior agreements, arrangements and understandings, whether written or oral, relating to matters provided for herein; provided, however, that the Confidentiality Agreement shall remain in effect until the Closing. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual agreement, and this Agreement shall not be deemed to have been prepared by any single party hereto. The headings of the sections and subsections of this Agreement are inserted as a matter of convenience and for reference purposes only and in no respect define, limit or describe the scope of this Agreement or the intent of any section or subsection. This Agreement may be executed in one or more counterparts and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Florida, applicable to contracts executed in and to be performed entirely within that State. The parties agree that the exclusive venue for any dispute concerning the entitlement to the Deposit shall be the courts of competent jurisdiction situated in

Portland, Oregon and that the exclusive venue for any other dispute between the parties (except those arising from a third party claim) shall be Hillsborough County, Florida.

     9.9    Specific Performance.  Each of the Sellers acknowledges and agrees that in the event of any breach of this Agreement, the Buyer would be irreparably and immediately harmed and could not be made whole by monetary damages.  It is accordingly agreed that the parties hereto (i) waive, in any action for specific performance, the defense of adequacy of a remedy at law and (ii) shall be entitled, in addition to any other remedy to which they may be entitled at law or in equity, to compel specific performance of this Agreement.

     IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

BUYER:

Traeger Pellet Grills LLC

By: _____
Name:  Albert Strausser
Title:  Managing Director of The Barish Fund LLC, as
      Managing Member of Traeger Pellet Grills LLC


SELLERS:

_____
Joe Traeger

_____
Brian Traeger

_____
Mark Traeger

_____
Randy Traeger

## <u>Annex I</u>

## **Allocation of Purchase Price Among Sellers**

<u>Cash at Closing:</u>

| | |
|---|---|
| Joe Traeger: | $2,842,000 |
| Randy Traeger: | $2,747,000 |
| Mark Traeger: | $2,747,000 |
| Brian Traeger: | $664,000 |
| Total: | $9,000,000 |

<u>Contingent Amount:</u>

| | Joe <u>Traeger</u> | Randy <u>Traeger</u> | Mark <u>Traeger</u> | Brian <u>Traeger</u> | <u>Total</u> |
|---|---|---|---|---|---|
| 2006 | $133,333 | $133,333 | $133,333 | $266,667 | $666,666 |
| 2007 | $133,333 | $133,333 | $133,333 | $266,668 | $666,667 |
| 2008 | $133,334 | $133,334 | $133,334 | $266,665 | $666,667 |

## Annex II

### Allocation of Phantom Equity

100% of the Phantom Equity will be allocated to Brian Traeger.

## Schedule 2.4(a)

### Permitted Encumbrances

**Permitted Encumbrances**

Liens in connection with the following equipment lease agreements:
- Silver Falls Bank UCC filing dated march 17, 2005 on "All inventory, Equipment and General Intangibles; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and accounts proceeds)" pursuant to a note payable and line of credit which shall be discharged at closing.
- De Lage Landen forklift capital lease
- Norlift new forklift capital lease/purchase agreement
- First Data lease of three visa machines
- IOS Capital lease of two copiers
- Pitney Bowes lease of postage machine

All Distributors and Dealers are authorized in the use of the Traeger name and logo, and related marketing elements, in the ordinary course of advertising and promoting of products.

Cookshack is authorized, through a commercial license agreement as disclosed in Material Contracts Schedule 2.11, in the use of the Traeger name and logo, and related manufacture and marketing of commercial products, and in utilizing of certain Intellectual Property (of which the Sellers shall have served termination notice prior to Closing).

Pinnacle is authorized, through a license agreement unrelated to the Business, in the use of the Traeger name and logo, and related manufacture and marketing of pellet fired furnaces and boilers.

**Exhibit A**

**IP Descriptions**

All the patents, patent rights, proprietary info and projects, trade secrets, personal goodwill and IP assets and properties used or usable in the business, including but not limited to the following:

**[Seller's IP counsel to update schedule prior to closing, including status of patent applications, office actions, objections etc (if any)]**

- Traeger name and tree logo (which Seller is assigning including any rights to register, in connection with the Business only)
- Smokeman-TII 2,987,301
- Design Patent 370,823 (pig design)
- Patent 4,823,684 (Pellet-Fired Barbecue grill)
- Patent 4,989,521 (Gravity Fed Pellet Burner)
- Patent Applications:
  - US—10/924,430—flavored wood pellet with wood oil
  - Canada 2,521,734-flavored wood pellet with wood oil
  - US THH314—smoke generator
  - US THH315—pellet fired BBQ
  - US THH316—burner design
- Any other marks, logos, copyrights or other intellectual property used in connection with the Business, including without limitation likenesses of people and images used in advertising (who shall sign documentation allowing the Buyer to continue to use the likenesses without cost and deliver said documentation to Seller at Closing), packaging and labeling, artwork used on Business products, product names, including without limitation BBQ070, 075, LHS, PIG, 100, 124, 125, and SW, Traeger Professional, Traeger Executive, Commercial Models, "Lil Pig", "Longhorn Steer" , formulations for shakes, sauces, rubs, samplers, pellets, designs, tooling, masters, stats, dies, photos, TV programs including names, formats, rights, videotapes or films, design, masters, layout, of instruction manuals, training aids and material, video and film productions, cookbooks, recipes

Domain names including traegerindustries.com or any other domain name used or registered by the Business, whether or not currently registered using the name "Traeger"

## Schedule 2.6(a)

## IP Claims

Graybeal Jackson Haley LLP, on behalf of the Danson's Group Inc. sent a letter (known by Seller and Buyer as the "Dansons letter") dated December 15, 2004 alleging "false marking" of Traeger's product under patent 4,823,684.  This letter has been provided to the Buyer during due diligence.

EXHIBIT 7

2014 Traeger Products vs. 2015 Pit Boss Products



2015 Pit Boss 820—Image from https://web.archive.org/web/20150503011332/http://pitboss-grills.com/grills/pb820.php

Key Stats:



2014 Traeger Lil Tex—Image from
https://web.archive.org/web/20140215123530/http://www.traegergrills.com/shop/grills

2014 Traeger Products vs. 2015 Pit Boss Products



2015 Pit Boss 820 Deluxe—Image from
https://web.archive.org/web/20150503011355/http://pitboss-grills.com/grills/pb820d.php



2014 Traeger Lil Tex Elite—Image from
https://web.archive.org/web/20140222005024/http://www.traegergrills.com/shop/detail/BBQ07E

2014 Traeger Products vs. 2015 Pit Boss Products



2015 Pit Boss 340—Image available at
https://web.archive.org/web/20150503011253/http://pitboss-grills.com/grills/pb340.php



2014 Traeger Junior—image available at
https://web.archive.org/web/20140215123530/http://www.traegergrills.com/shop/grills

2014 Traeger Products vs. 2015 Pit Boss Products



2015 Pit Boss 440 Deluxe—Image available at
https://web.archive.org/web/20150503011309/http://pitboss-grills.com/grills/pb440d.php



2014 Traeger Junior Elite—Image available at
https://web.archive.org/web/20140227003144/http://www.traegergrills.com/shop/detail/BBQ155

EXHIBIT 8



True and correct screenshot of Traeger's Pellet Flavor Guide. Captured July 8, 2019.



True and correct screenshot of Pit Boss' Wood Pellet Flavors. Captured July 8, 2019.

-1-



True and correct screenshot of the back of a Pit Boss pellet bag. Captured at https://www.4thegrill.com/shop/apple-wood-pellets-2lbs-pit-boss/ on July 11, 2019.



True and correct screenshot of the back of a Pit Boss pellet bag. Captured at
https://www.4thegrill.com/shop/hickory-wood-pellets-2lbs-pit-boss/ on July 11, 2019.

-3-



True and correct screenshot of Louisiana Grill's Wood Pellet Pairing Guide. Captured July 8, 2019.

4828-3965-3532

# EXHIBIT 9

# APRON

SIMILAR COLOR AND POCKETS

Pit Boss

Traeger





Pit Boss website, accessed 11/16/18

Traeger website, accessed 11/16/18

# BAMBOO MAGNETIC CUTTING BOARD

## SIMILAR SIZE, ATTRIBUTES, AND COLORING

Pit Boss

Traeger





Pit Boss website, accessed 11/16/18

Traeger website, accessed 11/16/18

# MAGNETIC HOOKS

## NEARLY IDENTICAL

Pit Boss

Traeger





Pit Boss website, accessed 11/19/18

Traeger website, accessed 11/19/18

# MAGNETIC HOOKS

## PACKAGING DIFFERENT, BUT SOLD IN THREE PIECE SET

Pit Boss

Traeger





Pit Boss website, accessed 11/19/18

Traeger website, accessed 11/19/18

EXHIBIT 10



**Creators of world class, competitive and innovative products**



# JOE TRAEGER JOINS LOUISIANA GRILLS

FOR IMMEDIATE RELEASE

Contact: Ashley Evdokimo, Louisiana Grills

Phone: 1.877.303.3135 ext 160

Email: marketing@dansons.com

Pellet Grill Founder to Join Leading Grill Manufacturer

Joe Traeger joins Louisiana Grills

Phoenix, AZ, Thursday, September 20th – Louisiana Grills (Dansons, USA) is proud to announce the original founder of the pellet grill, Joe Traeger, has joined the Thiessen family at Dansons to elevate the Louisiana Grills brand and product portfolio. In this partnership, Traeger will be developing new pellet grilling products alongside Louisiana Grills founder and pellet grill innovator, Dan Thiessen.

Raised by an inventor father, Joe proceeded down his own path of innovation developing the first pellet grill to market. Traeger, a longtime grilling enthusiast, was inspired to create a new grilling experience after a friend shared a bucket of wood pellets. This bucket of wood pellets inspired Joe's original innovation and the first pellet grill was born in 1983 in the signature Traeger barn, which still sits as a landmark in Mount Angel, Oregon.

"I love creating products that bring people together and that's what grilling does; it brings people together and allows them to create lasting memories," Joe Traeger, Product Development, Dansons

Joining Louisiana Grills provides a unique opportunity for Joe Traeger to keep his passion and drive for pellet grills alive. Joe's son and longtime pellet industry veteran, Brian Traeger, will also be joining the organization as

Divisional Sales Manager. The families look forward to bringing next level grilling products to market.



"By adding Joe Traeger to the Dansons organization, we see opportunity to reignite the industry with new innovations and exciting products. As the industry founder, we feel Joe can bring unmatched expertise to our growing organization and we're thrilled about the endless possibilities. No doubt this partnership was God putting us on a similar path; He prepared our hearts so we could work together – and enjoy it!" Dan Thiessen, CEO, Dansons

Known for their high-quality grills, built sturdily to last a lifetime, Louisiana Grills promote best-in-class grilling, smoking, searing, baking, and charbroiling meals to perfection, every time – in the comfort of one's own backyard. Louisiana Grills is raising the stakes with its line of sleek, affordable, pragmatic pellet grills, and the new partnership marks a defining moment in the industry.

Louisiana Grills is a subsidiary of Dansons, Inc. which was founded in 1999 by Dan Thiessen and his two sons, Jeff and Jordan. Louisiana Grills is known for their durability and craftsmanship. From portable grills, to built-ins, to impressive standalone grills – Louisiana Grills takes pride in creating whatever the customers (and employees) dream up. Last year, Dansons was awarded EY Entrepreneur of the Year (2017). See what Louisiana Grills brings to the table at the National Hardware Show May 8th – 10th, in Las Vegas, NV. LG is a must see and at the NHS you will be able to feel the difference between LG and its competitors. LG will be at booths 450 (inside) and 11735 (outside). For more information about Louisiana grills, please visit the website at: https://www.louisiana-grills.com/.

Joe and Brian Traeger, as well as Dansons, are not affiliated with Traeger Grills, LLC.

If you would like more information about this topic, please contact:

Kristen Mathis

3411 N 5th Avenue, Suite 500

Phoenix, AZ 85013

Office: 1.877.303.3134 (ext 160)

Cell: 952.540.7383

Email: marketing@dansons.com



HEADQUARTERS

3411 N 5th Avenue, Suite 500

Phoenix, AZ 85013

Media Center

 

# EXHIBIT 11



Creators of world class, competitive and innovative products



# FOUNDERS SERIES



**FOR IMMEDIATE RELEASE**
**Contact:** Ashley Evdokimo
**Phone:** 480.220.6700
**Email:** ashley.evdokimo@dansons.com

## WIFI Connected 8-in1 Pellet Grill and Smoker Hits the Market
### Founders Team up to Bring the Best of the Best to the Pellet Grill Industry

**Phoenix, AZ, Thursday, March 14th –** Louisiana Grills is honored to announce its first WIFI enabled grill and smoker with - The **Founder Series** A cutting-edge grilling experience that uses SmartSmokeIT™ to out smoke the competition. The **Founder Series** is brought to you proudly by Joe Traeger, the founder of the original pellet grill, and Dan Thiessen, an accomplished innovator in the pellet grill industry.

*"It's exciting to continue to bring innovation to the industry," mentioned Joe Traeger, Product Development. "Not only are we designing something practical, for everyday use, but we are adding in design elements that are top notch, and it truly sets us apart. And we are having a bit of fun along the way while we do it!"*

This dynamic duo left no rock unturned when it came to the options they explored, and the customers they listened to while developing this state-of-the-art pellet grill.

*"Teaming up with Joe Traeger has been a blessing. He's fired up and brings fresh ideas to the table, and we work very well together. This journey has just begun, and we are already excited about what we are bringing to market, and what we will be offering our customers. We've just scratched the surface of this partnership and its capabilities – and neither of us is going anywhere," said Dan Thiessen.*

The revolutionary **Founder Series** comes equipped with breakthrough technology - the brand-new LG Smart Touch™ control pad with WIFI and Bluetooth connectivity. Allowing you to smoke and grill smarter, with SmartSmokeIT™. You can enjoy your backyard party and control your grill's temperature with precision and ease, right from your mobile device.

The **Founder Series** showcases elegant durability with an artfully crafted mirror finish, 304 stainless-steel design, and innovational double walled construction for supreme heat

insulation and retention. The extra-large 34-pound hopper with dual pane victory site glass and LED control pad lighting, allow for around-the-clock cooking and hands-off progress checking, even at night. The heavy-duty folding front table, solid stainless-steel side and bottom shelf, and four locking caster wheels with pull pin extendable front wheels show how much time, and thought the duo put into this design.

Engineered with the same trusted features of a Louisiana Grill - dual fan forced convection cooking, adjustable slide plate flame broiler with 1000°F direct heat access, robust temperature range of 170°F to 600°F, and two tiers of porcelain coated cast iron cooking grids – The **Founder Series** stands ahead of its class with additional exclusive features, and with Joe Traeger and Dan Thiessen working together, there is sure to be more great things to come.

Enjoy new SmartSmokeIT™, and top-notch, world-class BBQ in your own backyard with the **Founder Series** by Louisiana Grills. Where tradition meets innovation.

Available in 800, 1000, and 1200 square inches with an optional lower cabinet.

**Louisiana Grills** is a subsidiary of **Dansons, Inc.** which was founded in 1999 by Dan Thiessen and his two sons, Jeff and Jordan. Louisiana Grills is known for its durability and craftsmanship. From portable grills to built-ins, to impressive standalone grills – Louisiana Grills takes pride in creating whatever the customers (and employees) dream up. Last year, Dansons was awarded EY Entrepreneur of the Year (2017). See what Louisiana Grills brings to the table at the National Hardware Show May 8th – 10th, in Las Vegas, NV. LG is a must see, and at the NHS you will be able to feel the difference between LG and its competitors. LG will be at booths 450 (inside) and 11735 (outside). For more information about Louisiana grills, please visit the website at

If you would like more information about this topic, please contact:

Kristen Mathis

Dansons

3411 N 5th Avenue, Suite 500

Phoenix, AZ 85013

Office: 1.877.303.3134 (ext 160)

Cell: 952.540.7383

Email: kristen.mathis@dansons.com



HEADQUARTERS

3411 N 5th Avenue, Suite 500

Phoenix, AZ 85013

Media Center


