**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Traeger Pellet Grills, LLC, | No. CV-19-04732-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| Dansons US, LLC, et al., | |
| Defendants. | |

Before the Court is Plaintiff Traeger Pellet Grills, LLC's ("Traeger Grills") motion for preliminary injunction against Defendant Dansons US, LLC ("Dansons"), which is fully briefed. (Docs. 11, 31, 34.) The Court held a preliminary injunction hearing on September 12, 2019, and thereafter took this matter under advisement. For the following reasons, Trager's motion is granted.

**I. Background**

Traeger Grills manufactures and sells wood pellet grills, grill accessories, and wood pellets. The Traeger story originates with Joe Traeger, who is credited with inventing the wood pellet grill in the 1980s. Following this invention, Joe Traeger manufactured and sold wood pellet grills through Traeger Industries, Inc. ("TII"), a company owned and operated by Joe and his family. TII first used the name Traeger in commerce as a trademark for grills, grill accessories, and wood pellets on January 1, 1986.

On February 21, 2006, Traeger Grills, a limited liability company registered and headquartered in Tampa, Florida, entered the picture by means of two transactions. First,

Traeger Grills entered into an Asset Purchase Agreement ("APA") with TII, The Joe Trager Charitable Trust, The Randy Traeger Charitable Trust, The Mark Traeger Charitable Trust, Brian Traeger, Joe Traeger, Randy Traeger, and Mark Traeger. (Doc. 11-1 at 22-67.) Pursuant to the APA, the sellers assigned to Traeger Grills all their rights, title and interest in and to the business, and all assets including but not limited to all accounts receivable, inventory, equipment and machinery, tools and goodwill associated with the business. (*Id.* at 23-24.) Traeger Grills paid $3,402,122 in consideration for these assets. (*Id.* at 27.) Second, Traeger Grills entered into an Intellectual Property Rights Assignment Agreement ("IPRAA") with Joe, Brian, Mark and Randy Traeger. (*Id.* at 69-91.) Pursuant to the IPRAA, the sellers assigned to Traeger Grills "all of their right, title and interest in and to the Intellectual Property rights," including but not limited to "[a]ll the patents, patent rights, proprietary info and projects, trade secrets, personal goodwill and IP assets and properties used or usable in the business[.]" (*Id.* at 70, 95.) Traeger Grills paid $9,000,000 in consideration for the seller's right, title and interest in and to the intellectual property rights assigned and transferred per the IPRAA. (*Id.* at 71.)

Since assuming these assets and rights, Traeger Grills has poured over $100 million into developing the Traeger brand. (*Id.* at 9.) On May 22, 2007, Traeger Grills obtained a Federal Trademark Registration for the trademark TRAEGER as used in connection with the sale of grills, grill accessories, and wood pellets, and Traeger Grills now owns nine other active federal trademark registrations. (*Id.* at 5-7.) In addition, Traeger Grills' marketing includes images of the Traeger Barn and promotion as the originator of the wood pellet grill. (*Id.* at 8.)

Traeger Grills competes in the wood pellet grill market with Dansons, which manufactures and sells wood pellet grills and grill accessories under the brand names Pit Boss and Louisiana Grills. The instant conflict between the companies arose on September 20, 2018, when Dansons issued a marketing release announcing that it had hired Joe and Brian Traeger to elevate the Louisiana Grills brand. (Doc. 11-3 at 32-33.) Dansons' marketing release features two photos of Joe and Brian alongside Danson executives,

standing in front of the Traeger Barn with the Traeger name prominently displayed behind them, and a third photo of Joe and Dansons' CEO, Dan Theissen. (*Id.*) On September 21, 2018, Traeger Grills sent Mr. Theissen a cease and desist letter, demanding that Dansons "discontinue all activities which suggest or create the impression of a connection between Dansons and Traeger Grills." (Doc. 31-10 at 4.) Counsel for Dansons responded by email, requesting a telephone call to discuss how Dansons might address Traeger Grills' concerns, but a resolution between the two parties was never reached. (Doc. 31-11.)

On March 14, 2019, Dansons announced that the Louisiana Grills brand planned to introduce a new series of grills in Fall 2019 called the Founders Series "brought to you proudly by Joe Traeger, the founder of the original pellet grill, and Dan Thiessen, an accomplished innovator in the pellet grill industry." (Doc. 11-3 at 36.) Following this announcement, Dansons began posting a series of advertisements on Instagram, Facebook and Twitter, including photos and statements featuring the names and likenesses of Joe and Brian Traeger and the Traeger mark and barn promoting Dansons, Danson's products, and the Founders Series. (*Id.* at 39-49; Doc. 11-4.) On July 16, 2019, Traeger Grills filed this action against Dansons and George Koster. (Doc. 1.) On the same date, Traeger Grills filed a separate lawsuit against Joe, Brian and Mark Traeger in the Middle District of Florida. (Doc. 31-4 at 3.)

On July 17, 2019, Traeger Grills filed its motion for preliminary injunction, which was fully briefed on August 28, 2019. (Docs. 11, 31, 34.) In its motion, Traeger Grills requests that the Court preliminarily enjoin Dansons from:

a. Using or assisting or consenting to others in using or publishing, in any manner, the TRAEGER name, images of the TRAEGER Barn location in Mt. Angel, Oregon, images of Joe or Brian Traeger, references to Joe as the founder or creator of the pellet grill (collectively the "Traeger Intellectual Property") in connection with the advertising, marketing, or sale of wood pellet grills and associated products.

b. Publishing, in any manner, any statement that affiliates in any way Joseph Traeger, Brian Traeger, or Traeger Grills with Dansons US LLC, LOUISIANA GRILLS, PIT BOSS, the FOUNDERS SERIES grills, Dan Thiessen, Jordan Thiessen, Jeff Thiessen or Dansons' products or endorses

     Dansons US LLC, LOUISIANA GRILLS, PIT BOSS, the FOUNDERS SERIES grills, or any Dansons grill-related product; [and]

  c. Arranging any public appearance anywhere in the United States that communicates an endorsement by Joseph Traeger or Brian Traeger of Dansons' US LLC, LOUISIANA GRILLS, PIT BOSS, the FOUNDERS SERIES grills, or any other Dansons grill-related product[.]

(Doc. 11 at 25.) The motion is now ripe for decision.

## II. Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). These elements may be balanced on a sliding scale, whereby a stronger showing of one element may offset a weaker showing of another. *See Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1131, 1134-35 (9th Cir. 2011). But the sliding-scale approach does not relieve the movant of the burden to satisfy all four prongs for the issuance of a preliminary injunction. *Id.* at 1135. Instead, "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. The movant bears the burden of proof on each element of the test. *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

## III. Discussion

Having carefully considered the parties' briefs, arguments, and presentations during the preliminary injunction hearing, the Court finds that Traeger has carried its burden on all four elements of the preliminary injunction test.

### A. Likelihood of Success on the Merits

#### 1. Trademark Claims

- 4 -

To prevail on its trademark infringement claims, Traeger Grills must establish (1) ownership of a valid trademark previously used in commerce and (2) that Dansons used in commerce a mark similar to Traeger Grills' trademark in a manner likely to cause confusion. 15 U.S.C. § 1114; *Nelson-Ricks Cheese Co., Inc. v. Lakeview Cheese Co., LLC*, 775 F. App'x. 350, 351 (9th Cir. 2019); *Bosley Med. Inst.*, *Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005); *Playboy Enters., Inc. v. Netscape Cmmc'ns Corp.*, 354 F.3d 1020, 1024 (9th Cir. 2004). The Ninth Circuit assesses the second element, likelihood of confusion, by weighing the eight *Sleekcraft* factors: (1) the strength of the plaintiff's mark; (2) the proximity or relatedness of the goods; (3) the similarity of the parties' marks; (4) evidence of actual confusion; (5) marketing channels used; (6) the type of goods and degree of care likely to be exercised by the buyer; (7) the defendant's intent in adopting the junior mark; and (8) likelihood of expansion of the parties' product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979). "[T]his eight-factor test . . . is pliant. Some factors are much more important than others, and the relative importance of each individual factor will be case-specific. Although some factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important, it is often possible to reach a conclusion with respect to the likelihood of confusion after considering only a subset of the factors." *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999) (citation omitted).

Here, Traeger Grills asserts trademark infringement claims regarding two marks: the Traeger mark and the Traeger Barn. The Court will address the merit of each of these claims in turn.

### i. The Traeger Mark

It is undisputed that Traeger Grills possesses valid ownership of and has previously used the Traeger mark in commerce. (Doc. 11 at 12-13; Doc. 31 at 7.) Further, Dansons does not dispute that nearly all the *Sleekcraft* factors support a finding that confusion is likely. Indeed, the Court's independent weighing of the *Sleekcraft* factors leads it to find a likelihood of confusion.

First, the Traeger mark is strong, having acquired distinctiveness through secondary meaning after use in commerce for over three decades in association with the market leader's manufacture and sale of wood pellet grills and Traeger Grills' investment of over $100 million in marketing its products bearing the Traeger mark. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992) (finding that a personal name constitutes a strong mark by acquiring a secondary meaning through "long, continued use of the mark, the mark's widespread, national public recognition, and . . . extensive and expensive advertising and promotion of products bearing the mark"). Second, because Traeger Grills and Dansons directly compete, confusion is far more likely. Third, Dansons' use of the Traeger mark on the Traeger Barn is identical to the Traeger mark, intensifying the likelihood of confusion. In the same vein, Danson's use of Joe and Brian Traeger's full name is sufficiently similar to the Traeger mark to support a finding of likely confusion. *Gallo*, 967 F. 2d at 1292 ("many courts have found the mere addition of a first name insufficient to prevent confusion"). Factor five indicates a likelihood of confusion because the parties share identical marketing channels in which their goods are "sold to the same class of purchasers [and] in some of the same stores[.]" *VIP Products, LLC v. Jack Daniel's Props., Inc.*, 291 F. Supp. 3d 891, 910 (D. Ariz. 2018). Factor six—the type of goods and degree of care likely to be exercised by the buyer—weighs neither in favor of nor against likely confusion. The relatively high price of the parties' primary good, wood pellet grills, might persuade potential buyers to exercise caution and conduct research prior to purchase, enabling them to better distinguish between Traeger Grills and Dansons products. *Adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 1029, 1060 (D. Or. 2008) (citations omitted). But the parties also produce lower cost items, including grill accessories and wood pellets, which customers likely purchase on a whim, entailing little to no opportunity to avoid confusion. Under factor seven, Dansons has adopted the Traeger mark in the face of a cease and desist letter and has exhibited an intent the capitalize on Traeger Grills' good will, suggesting a greater likelihood of confusion. *See Network Automation Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1153 (9th Cir. 2011) (citation omitted) ("When

the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived."). Finally, factor eight—that the parties offer goods and services in the same field—weighs in favor of a finding that confusion is likely. *VIP Products*, 291 F. Supp. 3d at 911.

Dansons instead contends that Traeger Grills has not shown a likelihood of success on its Traeger mark trademark infringement claim because (1) the fourth *Sleekcraft* factor weighs against a finding that confusion is likely and (2) Dansons' use of the Traeger name constitutes fair use. (Doc. 31 at 8-12.)

To this first point, Dansons asserts that insufficient or no[1] evidence of actual confusion exists. (*Id.* at 9-12.) In support, Dansons notes that Traeger Grills only proffers evidence that six different people,[2] representing less than one-tenth of one percent of the total number of people who viewed the relevant social media posts, commented on them expressing what could be interpreted as confusion regarding the relationship between Dansons and Traeger Grills.[3] (*Id.* at 10.) Dansons' argument is unavailing. Though only a minor percentage of the total number of people who viewed the posts went on to comment about their confusion, it does not follow that only a minor percentage of the audience was confused. On the contrary, it is possible that individuals were so confused by the posts that they assumed an affiliation between Traeger Grills and Dansons and found no need to clarify their relationship. Dansons' argument that its disclaimers prevent actual confusion

---

[1] Dansons argues that the social media comments cited by Plaintiff to indicate actual confusion do not demonstrate actual confusion, but rather consumers' ability to "readily distinguish" between the brands. (Doc. 31 at 11.) The Court does not find this argument persuasive.

[2] Dansons emphasizes that one of these people is a Traeger Grills employee. (Doc. 31 at 11.) It argues that this fact suggests that Plaintiff made an effort to manufacture evidence of actual confusion. However, there is no evidence that this employee commented on the post at the direction of Traeger Grills or was even aware of the lawsuit between Traeger Grills and Dansons.

[3] Comments include, in relevant part, "[is] Louisiana grills the same company as Traeger[,]" "[w]hy is Joe Traeger now advertising for [D]ansons/Louisiana Grills[,]" "[i]s Traeger building the [Louisiana Grills] or is Joe Traeger now with LG[,]" "[d]id the founders of Traeger have a hand in Louisiana Grills[,]" "[w]hy does one photo have a sign for 'Joe Traeger'? As if an ad for Traeger[,]" and "why is the Traeger barn in the background[.]"

is similarly unpersuasive. *See Au-Tomotive Gold Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1077 (9th Cir. 2006) ("Courts have been justifiably skeptical of [disclaimers]—particularly where exact copying is involved.") Dansons' disclaimers often are too small to be legible,[4] only accessible if viewers perform a second step to access them,[5] or entirely absent.[6] In addition, Dansons' general disclaimer does not contain the necessary information—that Traeger Grills has no relationship with Dansons and does not endorse Dnasons or its products—to prevent confusion.

Regardless, Traeger Grills is not required to provide proof of actual confusion for the Court to find a likelihood of confusion at the preliminary injunction stage. *See Acad. of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) (citation omitted) ("[I]n this circuit, actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act."). Therefore, the fact that Traeger Grills already has produced various examples of actual confusion is significant and weighs in favor of a finding that confusion is likely. *Brookfield*, 174 F.3d at 1050.

Dansons next asserts a "classic fair use" defense, contending that Dansons is not using "Traeger" as a trademark, but only "to identify individuals named Joe Traeger and Brian Traeger." (*Id.* at 9.) In order to succeed on the affirmative defense of classic fair use, "[a] defendant must show that its use is (1) other than as a trademark, (2) descriptive of the defendant's goods, and (3) in good faith." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 935 (9th Cir. 2017) (citing 15 U.S.C. § 1115(b)(4)). Dansons' classic fair use defense is not likely to succeed. First, Dansons' use of images of the Traeger mark on the Traeger Barn (*see, e.g.,* Docs. 11-3 at 29; 11-4 at 3, 7, 13, 17) seeks to attract attention

---

[4] *See, e.g.*, (Doc. 11-4 at 16-17, 19-20, 39-40.)
[5] *See, e.g.*, (Doc. 11-3 at 39-40, 43-44, 47-49; Doc. 11-4 at 1-5, 7, 31)
[6] For example, Dansons did not include a disclaimer in its March 14, 2019 marketing release announcing the Founders Series Grills, even though the release focuses entirely on the teaming up of Joe Traeger and Dan Thiessen to innovate the industry. (Doc. 11-3 at 36-37.) Dansons also has repeatedly posted potentially confusing images on social media without providing a disclaimer. (Doc. 11-3 at 41-42, 45-46; Doc. 11-4 at 6, 8, 10-13, 27, 32.)

rather than to describe the nature of its products.[7] In these images, Dansons prominently[8] displays "Traeger" in large block letters at the top or center, suggesting that Dansons is using "Traeger" as a trademark. *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1040 (9th Cir. 2010) (citations omitted) ("Indications of trademark use include whether the term is used as a 'symbol to attract public attention,' which can be demonstrated by 'the lettering, type style, size and visual placement and prominence of the challenged words'"). Second, Dansons likely is not otherwise using the Traeger mark—specifically by using the names Joe Traeger and Brian Traeger—in good faith. When considering whether a defendant is using a mark in good faith, the Ninth Circuit looks to "whether [the] defendant in adopting [the] mark intended to capitalize on [the] plaintiff's good will." *Marketquest*, 862 F.3d at 934. Dansons admitted that it hired Joe and Brian Traeger "because of Joe's face" and his renown in the industry. (Doc. 34-1 at 13.) It therefore seems that Dansons is using Joe and Brian Traeger's names to capitalize on Traeger Grills' good will stemming from its association with the Traeger family.

Traeger Grills therefore has demonstrated that it likely will succeed on its Traeger mark trademark claim.

### ii. The Traeger Barn

Traeger Grills also has shown a likelihood of success on the merits of its Traeger Barn[9] trademark infringement claim.

It is undisputed that Traeger Grills has never applied to federally register the Traeger Barn as a mark. Thus, in order to prove valid ownership of the Traeger Barn image, Traeger Grills must establish common law trademark rights to it. To make this showing, Trager

---

[7] The Court acknowledges that Dansons removed the Traeger name from the Traeger Barn in August. (Doc. 31 at 8.) It also recognizes that Dansons had removed all posts from social media featuring the Traeger Barn with the name "Traeger" as of September 27, 2019. (Doc. 48.) The Court nevertheless addresses the Traeger Barn issue because Dansons has provided no assurances that it will not use images of the Traeger Barn with the Traeger name in the future. (Doc. 50.)

[8] Most of such images are black-and-white, contrasting the black Traeger name with primarily white backgrounds. (Doc. 11-4 at 17, 26, 35.)

[9] When the Court refers to the Traeger barn, it alludes to the particular Dutch roofed structure, with or without the Traeger mark.

Grills must demonstrate (1) prior adoption of the mark[10] and (2) use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind. *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1205 (9th Cir. 2012) (quoting *New W. Corp. v. NYM Co. of Cal.*, 595 F.2d 1194, 1200 (9th Cir. 1979)).

Under this standard, Traeger Grills likely has common law trademark rights to the Traeger Barn image. Turning to the first prong, Traeger Grills has shown that TII adopted the Traeger Barn as a mark in association with its products as early as 2005.[11] Traeger Grills thereafter used the mark[12] and specifically adopted its current version of its barn logo in 2014. (Doc. 34 n.11.) This evidence indicates that Traeger Grills adopted the mark before Dansons' first use on September 20, 2018. Traeger Grills also has met the requirements of the test's second prong. Traeger Grills asserts, "Traeger and its distributors have displayed artwork, images and photos of the TRAEGER Barn, on websites and at point-of-sale, brick-and-mortar locations where customers can purchase Traeger Grills' products and apparel, including TRAEGER Barn-themed tee shirts and hats. Brick-and-mortar dealers who sell Traeger Grill products also display signs of the TRAEGER Barn provided by Trager Grills[.]" (*Id.* at 9.) Traeger Grills also explains that it has conducted various advertising efforts that incorporate the mark including nationwide direct television campaigns, social media marketing, and roadshows. (Doc. 11 at 6.) Such use has been sufficiently public to identify or distinguish the marked goods in an appropriate segment in the public mind. Traeger Grills therefore has met the first factor in showing a likelihood of success on the merits of its Traeger barn trademark infringement claim.

Next, the Court concludes after weighing the *Sleekcraft* factors[13] that confusion is likely. The first factor supports that confusion is likely because the Traeger Barn mark, as

---

[10] *See Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use . . . the party claiming ownership must have been the first to actually use the mark in the sale of goods or services.").

[11] Traeger Grills provides an archive of TII's 2005 webpage, which features an artistic rendition of the Traeger Barn. (Doc. 11-1 at 15-16.)

[12] In one example, Traeger Grills incorporated a black and white advertisement featuring the Traeger Barn into its 2017 product catalogue. (Doc. 11-1 at 8.)

[13] Because the Court's analysis of factors 2, 4, 5, 6 and 8 is identical to the Court's assessment for the Traeger mark claim, the Court will not reanalyze those factors here.

an arbitrary mark, is strong. Arbitrary marks or marks whose design does not have an intrinsic connection to the products sold under the mark should "be afforded the widest ambit of protection from infringing uses." *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 506 (9th Cir. 1991) (quoting *Sleekcraft*, 500 F.2d at 349). The Traeger Barn is an arbitrary mark because there is no fundamental connection between a Dutch roofed barn and wood pellet grills. Rather, the connection derives from the history of Traeger Grills' company, particularly that Joe Traeger invented the wood pellet grill within the Traeger barn. The third factor further supports that confusion is likely. Before Dansons removed the "Traeger" sign from the Traeger Barn in August 2019, the parties' marks were identical. However, the barn's silhouette and the Traeger Barn mark are incredibly similar: they both portray the same barn in a similar realist fashion. Also, the Court agrees that, "[g]iven the long association of the barn's silhouette with the Traeger brand coupled with Danson's repeated use of the barn in conjunction with the Traeger Mark, consumers are likely to view continued use of the barn's silhouette as invoking the TRAEGER brand." (Doc. 34 at 10.) Finally, under the seventh factor, Dansons has exhibited an intent to capitalize on Traeger Grills' good will, strongly suggesting that confusion is likely. In fact, Dansons' decision to use the Traeger Barn, specifically in its advertising, can likely only be explained by an intent to capitalize on the Joe Traeger invention story. Otherwise, Dansons could use any other barn, building, or object (real or imaginary) as a mark.

Traeger Grills therefore has shown that it likely will succeed on its Traeger Barn trademark claim.

### 2. Right of Publicity Claim

In its right of publicity claim, Traeger Grills asserts that Dansons' use of Joe and Brian Traeger's name, likeness and goodwill in connection with the manufacture, marketing, and sale of its grills and grill-related products violates Traeger Grills' exclusive right to such use. (Doc. 1 at 48-49.) Under Arizona law, a cause of action may be brought "against one who appropriates the commercial value of a person's identity for purposes of trade[] in advertising the user's goods or services." *In re Estate of Reynolds*, 327 P.3d 213,

217 (Ariz. Ct. App. 2014); *see ACT Grp., Inc. v. Hamlin*, No. CV-12-567-PHX-SMM, 2015 WL 11117191, at *2 (D. Ariz. Apr. 27, 2015). In addition, "the right of publicity is 'freely assignable,' and an assignment 'transfers ownership to the assignee, who has standing to assert the right against others.'" *In re Estate of Reynolds*, 327 P.3d at 217 (quoting Restatement (Third) of Unfair Competition § 46 (Am. Law Inst. 1995)). For Traeger Grills to prevail on its right of publicity claim, it must show that it (1) had exclusive rights to Joe and Brian Traeger's name, likeness, and/or personal goodwill and (2) Dansons misappropriated those rights.

To determine whether these rights were likely assigned to Traeger Grills, the Court looks to the 2006 IPRAA. To begin, neither party disputes that the agreement is governed by Florida law. Under Florida law, "[w]here the language in a[] contract is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning[.]" *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So. 3d 943, 948 (Fla. 2013) (citation omitted). However, "when the terms of the contract are ambiguous . . . parol evidence is admissible to 'explain, clarify or elucidate' the ambiguous term." *Strama v. Union Fidelity Life Ins. Co.*, 793 So. 2d 1129, 1132 (Fla. Dist. Ct. App. 2001). Having reviewed the IPRAA, the Court finds that Joe and Brian Traeger likely assigned the exclusive right of publicity to their names, likenesses, and goodwill to Traeger Grills.

In the IPRAA, Joe, Brian, Mark and Randy Traeger (the "Sellers") assign "all of their right title and interest in and to the Intellectual Property Rights[,]" "used or useful in the conduct of the business" to Trager Grills (the "Buyer") in exchange for $9,000,000. (Doc. 11-1 at 69-71.) The IPRAA confirms that "[a]ll the Intellectual Property Rights are valid and subsisting and will provide the Buyer right to exclude all others from the use thereof[.]" (*Id.* at 75.) To decide what rights were specifically assigned, the Court must determine the meaning of Intellectual Property Rights, per the agreement. The IPRAA's definition section explains,

> Intellectual Property Rights include but are not limited to the items listed on Exhibit A hereto *and* all of the patents, applications, trademarks, copyrights, know-how, droit moral, show-how, mask work, proprietary innovations and

- 12 -

> inventions, methods or techniques, *likenesses* or other intellectual property held by the Sellers or any of their Affiliates and *used or useful*, directly or indirectly, in the Business and any other matters within the scope of business of the Company whether or not reduced to writing.

(*Id.* at 86) (emphasis added.) Looking to the above section, the IPRAA likely assigned Brian and Joe Traeger's likenesses to Traeger Grills. Dansons argues that Brian and Joe only assigned rights to their likenesses that were previously used in advertising, citing to the list within Exhibit A. (Doc. 31 at 12) (transferring "likenesses of people and images used in advertising[.]") However, the IPRAA and Exhibit A, itself, make clear that Exhibit A is a non-exclusive list of the rights assigned in the agreement. The IPRAA's definition section reads much broader, assigning "likenesses or other intellectual property held by the Sellers…used or useful…within the scope of the business…whether or not reduced to writing." (Doc. 11 at 86.)

The IPRAA also likely assigned to Traeger Grills the exclusive rights to Joe and Brian Traeger's personal goodwill. In doing so, the IPRAA necessarily assigned exclusive rights to the Traeger name. Exhibit A provides that the rights assigned by the agreement include "[a]ll of the patents, patent rights, proprietary info and projects, trade secrets, *personal goodwill* and IP assets and properties used or usable in the business[.]" (Doc. 11-1 at 95) (emphasis added.) Per this exhibit, Brian and Joe Traeger's personal good will was assigned to Traeger Grills. It therefore is essential to determine what the term "personal good will" encompasses.

Florida law "distinguishes between personal goodwill, which derives from a person's reputation, and enterprise goodwill,[14] which is 'separate and distinct from the presence and reputation' of an individual." *Held v. Held*, 912 So. 2d 637, 639 (Fla. Dist. Ct. App. 2005). Consistent with this explanation, personal goodwill in the context of the agreement unambiguously means the reputations of the Sellers. Webster's dictionary defines reputation as the "overall quality or character as seen or judged by people in

---

[14] Joe and Brian Traeger assigned all "goodwill associated with the Business" to Traeger Grills in the APA. (Doc. 11-1 at 24.)

general, a recognition by other people of some characteristic or ability [and] a place in public esteem or regard: good name." Reputation, Merriam-Webster Online Dictionary (Sep. 27, 2019, 12:43 PM), https://www.merriam-webster.com/dictionary/reputation. Thus, in assigning their personal good will to Traeger Grills, Joe and Brian Traeger necessarily assigned their "good name." Other portions of the IPRAA also indicate that Joe and Brian Traeger likely assigned the rights to the Traeger name. For example, under the agreement, "[a]ll Distributors and Dealers are authorized in the use of the Traeger name . . . in the ordinary course of advertising and promoting of products." If the agreement had intended to state that distributors and dealers were authorized to use the Traeger trademark, rather than the Traeger name, it could have done so; indeed, it refers to Traeger's trademarks otherwise throughout.[15] Based on the foregoing, Traeger Grills has made a showing that it likely possesses exclusive rights to Joe and Brian Traeger's name, likeness, and personal goodwill.

Traeger Grills also has demonstrated that Dansons likely misappropriated those rights. This misappropriation began when Dansons issued a marketing release on September 20, 2018. (Doc. 11-3 at 32-33.) The release, which includes three images of Joe Traeger and two images of Brian Traeger, tells the story of Traeger family, references the Traeger Barn and explains the origin of the wood pellet grill. (*Id.*) The misappropriation continued when Dansons issued its March 14, 2019 release announcing the Founders Series Grills "brought to you proudly by Joe Traeger," and including an image of Joe next to Dan Thiessen. (Doc. 11-3 at 36-37.) Thereafter, the misappropriation continued through Dansons' social media activity and the Founders Series promotional events. (Doc. 11-3; Doc. 11-4.)

---

[15] In a last-ditch effort, Dansons protests that assignment of Joe and Brian Traeger's rights to their names, likenesses and goodwill to Traeger Grills is "tantamount to a lifetime noncompetition agreement[,]" whereas Joe Traeger only agreed to a five year noncompetition clause following his post-sale employment with Traeger Grills. (Doc. 31 at 14.) True, any non-compete, enforceable or not, against Joe or Brian Traeger has expired; they are free to work for whomever they wish. Brian Traeger is free to carry on as Dansons' Divisional Sales Manager, for example. But it does not follow that Joe and Brian are free to work as the names and faces of a competitor such that the competitor may capitalize on the names, likenesses, and personal good will of the two men.

In sum, Traeger Grills likely will succeed on its right of publicity claim.

**B. Irreparable Harm**

Irreparable injury is likely in the absence of an injunction where damage to a plaintiff's goodwill is likely. *See Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *Am. Trucking*, 559 F.3d at 1057 ("loss of goodwill and reputation" supports injunctive relief); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm."). Here, Dansons' use of the Traeger story and the faces of Joe and Brian Traeger to promote its own business could continue to confuse consumers and diminish the distinctiveness of Traeger Grills' brand, thereby preventing Traeger Grills from controlling its reputation, which is based largely on the Traeger story and family. Loss of such reputation cannot adequately be repaired by monetary damages. As such, Traeger Grills has shown that it is likely to suffer irreparable harm in the absence of preliminary relief.

**C. Balance of Equities**

The balance of equities factor "requires the court to 'balance the competing claims of injury' and 'consider the effect on each party of the granting or withholding of the requested relief.'" *Mendoza v. Garrett*, 358 F. Supp. 3d 1145, 1181 (D. Or. 2018) (quoting *Winter*, 555 U.S. at 24.). Traeger Grills argues that the balance of hardships "tips sharply" in its favor. (Doc. 11 at 22.) Absent injunctive relief, Traeger Grills may suffer "further loss of control of and harm to its goodwill, exacerbated by additional customer confusion." (*Id.*)

Conversely, Dansons argues that a preliminary injunction should not issue in light of "Dansons' reliance on [Traeger Grills'] silence." (Doc. 31 at 16.) In doing so, Dansons appears to assert a laches argument of sorts, contending that Traeger Grills' failure to resolve its conflict informally with Dansons and thereby "allowing" over a year of alleged infringement to take place has made Dansons dependent on the allegedly infringing business strategy. (*Id.*) The Court disagrees. Traeger Grills sent Dansons' CEO a cease

and desist letter on September 21, 2018, and its decision not to settle the conflict out of court does not equate with implicit consent to Dansons' behavior. In addition, in determining the merit of a laches argument, the Court considers the good faith of the junior user. *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983). Dansons' argument—that it should be allowed to engage in possible infringement because Traeger Grills failed in preventing it—hardly supports the notion that Dansons is acting in good faith.

Furthermore, the Ninth Circuit has approved the entry of a preliminary injunction when the harm complained of resulted from a defendant's allegedly infringing conduct, even where the defendant presented evidence that the injunction would be fatal to its business. *See 2Die4Kourt v. Hillair Capital Mgmt., LLC*, 692 F. App'x 366, 369 (9th Cir. 2017) (citing *Triad Sys. Corp. v. Se. Express Co.*, 54 F.3d 1330, 1338 (9th Cir. 1995)); *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013). Dansons has not shown that an injunction would be fatal to its business. In fact, it has made no pertinent allegation as to the extent that its business would suffer in the face of an injunction.[16] Dansons has competed successfully alongside Traeger Grills for almost twenty years without any connection to Joe and Brian Traeger, the Traeger mark, or the Traeger Barn. It has made no showing will suffer particular harm if it must do so again. Consequently, the balance of equities tips in Traeger Grills' favor.

**D. Public Interest**

An injunction that seeks to prevent confusion to consumers in a trademark case is in the public interest. *Internet Specialties West, Inc. v. Milon-DiGiogio Enters., Inc.*, 559 F.3d 985, 993 (9th Cir. 2009); *Inwood Labs., Inc. v. Ives Labs. Inc.*, 456 U.S. 844, 854 n.14 (1982); *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990) (defining the "public interest" for a preliminary injunction in a trademark case as "most

---

[16] Dansons asserted that the implementation of an injunction prior to the company's September 14, 2019 promotional event would cause it to lose approximately $250,000 of its previously invested money. (Doc. 31 at 3.) However, that event has already occurred, rendering the issue moot. Dansons has made no other contentions as to potential future loss.

often a synonym for the right of the public not to be deceived or confused"). However, Dansons contends that the "*de minimus* amount of confusion [in this case] should not outweigh the overwhelming public interest in favor of fair competition." (Doc. 31 at 18 (citing *Monitek,* 720 F.2d at 607.)

The Court must balance the public's interests on a case-by-case basis. *Monitek*, where the public's interest in fair competition outweighed its interest in preventing consumer confusion, is distinguishable. There, the Ninth Circuit reversed a judgment enjoining Monitek from using its trademark and tradename—because of its similarity to the plaintiff Montek's name and mark—where Monitek adopted its name in good faith ignorance of Montek, both companies operated for years without knowledge of the other, and the companies produced complementary products, leading to a reduced likelihood of consumers confusion. *Monitek*, 720 F.2d at 606-07. The Court found, on balance, that the public interest favored encouraging free competition. However, the factors supporting that finding are not present here. Rather, Dansons has used the Traeger name and barn and contracted with Joe and Brian Traeger, despite the APA and IPAA and with full knowledge of Traeger Grills' existence as its main competitor. Considering the higher risk of consumer confusion, lack of good faith usage on the part of Dansons, and effect of the APA and IPAA, the interest in preventing consumer confusion outweighs the interest in encouraging free competition. Consequently, an injunction is in the public interest.

**E. Conclusion**

For the foregoing reasons, Traeger Grills is entitled to the preliminary injunction it seeks. The Court will not require Traeger Grills to post bond, given that Dansons has not requested the Court do so or submitted evidence as to what kind of bond would be appropriate and adequate under these circumstances. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F. 3d 878, 883 (9th Cir. 2003) (affirming decision of the district court to not require plaintiffs to post bond where defendant did not "ask the court to set a bond or submit any evidence as to what damages she might incur as a result of the injunction.")

**IT IS ORDERED** that Traeger Grills' motion for preliminary injunction (Doc. 11) is **GRANTED** as follows.

Dansons is hereby enjoined from:

1. Using or assisting or consenting to others in using or publishing, in any manner, the Traeger name, images of the Traeger Barn location in Mt. Angel, Oregon, images of Joe or Brian Traeger, references to Joe as the founder or creator of the pellet grill (collectively the "Traeger Intellectual Property") in connection with the advertising, marketing, or sale of wood pellet grills and associated products;

2. Publishing, in any manner, any statement that affiliates in any way Joe Traeger, Brian Traeger, or Traeger Grills with Dansons US LLC, Louisiana Grills, Pit Boss, the Founders Series grills, Dan Thiessen, Jordan Thiessen, Jeff Thiessen or Dansons' products or endorses Dansons US LLC, Louisiana Grills, Pit Boss, the Founders Series grills, or any Dansons grill-related product; and

3. Arranging any public appearance anywhere in the United States that communicates an endorsement by Joe Traeger or Brian Traeger of Dansons' US LLC, Louisiana Grills, Pit Boss, the Founders Series grills, or any other Dansons grill-related product.

Dated this 3rd day of October, 2019.

_____
Douglas L. Rayes
United States District Judge